# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VASHTI SHERROD                      :
EUGENE SHERROD,                     :
                                    :
       Plaintiffs,          :     Civil Action No. 16-0816 (RC)
v.                                  :
                                    :
PHILLIP MCHUGH                      :
DISTRICT OF COLUMBIA                :
DIANE LEE SCHULZ,                   :
                                    :
       Defendants.          :

## PLAINTIFFS' MOTION TO PRECLUDE THE TRIAL TESTIMONY OF SHANA MELL

Plaintiffs, through counsel, here move the Court to preclude the trial testimony of Shana Mell, an employee of Defendant District of Columbia's Metropolitan Police Department.

Before filing this motion, Plaintiffs' counsel made a good-faith effort to resolve the matter at issue with opposing counsel for Defendant District of Columbia without success. Plaintiffs' counsel also determined that the District will oppose the Court affording the relief sought in this motion.

The grounds supporting this motion are set forth in the accompanying memorandum.



EXHIBIT

A

Respectfully submitted,


*/s/ Peter T. Enslein*
Peter T. Enslein
D.C. Bar No. 367467
Law Offices of Peter T. Enslein, P.C.
1738 Wisconsin Avenue, NW
Washington, DC 20007
T: (202) 329-9949
F: (202) 625-3490
E: peter@ensleinlaw.com

*/s/ Kenneth D. Bynum*
Kenneth D. Bynum
D.C. Bar No. 424515
Bynum & Jenkins
1010 Cameron Street
Alexandria, VA 22314
T: (703) 549-7211
E: kbynum@bynumandjenkinslaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

VASHTI SHERROD                          :
EUGENE SHERROD,                         :
                                        :
           Plaintiffs,                  :        Civil Action No. 16-0816 (RC)
v.                                      :
                                        :
PHILLIP MCHUGH                          :
DISTRICT OF COLUMBIA                    :
DIANE LEE SCHULZ,                       :
                                        :
           Defendants.                  :

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION**
**TO PRECLUDE THE TRIAL TESTIMONY OF SHANA MELL**

Plaintiffs, through counsel, have moved the Court to preclude the trial

testimony of Shana Mell, an employee of Defendant District of Columbia's

Metropolitan Police Department ("MPD").  The grounds supporting this motion

are as follows.

This Court's Scheduling Order, as amended, required all fact discovery to be

completed by August 15, 2017.[1]  The District violated the order by delaying until

October 17, 2017, to reveal Shana Mell as a potential trial witness.  On that date,

the District served "Defendants' Supplemental Initial Disclosures,"[2] in which it

---

[1] March 13, 2017 Minute Order granting Plaintiffs' Consent Motion to Amend the
Scheduling Order.

[2] Defendants' Supplemental Initial Disclosures is appended as Exhibit 1.

stated that Ms. Mell intends to testify at trial about her "[k]nowledge of IACP and the extent to which MPD relies on IACP's policies."[3]

Plaintiffs' counsel immediately objected to the District's untimely disclosure of Ms. Mell, coming as it did two months *after* the August 15, 2017 close of fact discovery.[4] On October 23, 2017, in response to Plaintiffs' counsel's objection, the District served up this disingenuous explanation for its failure to disclose Ms. Mell during the discovery period:

> [A]s to Shana Mell, MPD policy writer, she was identified only after Defendants received Mr. Hayden's [September 30, 2017] expert report. Mr. Hayden relies heavily on IACP to establish a relevant standard of care relating to criminal investigations, and applications process for securing arrest and search warrants. The Defendants did not know the basis for Mr. Hayden's opinions until he produced his expert report. Ms. Mell certainly can testify, pursuant to Fed. R. Civ. P. 30(b)(6), about the extent to which MPD follows and/or relies on the IACP model policies. Accordingly, the Defendants will not withdraw their Supplemental Disclosures as to Ms. Mell. [5]

---

[3] Defendants' Supplemental Initial Disclosures at 1. "IACP" is the abbreviation for the International Association of Chiefs of Police.

[4] Letter dated Oct. 19, 2017 from Peter T. Enslein to David A. Jackson, attached as Exhibit 2.

[5] Letter dated Oct. 23, 2017 from David A. Jackson to Peter T. Enslein, attached as Exhibit 3.

The District's explanation for its failure to timely disclose Ms. Mell's identify is utterly without merit.   The District has known since **May 8, 2017** that Plaintiffs intend to offer expert testimony that, in the District's words, "relies heavily upon IACP to establish a relevant standard of care relating to criminal investigations, and applications process for securing arrest and search warrants."[6]

On May 8, 2017, Plaintiffs timely produced to the District of Columbia's lawyers the expert report of Robert W. Klotz, a retired MPD detective and veteran expert witness on police procedures.[7]  A cursory reading of Mr. Klotz's expert report would have put even the most junior District of Columbia lawyer on notice that the "criminal investigations, and applications process for securing arrest and search warrant policies" of the IACP were to be the subject of expert testimony in this litigation. The need for the District to supplement its witness disclosure to identify Ms. Pell should have been immediately apparent to its counsel upon reading the following portions of Mr. Klotz's May 5, 2017 expert report:

---

[6] Letter dated Oct. 23, 2017 from David A. Jackson to Peter T. Enslein, attached as Exhibit 3.

[7]  Email dated May 8, 2017 from Peter T. Enslein to all defense counsel of record producing the May 5, 2017 letter report of Robert W. Klotz, attached as Exhibit 4. Mr. Klotz's report is attached as Exhibit 5.

As noted in my resume, I spent twenty-five years with the Metropolitan Police Department. …. I was the Deputy Chief Commander of the Special Operations & Traffic Divisions. During my tenure, I also travelled the country lecturing for the International Association of Chief's of Police (IACP). After my retirement in 1980, I continued lecturing for the IACP and worked for a similar group known as Murphy and Associates. In this capacity, I engaged in reviews of various police agencies to recommend various methods of improved services.

* * *

### Discussion

The purpose of this report is to evaluate the conduct of the District of Columbia Metropolitan Police Department ('MPD') during the criminal investigation of the May 14, 2015 altercation between Ms. Schulz and Mrs. Sherrod, as well as the specific actions of Det. McHugh during this investigation. **I have used the Model Policies put forth by various professional police organizations, in my evaluation of the actions of the MPD law enforcement officers involved in this case. <u>The IACP's Model Policies</u> have been widely accepted by police departments in the United States and reflect generally accepted standards for law enforcement conduct in this country.** (footnote omitted)

* * *

<u>Officer Patel's Preliminary Investigation</u>

According to the <u>**IACP Model Policy for Criminal Investigations**</u>, a criminal investigation is defined as '[t]he collection of facts and information intended to identify an offender and to organize facts and information in a way that presents evidence sufficient for criminal charges.' Model Policy for Criminal Investigations at 1 (emphasis supplied). 'Normally, criminal investigations consist of a preliminary investigation, generally conducted by the responding patrol officer and, if necessary, a follow-up investigation performed by investigative services.' See <u>**IACP Criminal Investigations Concepts and Issues Paper**</u> at 1. '[I]t is very important that patrol officers and first line supervisors have a broad understanding of the criminal investigation process in order to ensure that they take those measures and avoid missteps that will better ensure the overall success of criminal investigations.' Id. at 1.

4

\* \* \*

According to the **IACP Model Policies for Criminal Investigations**, officers conducting a preliminary investigation should '[t]ake written notes and conduct voice recordings whenever possible.'

\* \* \*

Accurate note taking by investigating police officers a matter of particular importance. 'Note taking is important when conducting a preliminary investigation and is vital to a successful criminal investigation... Notes should be legible, understandable, accurate, and complete, as they will serve to facilitate the officer's memory and may need to be used in court where their accuracy may be challenged... Before a patrol officer turns the case over to investigative services, he or she must be certain that the preliminary report is clear and all information detailed. The information should have been collected in such a way that investigators would not need to repeat the steps of the preliminary investigation but would have an outline for developing effective follow-up plans.  See **Criminal Investigations Concepts and Issues Paper** at 2-3.

It is impossible to reconcile the disparity between Officer Patel's handwritten interview notes regarding what Ms. Schulz allegedly told him during the interview about the gun with his description of the events of the interview in the report that he prepared within minutes of the interview's conclusion.... At a minimum, Officer Patel failed to properly interview Ms. Schulz and failed to meet the standard required of a police officer to prepare 'understandable, accurate, and complete' notes in this case.

Detective McHugh's Follow-Up Investigation

The following day, on May 15, 2015, Det. McHugh was assigned to the case in order to conduct a follow-up investigation. 'The primary goal of the follow-up investigation is to gather information and evidence.' See **IACP Criminal Investigation Concepts and Issues Paper** at 5. 'To accomplish this goal, the investigator may decide to re-interview the victim, any witnesses or others in the hope that additional information can be uncovered.' Id. 'When the investigator re-interviews the victim and witnesses, he or she must test and retest

5

the validity of their statements.' Id. 'The investigator must be able to recognize that factors of fear, stress, relationship, friendship, or dishonesty color and affect the credibility of the responses.' Id. 'Information obtained by persons should … be primarily categorized as investigative leads rather than positive evidence of a suspect's guilt or innocence.' Id.

\* \* \*

Det. McHugh believed that Sergeant Architezo directed Officer Patel to classify the alleged incident as a threat report due to a 'delay in reporting,' as Ms. Schulz had waited approximately seven hours before calling the police about this alleged event. See McHugh Dep. at 76:6-10; 275:7-12. It is important to note that the **IACP** considers the question of 'Was the amount of time between the crime's occurrence and the notification of the police normal?' an important factor for an investigating police officer to consider when assessing the credibility of a complaining witness. See **Criminal Investigations Concepts and Issues Paper** at 2. Det. McHugh admitted that he considered Ms. Schulz's long delay in reporting 'strange.' McHugh Dep. at 83:2-15.

'[A] typical follow-up investigation outline' consisting of 19 activities. **IACP, Criminal Investigation, Concept and Issues Paper** at 4. Of relevance to this case are the following activities that Det. McHugh employed in his follow-up investigation: 'Telephone the victim,' 'Interview the victim, witnesses, and potential witnesses,' 'conduct a records search,' 'transmit all-points bulletins and other official communications,' 'prepare required reports and records on case progress' and 'contact other government agencies.' Id.

Moreover, **the IACP Model Policy for Criminal Investigations** provides that an officer in charge of a follow-up investigation should 'search for new witnesses,' 'complete background checks on witnesses, victims, and suspects as appropriate,' and 'seek additional information from other officers' In this case, it does not appear that Defendant McHugh completed any of these crucial steps during his follow-up investigation of the May 14, 2015 incident.

\* \* \*

6

On May 15, 2015, Det. McHugh interviewed Ms. Schulz at her
apartment.   According to Det. McHugh, during their meeting, Ms.
Schulz claimed that during the May 14, 2015 incident 'Mrs. Sherrod
went to her car and reached under the driver's seat, pulling out what
Schulz described as a black semi-automatic pistol similar to what a
police officer would carry.' (emphasis supplied) See McHugh Answer
to Request for Admission No. 32.    Contrary to **IACP policy**, Det.
McHugh failed to take detailed notes during his investigation and
denied taking any notes other than those sparse notes contained in the
exhibits of record.    See McHugh Depo. at 87-88, 286-87; **IACP
Criminal Investigations Concepts and Issues Paper** at 6-7 ('As
with the preliminary investigation, it is important for Detectives to
record all information obtained during the follow-up investigation. A
Det. must develop the sound habit of taking legible and accurate notes
… from the moment he or she arrives on the scene … The importance
of note taking by preliminary investigators and investigative personnel
is again underscored. Field notes should be taken as facts are learned
and as evidence is obtained. These notes are the foundation of the
investigative report; therefore, it is important that they be clear and
concise.')
                                    * * *

Det. McHugh also located a video of the incident, recorded by a
Gingko Gardens security camera, and watched it on the computer in
the flower shop. Id. at 118:17-5. Det. McHugh downloaded the video
and brought it back to the police station, where he showed it to his
supervisor, Lieutenant Richard Brady. Id. at 119:6-11.   The video,
according to McHugh, was 'grainy and not clear,' and he could not
tell whether Mrs. Sherrod had a gun in her hand at any point during
the encounter. Id. at 119:14-16; 147:16-18; 157:15-20. Note that the
IACP considers the question of 'Does the physical evidence support
the facts of the crime related by the victim?' an important factor for an
investigating police officer to consider when assessing the credibility
of a complaining witness. See **Criminal Investigations Concepts
and Issues Paper** at 2. Despite the poor quality of the surveillance
video, Defendant McHugh did not seek to have the video-recording
enhanced in order to see what was in Mrs. Sherrod's hand more
clearly and, in fact, did not even ask whether such enhancement
would be possible. Id. at 267:2-10.

The video does not corroborate and, in fact, contradicts the allegations that Ms. Schulz had asserted against Mrs. Sherrod.

\* \* \*

A critical part of any police investigation is the identification and interview of witnesses to an alleged crime and determining whether there are 'any discrepancies in the statements of victims and witnesses.' **See Criminal Investigation Concept and Issues Paper** at 2. This should include attempting to locate any potential witnesses at the scene of the alleged offense, as well as canvassing the neighborhood or surrounding area for any witness that may exist. Id. The significance of the failure of Det. McHugh to identify and interview Mr. Wright cannot be over stated. This witness plainly contradicted Ms. Schulz' story and, as Det. McHugh would learn, supported Mrs. Sherrod's position that she did not own a gun and did not display or point one at Ms. Schulz at any time during the May 14, 2015 incident.

\* \* \*

Opinions

It is my opinion: (1) **that the criminal investigation performed by the MPD and, in particular, Det. McHugh, was flawed and fell below the standard of care set by the IACP**; (2) that, as a result, Det. McHugh failed to determine from the outset that there lacked probable cause to prosecute Mrs. Sherrod of assault with a deadly weapon; (3) that Det. McHugh's actions during his follow up investigation of the May 14, 2015 incident was not that expected of a reasonable officer similarly situated; his actions were contrary to national police standards for probable cause for an arrest and he conducted a follow up investigation that no reasonable police officer would believe to be proper; (4) that Det. McHugh in his reports and actions during his follow-up investigation submitted police reports that were misleading and contained false information and took actions that were contrary to national police standards for such activities, and that no reasonable police officer would believe this to be proper; (5) that Det. McHugh, in continuing to attempt to prosecute Mrs. Sherrod despite the information obtained during his follow up investigation, acted contrary to national police standards and that no reasonable officer would believe this to be proper; and (6) that Det. McHugh's supervisors, who were monitoring his actions during his investigation,

8

took no steps to prevent Det. McHugh from taking actions such as pursuing the arrest and prosecution of Mrs. Sherrod; failed to properly supervise, correct, and prevent the improper prosecution of Mrs. Sherrod; failed to adequately perform their supervisory duties; and thereby violated national police standards, conduct that no reasonable police supervisor would believe to be proper.[8]

Mr. Klotz remained an expert witness in this case until September 7, 2017 when he withdrew from further particaption in this case because of illness and was replaced by Dr. Hayden as Plaintiffs' police procedures expert witness.[9] As Dr. Hayden's report does not differ in any significant way from Mr. Klotz's report regarding the IACP's model policies, the District was on notice since May 8, 2017 that the IACP model policies would be the subject of expert testimony in this litigation.[10] Therefore, the substitution of Dr. Hayden's expert report in place of Mr. Klotz's expert report provides no excuse for the District's untimely disclosure of Ms. Mell.

Federal Rule of Civil Procedure 26(a)(1)(A)(i) provides, that a party must disclose, without awaiting a formal discovery request, "the name...of each individual likely to have discoverable information—along with the subjects of that

---

[8] Mr. Klotz's report is attached as Exhibit 5. (emphasis supplied).

[9] *See* Memorandum in Support of Plaintiffs' Consent Motion to Amend the Scheduling Order (ECF 53-1) at 6.

[10] Dr. Hayden's expert report is attached as Exhibit 6 and was timely served on defense counsel.

information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." On January 6, 2017, the District served its initial disclosures and failed to identify Ms. Mell as an individual likely to have discoverable information.[11]

Rule 26(e)(1)(A) required the District to file supplemental disclosures "in a timely manner." While Rule 26(e) does not define "in a timely manner," it is beyond cavil that the "supplementation must occur in a fashion that will allow the opposing party to conduct meaningful discovery and avoid undue delay in the progress of the case." *Poitra v. Sch. Dist. No. 1 in the County of Denver*, 311 F.R.D. 659, 666 (D. Colo. 2015) (quoting *United States v. Guidant Corp.,* No. 3:03-0842, 2009 WL 3103836, at *4 (M.D.Tenn. Sept. 24, 2009)); *see also Reed v. Washington Area Metropolitan Transit Authority*, No. 1:14cv65, 2014 WL 2967920, at *2 (E.D.Va. July 1, 2014) ("Making a supplemental disclosure of a known fact witness a mere two days before the close of discovery...is not timely by any definition.").

Where a party fails to make a disclosure required by Rule 26(a)(1), that party may not use at trial any witness or information not so disclosed, unless the court determines that the failure to disclose was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). The District bears the burden of showing that it

---

[11] Defendants' Initial Disclosures, served Jan. 6, 2017, is attached as Exhibit 7.

was substantially justified in failing to comply with Rule 26(a)(1).  *Elion v.*

*Jackson*, 544 F.Supp.2d 1 (D.D.C. 2008) ("The burden is on the party facing

sanctions to prove that the violation was either substantially justified or harmless.")

(internal citations omitted).

There is no justification for the District's failure to disclose Ms. Mell and the

substantial prejudice to Plaintiffs caused by the District's litigaion misconduct is

*obvious*.  The District's gamesmanship made it impossible for Plaintiffs to take any

discovery of Ms. Mell.  With fact discovery closed, Plaintiffs are barred from

taking Ms. Mell's deposition, or propounding interrogatories or document requests

to Ms. Mell seeking information about her purported writing of the MPD policies

at issue or her knowledge of "the extent to which MPD follows and/or relies on the

IACP model policies."  *See, e.g.*, *Smith v. Henderson*, 54 F.Supp.3d 58, 66 (D.D.C.

2014) ("Generally, the harm from the failure to disclose a witness flows from the

unfair surprise hindering the prejudiced party's ability to examine and contest that

witness' evidence. If the court accepts eleventh-hour declarations, then the

[prejudiced party] would effectively be deprived the opportunity to depose [the]

new witnesses. The [prejudiced party] would also have to unexpectedly gather

rebuttal evidence at a moment's notice, which could cause substantial harm to its

case.") (internal quotations and citations omitted); *Elion*, 544 F.Supp.2d at 5

(excluding testimony of a witness who was not timely disclosed because the

"failure to disclose [the witness] prevented the [prejudiced party] from preparing to

11

meet [the witness'] testimony."); *compare Burns v. Georgetown University Medical Center*, 106 F.Supp.3d 238 (D.D.C. 2015) (allowing untimely addition of two additional witnesses because the plaintiff's illness during the time she should have disclosed the witnesses was a valid justification for the delay *and* the opposing party would be allowed to depose the witnesses or serve interrogatories upon them to dispel the prejudice that would otherwise result).

Once again, the District has simply ignored the Scheduling Order and served up a disingenuous excuse for its failure. The Court will recall that the District's lawyers failed to abide by the Scheduling Order's requirement that they produce the District's expert's report by the Order's June 16, 2017 deadline. The District's lawyers asked the Court to excuse their failure by making the specious assertion that they only realized the need for an expert report on the very day the report was due ("Defendant's counsel inadvertently did not determine to designate an expert to complete a report until June 16, 2017.").[12]

The District's explanation for its failure to disclosure Ms. Mell during the fact discovery period is likewise incredible and dishonest. It was impossible for the District's lawyers not to have understood the importance of Ms. Mell's

---

[12] Defendant District of Columbia's Motion for Leave to File Expert Designation and Report *Nunc Pro Tunc* and to Amend the Scheduling Order (ECF 46) at 1.

knowledge and their duty to disclose her identity to Plaintiffs' counsel the moment they read Mr. Klotz's May 5, 2017 report.

"A scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Saunders v. District of Columbia*, 279 F.R.D 35 (D.D.C. Jan. 6, 2012) (quoting *St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection Inc.*, Civil Action No. 05-2115 (CKK), 2007 WL 1589495, at *5 (D.D.C. June 1, 2017)). "Indeed, disregard of the order undermines the court's ability to control its docket, disrupt the agreed-upon course of litigation, and reward the indolent and the cavalier." *Id.* Nevertheless, the Court excused the District's earlier violation of the Scheduling Order and permitted the District to name an expert witness after it had failed to do so within the Order's orginal deadline.[13]

Moreover, the District's flagrant disregard of scheduling orders in the past has not been met with appropriately harsh sanctions, which only encourages the District to continue this inappropriate behavior. *Robinson v. District of Columbia*, 75 F.Supp.3d 190 (D.D.C. 2014) (admonishing the District that "the Court cautions Defendants that is does not condone their shortcomings here," but declining to exclude testimony). The Court's decision to not sanction the District when it

---

[13] Aug. 8, 2017 Minute Order granting in part and denying in part Defendant District of Columbia's Motion for Leave to File Expert Designation and Report Nunc Pro Tunc and to Amend the Scheduling Order.

violated the Scheduling Order the first time here, as in the past, only emboldened

the District to violate the Order again.

The observations of the late U.S. District Judge William W. Schwarzer

about the danger to the judicial process created by the failure of judges to sanction

those who engage in litigation misconduct in an analogous context are especially

apt here:

> Of all the duties of a judge, imposing sanctions on lawyers is perhaps
> the most unpleasant. A desire to avoid doing so is understandable. But
> if judges turn from Rule 11 and let it fall into disuse, the message to
> those inclined to abuse or misuse the litigation process will be clear.
> *Misconduct, once tolerated, will breed more misconduct* and those
> who might seek relief against abuse will instead resort to it in self-
> defense.

Sanctions Under the New Rule 11 – A Closer Look, 104 F.R.D. 181, 205 (1985)

(emphasis supplied).

The Court's tolerance for the District of Columbia's earlier litigation

misconduct has only served to breed more misconduct by the District. The integrity

of this Court and the judicial process will be eroded if the Court fails to sanction

the District for its latest misconduct. The Court has an obligation "to prevent

abuses of the judicial process by holding parties in contempt and ordering

sanctions for violations of the court's orders." *Cobell v. Babbitt*, 37 F. Supp. 2d 6,

9 (D.D.C. 1999) (quoting *Webb v. District of Columbia,* 146 F.3d 964, 971

(D.C.Cir.1998)). Under these circumstances precluding the trial testimony of Ms.

Mell is not only an appropriate sanction for the District's litigation misconduct, but

14

it will also prevent the District and other litigants from engaging in such misconduct in the future and uphold integrity of this Court. *See DL v. District of Columbia*, 274 F.R.D. 320, 325 (D.D.C. 2011) ("In determining whether a severe sanction is justified, the district court may consider the resulting prejudice to the other party, any prejudice to the judicial system, and the need to deter similar misconduct in the future. The D.C. Circuit has held that the district court's interest in deterrence is a legitimate one, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.") (internal citations omitted). If the Court truly "expects litigants, especially repeat players like the District, to comply with the Rules," appropriately harsh penalties must be imposed. *Robinson v. District of Columbia*, 75 F.Supp.3d 190, 197 (D.D.C. 2014).

Respectfully submitted,

*/s/ Peter T. Enslein*
Peter T. Enslein
D.C. Bar No. 367467
Law Offices of Peter T. Enslein, P.C.
1738 Wisconsin Avenue, NW
Washington, DC 20007
T: (202) 329-9949
F: (202) 625-3490
E: peter@ensleinlaw.com

_/s/ Kenneth D. Bynum_
Kenneth D. Bynum
D.C. Bar No. 424515
Bynum & Jenkins
1010 Cameron Street
Alexandria, VA 22314
T: (703) 549-7211
E: kbynum@bynumandjenkinslaw.com

_Attorneys for Plaintiffs_

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

VASHTI SHERROD                     :
EUGENE SHERROD,                    :
                                   :
          Plaintiffs,      :      Civil Action No. 16-0816 (RC)
  v.                               :
                                   :
PHILLIP MCHUGH                     :
DISTRICT OF COLUMBIA               :
DIANE LEE SCHULZ,                  :
                                   :
          Defendants.      :

## [Proposed] ORDER

Upon consideration of Plaintiffs' Motion to Preclude The Trial Testimony of Shana Mell and the Opposition of Defendant District of Columbia, it is by the Court this ____ day of _____, 2017

ORDERED that the Motion be, and hereby is, GRANTED; and it is further

ORDERED that Shana Mell is precluded from testifying at the trial of this matter.

                    _____
                        Rudolph Contreras
               United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VASHTI SHERROD, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-cv-00816 (RC) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' SUPPLEMENTAL INITIAL DISCLOSURES

Pursuant to Fed. R. Civ. P. 26 (a)(1)(A), Defendants, the District of Columbia and Detective Phillip McHugh ( "Defendants"), supplement their initial disclosures. The persons listed below may have discoverable information regarding the events and facts alleged in the Amended Complaint and may be relevant to Defendants' potential defenses.

| Name | Position | Areas of Knowledge |
|---|---|---|
| Detective Sergeant Thomas Boone | MPD- Detective McHugh's supervisor | Knowledge of Detective McHugh's investigation |
| Lieutenant Richard Brady | MPD First District | Approved and reviewed the arrest warrant |
| Shana Mell | Policy Writer MPD Policy and Standards Branch | Knowledge of IACP and the extent to which MPD relies on IACP's policies |
| Sergeant Architzel | MPD –Officer Patel's supervisor | Knowledge of Officer Patel's interview of Ms. Schulz and the reason w |

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

1


EXHIBIT
1

Michael K. Addo
Chief, Civil Litigation Division Section IV

*/s/ David A. Jackson*
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW, Suite 630 South
Washington, D.C. 20001
(202) 724-6618
(202) 741-8999 (fax)
davida.jackson@dc.gov

*/s/ Judson N. Kempson*
JUDSON N. KEMPSON[1]
Assistant Attorney General
441 Fourth Street, N.W., Suite 630 South
Washington, DC 20001
(202) 442-9845
(202) 730-1897(fax)
judson.kempson@dc.gov

*Counsel for Defendants*

---

[1] Pursuant to LCvR 83.2 and D.C. Court of Appeals Rule 49(c)(4), admitted to practice only in the Commonwealth of Virginia [90830] and practicing in the District of Columbia for the Office of the Attorney General for D.C. under the direct supervision of Michael K. Addo, a member of the D.C. Bar.

2

# LAW OFFICES OF PETER T. ENSLEIN P.C.

**Peter T. Enslein**
202.329.9949
peter@ensleinlaw.com

October 19, 2017

*Via U.S. and Electronic Mail*
David A. Jackson, Esq.
Office of Attorney General  of the District of Columbia
441 Fourth Street, NW, 6th Floor North
Washington, DC 20001

Re:   *Vashti Sherrod, et al. v. Phillip McHugh, et al.*
      U.S. District Court for the District of Columbia
      Civil Action No. 16-816 (RC)

Dear Mr. Jackson:

As you must be aware, the Court ordered that *all* fact discovery in this litigation be completed by August 15, 2017.  Mr. Bynum and I were therefore astonished to receive Defendants' Supplemental Initial Disclosures on October 17, 2017 which names three new MPD employee fact witnesses two months *after* the close of fact discovery.  The post-close of fact discovery disclosure of these witnesses -- witnesses whose identity should have been known to you and disclosed during the lengthy fact discovery period  --  makes it impossible for Plaintiffs to depose the witnesses or take other relevant discovery concerning their testimony.

The District has once again flaunted the Scheduling Order's deadlines.  There is no justification for your untimely supplemental initial disclosures.  I ask that you withdraw the three witnesses by the close of business, Monday, October 23, 2017.  If you fail to do so, we intend move the Court to strike your tardy identification of these witnesses and prohibit their trial testimony.  The motion may also seek sanctions against the District for its blatant discovery misconduct.

Yours sincerely,

Peter T. Enslein

cc:  Kenneth D. Bynum

---

**EXHIBIT**

2

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Office of the Attorney General

★ ★ ★

**ATTORNEY GENERAL**
**KARL A. RACINE**

**Civil Litigation Division**

October 23, 2017

Peter T. Enslein, Esquire
Law Offices of Peter T. Enslein, P.C.
1738 Wisconsin Avenue, NW
Washington, DC 20007

*Sherrod v. McHugh, et al.*, C.A. No. 16-cv-816 (RC)

Dear Mr. Enslein:

I am in receipt of your October 19, 2017 letter regarding the Defendants' Supplemental Initial Disclosures which was served on all counsel of record on October 17, 2017. The Defendants submit this letter in response. You state in your letter that you were "astonished to receive the Defendants' Supplemental Initial Disclosures ... which names three new MPD employee fact witnesses" but you did not identify the "three new employee" you are complaining about. In any event, the issue you raise in your letter is meritless.

First, the individuals identified in the Defendants' Supplemental Initial Disclosures are Detective Sergeant Thomas Boone, Lieutenant Richard Brady, Shana Mell and Sergeant Michael Architzel. Sergeant Boone and Lieutenant Brady were named in the Defendants' original Disclosures, which was served on the all counsel on January 6, 2017. Thus, the fact that I inadvertently included them in the Supplemental Initial Disclosure is of no moment, and there is no basis to exclude their testimony. Moreover, during Detective McHugh's deposition, Mr. Kenneth Bynum put into the record the January 6, 2017 Initial Disclosures. *See* McHugh Deposition Exhibit 87 at P65:3-9. Mr. Bynum then proceeded to question Detective McHugh about Sergeant Boone's and Lieutenant Brady's involvement in the Sherrod criminal investigation. McHugh Dep. P67:19-P68:8; P119:8-11. The fact that neither Sergeant Boone nor Lieutenant Brady was deposed was a conscious decision made by Plaintiffs' attorneys. Accordingly, the Defendants will not withdraw their Supplemental Disclosures as to Sergeant Boone or Lieutenant Brady.

Second, Sergeant Michael Architzel was Officer Patel's immediate supervisor during the relevant time period. As an initial matter, Sergeant Architzel's name was misspelled in Officer Patel's deposition transcript as "Architzeo." Mr. Bynum questioned Officer Patel extensively about the nature and substance of his conversation with Sergeant Architzel after Officer Patel's interview of Ms. Schulz. Patel Dep P28:21-22; P37:17-P46:6; P60:4-8. Based on Officer Patel's

**EXHIBIT**

3

testimony, Plaintiffs knew that Sergeant Architzel played a critical role in how Officer Patel classified his report of the Schulz interview. Additionally, Plaintiff's expert, Philip Hayden, also discusses the role Sergeant Architzel played in the classification of Officer Patel's police report. *See* Hayden's Expert Report at p. 3. Although, Sergeant Architzel was not identified in the original Initial Disclosures, Plaintiffs cannot in good faith claim surprise or that they are unfairly prejudiced by the fact that Sergeant Architzel was only identified in the Defendants' Supplemental Initial Disclosure. In essence, the Supplemental Initial Disclosure did nothing more than tell Plaintiffs what they already knew, which was that Sergeant Architzel had relevant information about the Sherrod criminal case. Accordingly, the Defendants will not withdraw their Supplemental Disclosures as to Sergeant Architzel.

Lastly, as to Shana Mell, MPD policy writer, she was identified only after Defendants received Mr. Hayden's expert report. Mr. Hayden relies heavily on IACP to establish a relevant standard of care relating to criminal investigations, and applications process for securing arrest and search warrants. The Defendants did not know the basis for Mr. Hayden's opinions until he produced his expert report. Ms. Mell certainly can testify, pursuant to Fed. R. Civ. P. 30(b)(6), about the extent to which MPD follows and/or relies on the IACP model policies. Accordingly, the Defendants will not withdraw their Supplemental Disclosures as to Ms. Mell.

Sincerely,

KARL A. RACINE
Attorney General

By:   *David A. Jackson*
       DAVID A. JACKSON
       Assistant Attorney General

cc:   Kenneth D. Bynum, Esquire
       David F. Grimaldi, Esquire

 **Gmail**                    Peter Enslein <penslein@gmail.com>

## Sherrod v. McHugh -- Plaintiffs' Expert Disclosure and Wright Declaration
5 messages

Peter Enslein <peter@ensleinlaw.com>                    Mon, May 8, 2017 at 5:38 PM
To: "Jackson, David (OAG)" <davida.jackson@dc.gov>, judson.kempson@dc.gov, d.grimaldi@mdgg.com
Cc: Kenneth David Bynum <kbynum@bynumandjenkinslaw.com>, Kenneth David Bynum
<kenbynumattorney@gmail.com>

Dear Counsel:

Pursuant to Fed. R. Civ. P. Rule 26(a)(2) and the Scheduling Order, as
amended, Plaintiffs here produce the expert report and disclosure information
of Robert W. Klotz.  Also attached is the declaration of fact witness Kenneth
Wright.

Regards,


Peter T. Enslein


--
————

Law Offices of Peter T. Enslein, P.C.
1738 Wisconsin Avenue, NW
Washington, DC 20007
(202) 329-9949

————————————————————

**2 attachments**

📄 **2017 05 05 Report of Robert W. Klotz .pdf**
    10371K

📄 **2017 04 27 Declaration of Kenneth Wright.pdf**
    9964K



**EXHIBIT**

4

**ROBERT W. KLOTZ**
**Consultant**
**3210 Havenwood Court**
**Edgewater, Maryland 21037**
**(410) 798-6868**

E-mail: rklotz1026@aol.com                                        Fax: (410)798-0371

May 5, 2017

Peter T. Enslein, Esquire                  Kenneth D. Bynum, Esquire
Law Offices of Peter T. Enslein, P.C.      Bynum & Jenkins
1738 Wisconsin Avenue, N.W.                1010 Cameron Street
Washington, D.C. 20007                     Alexandria, VA 22314

Re:   *Vashti Sherrod, et al. v. Phillip McHugh, et al.*

Dear Mr. Enslein and Mr. Bynum:

    The following report is submitted in compliance with Federal Rule of Civil Procedure 26(a)(1).  My background and experience are contained in my resume that is enclosed as Attachment #1.  I have not authored any articles in the past ten years. My fees for work performed are contained in my Fee Schedule that is enclosed as Attachment #2; I have been paid $2,500 to date.  A list of cases in which I have been deposed and/or testified in court is enclosed as Attachment #3.  A list of the materials I have reviewed and relied upon in arriving at my opinions in this matter are listed in Attachment #4.

    You have requested that I review the materials you have provided to determine if the action by the members of the Metropolitan Police Department (MPD) named in the above captioned litigation were in conformance with national police standards. My review evaluates the members' actions from the prospective of a reasonable officer and will consider the totality of circumstances that were involved.

    As noted in my resume, I spent twenty-five years with the Metropolitan Police Department.  Initially, I was an officer, responding to calls for service, investigating crimes, and making arrests.  Later, as an Official/Supervisor, I was responsible for the training and

**EXHIBIT**

5

supervision of those under my command. I served in assignments in various police Districts, the Planning and Development Division, and later as the Commander of the Internal Affairs Unit. While assigned as The Commanding Officer of the Personnel and Training Divisions, I was assigned by the Chief of Police to construct and administer the examinations for officers seeking to become Detectives and those Detectives seeking to become Detective Grade One.  Later, I was the Deputy Chief Commander of the Special Operations & Traffic Divisions. During my tenure, I also travelled the country lecturing for the International Association of Chief's of Police (IACP).

After my retirement in 1980, I continued lecturing for the IACP and worked for a similar group known as Murphy and Associates. In this capacity, I engaged in reviews of various police agencies to recommend various methods of improved services. While with this organization, I also participated in the training of senior police officials from a number of foreign countries under contract with the U.S. Department of State. Under the contract, we prepared lesson plans for the students that involved obtaining and utilizing department directives from throughout the United States.  I also began testifying in various courts as an expert witness in "Police Practices and Procedures" in some thirteen States and the District of Columbia.

<u>Discussion</u>

The purpose of this report is to evaluate the conduct of the District of Columbia Metropolitan Police Department ("MPD") during the criminal investigation of the May 14, 2015 altercation between Ms. Schulz and Mrs. Sherrod, as well as the specific actions of Det. McHugh during this investigation. I have used the Model Policies put forth by various professional police organizations, in my evaluation of the actions of the MPD law enforcement officers involved in this case.[1] The

---

[1] Along with the IACP Model Policies, I reviewed the National Standards set by the United States Constitution; the 1973 National Advisory Commission on Criminal Standards and Goals; multiple police department directives from departments across the country on the subjects of probable cause, searches, seizures, and police activity; the writings of experts in the field, including the text entitled "Police

IACP's Model Policies have been widely accepted by police departments in the United States and reflect generally accepted standards for law enforcement conduct in this country.

The event giving rise to this litigation occurred on May 14, 2015, at approximately 11:30 a.m., in front of the Gingko Gardens plant store, located at 911 11th Street S.E., Washington, D.C. The plaintiffs, Mrs. Vashti Sherrod and her husband, Mr. Eugene Sherrod, were seated in their parked automobile when the drivers' side rear view mirror was struck and damaged by an Isuzu Truck owned and operated by Ms. Diane L. Schulz. Ms. Schulz and the Sherrods exited their vehicles, and an altercation between Ms. Schulz and Mrs. Sherrod ensued. There is video footage of this encounter, captured by a Gingko Garden's security camera. Immediately after leaving the scene, Ms. Schulz notified her car insurance company, USAA, of the accident. *See* Schulz Dep. at 67:18-72:3. However, Ms. Schulz did not call the Metropolitan Police Department to report the incident until approximately 7:00 p.m. on May 14, 2015, when she placed a call to the District of Columbia's 911 emergency telephone number. *Id.* at 75:3-76:14.

Officer Patel's Preliminary Investigation

According to the IACP Model Policy for Criminal Investigations, a criminal investigation is defined as "[t]he collection of facts and information intended to identify an offender and to organize facts and information in a way that presents evidence *sufficient for criminal charges.*" Model Policy for Criminal Investigations at 1 (emphasis supplied). "Normally, criminal investigations consist of a preliminary investigation, generally conducted by the responding patrol officer and, if necessary, a follow-up investigation performed by investigative

---

Administration," authored by O.W. Wilson, former Chief of Police in Chicago and Dean of Criminology University in California, often referred to as the "Father of Police Administration"; and the Professional Standards set forth by the Commission on Accreditation of Law Enforcement Agencies, a professional organization that consists of members of the IACP, the National Sheriff's Association (NSA), and the Police Executive Research Foundation (PERF).

services." *See* IACP Criminal Investigations Concepts and Issues Paper at 1. "[I]t is very important that patrol officers and first line supervisors have a broad understanding of the criminal investigation process in order to ensure that they take those measures and avoid missteps that will better ensure the overall success of criminal investigations." *Id.* at 1.

The initial investigation was performed by Officer Sapan T. Patel of the First District, who responded to the MPD dispatcher's request for assistance following Ms. Schulz's 911 call. *See* Patel Dep. at 22:4-20. Officer Patel, who ultimately interviewed Ms. Schulz about the incident, had completed his police academy training only eight months before responding to Ms. Schulz's 911 call. *Id.* at 12:20-13:2. Moreover, Officer Patel had only been working on his own, without another more senior officer accompanying him, since December of 2014. *Id.* at 13:19-14:15. Officer Patel admitted during his deposition testimony that he did not receive training specific to taking notes of interviews in the police academy, but rather was merely trained in what information should be gathered to complete a report in the MPD's I/Leads system. *Id.* at 16:2-7.

According to the IACP Model Policies for Criminal Investigations, officers conducting a preliminary investigation should "[t]ake written notes and conduct voice recordings whenever possible." Officer Patel took handwritten notes during his interview of Ms. Schulz. His notes contain only one reference to a gun: "big black gun under the driver's seat." (Ex. 3a). After completing the interview, Officer Patel purportedly returned to his patrol car and prepared his incident report (Exhibit 6 police report #15070009; See Patel Dep. at 51:18-52:6), in which he wrote:

> C-1 [Ms. Schulz] stated that S-1 [Mrs. Sherrod] said "I'm not going to tell you my name, I'm going to get my gun." C-1 stated that S-1 then reached beneath the front passenger seat and brandished a large black handgun. C-1 then immediately got into her vehicle and drove away.

*See* Exhibit 6.

Accurate note taking by investigating police officers a matter of

particular importance.

> Note taking is important when conducting a preliminary
> investigation and is vital to a successful criminal investigation...
> Notes should be legible, understandable, accurate, and complete,
> as they will serve to facilitate the officer's memory and may need
> to be used in court where their accuracy may be challenged...
> Before a patrol officer turns the case over to investigative
> services, he or she must be certain that the preliminary report is
> clear and all information detailed. The information should have
> been collected in such a way that investigators would not need to
> repeat the steps of the preliminary investigation but would have
> an outline for developing effective follow-up plans.

*See* Criminal Investigations Concepts and Issues Paper at 2-3.

It is impossible to reconcile the disparity between Officer Patel's
handwritten interview notes regarding what Ms. Schulz allegedly told
him during the interview about the gun with his description of the
events of the interview in the report that he prepared within minutes of
the interview's conclusion.   Significantly, Ms. Schulz would ultimately
change her story about what the alleged gun looked like several times
after this initial interview, ultimately admitting in deposition that she
never saw a gun in Mrs. Sherrod's possession at any time. *See* Schulz
Dep. at 63:20-64:20; 83:4-16. At a minimum, Officer Patel failed to
properly interview Ms. Schulz and failed to meet the standard required
of a police officer to prepare "understandable, accurate, and complete"
notes in this case.

Officer Patel testified that he had initially desired to classify the
reported offense as an "assault with a dangerous weapon" (ADW), a
felony, although he admitted that this assessment was not contained in
his report or his notes from the interview. *See* Patel Dep. at 42:8-22.
Officer Patel discussed with his supervisor, Sergeant Architzeo, the
specifics of his conversation with Ms. Schulz, including information
about Mrs. Sherrod allegedly pulling a gun on Ms. Schulz.  Nevertheless,
Sergeant Architzeo directed Officer Patel to classify the alleged crime as
"threats to do bodily harm," a misdemeanor, which is reflected in the

police report that Officer Patel prepared. *Id.* at 37:1-40:21; 42:2-43:14, Ex 6.

**Detective McHugh's Follow-Up Investigation**

The following day, on May 15, 2015, Det. McHugh was assigned to the case in order to conduct a follow-up investigation. "The primary goal of the follow-up investigation is to gather information and evidence." *See* IACP Criminal Investigation Concepts and Issues Paper at 5. "To accomplish this goal, the investigator may decide to re-interview the victim, any witnesses or others in the hope that additional information can be uncovered." *Id.* "When the investigator re-interviews the victim and witnesses, he or she must test and retest the validity of their statements." *Id.* "The investigator must be able to recognize that factors of fear, stress, relationship, friendship, or dishonesty color and affect the credibility of the responses." *Id.* "Information obtained by persons should ... be primarily categorized as investigative leads rather than positive evidence of a suspect's guilt or innocence." *Id.*

At the time that he commenced the follow-up interview of Ms. Schulz, Det. McHugh had only recently graduated from Detective school, just three months before being assigned to investigate the May 14, 2015 incident. *See* McHugh Dep. at 31:17-22. Moreover, at that point, Det. McHugh was considered only an "investigator" and was completing a one-year probationary period. *Id.* at 38:6--39:4. Det. McHugh did not become a "Det." until after his involvement in the case had ended. *Id.* at 38:21-39:4.

On May 15, 2015, Officer Patel spoke to Det. McHugh about his interview of Ms. Schulz. Officer Patel told Det. McHugh that Sergeant Architzeo had previously advised him not to classify this incident as an ADW. *See* Patel Dep. at 44:19-45:12. While not his immediate supervisor, Sergeant Architezo was an officer of higher rank and with more experience than Det. McHugh. *Id.* at 45:22-46:6. Nevertheless, against the advice and judgment of a superior officer who had spoken to Officer Patel immediately after the initial interview with Ms. Schulz, and without any additional or different information than was available to Sergeant Architezo at the time that he made his initial assessment, Det.

6

McHugh appears to have unilaterally decided to reclassify this alleged offense as a felony ADW and investigate the matter as such. *See* Patel Dep. at 45:16-21.

Det. McHugh believed that Sergeant Architezo directed Officer Patel to classify the alleged incident as a threat report due to a "delay in reporting," as Ms. Schulz had waited approximately seven hours before calling the police about this alleged event. *See* McHugh Dep. at 76:6-10; 275:7-12. It is important to note that the IACP considers the question of "Was the amount of time between the crime's occurrence and the notification of the police normal?" an important factor for an investigating police officer to consider when assessing the credibility of a complaining witness. *See* Criminal Investigations Concepts and Issues Paper at 2. Det. McHugh admitted that he considered Ms. Schulz's long delay in reporting "strange." McHugh Dep. at 83:2-15.

"[A] typical follow-up investigation outline" consisting of 19 activities. IACP, Criminal Investigation, Concept and Issues Paper at 4. Of relevance to this case are the following activities that Det. McHugh employed in his follow-up investigation: "Telephone the victim," "Interview the victim, witnesses, and potential witnesses," "conduct a records search," "transmit all-points bulletins and other official communications," "prepare required reports and records on case progress" and "contact other government agencies." *Id.*

Moreover, the IACP Model Policy for Criminal Investigations provides that an officer in charge of a follow-up investigation should "search for new witnesses," "complete background checks on witnesses, victims, and suspects as appropriate," and "seek additional information from other officers" In this case, it does not appear that Defendant McHugh completed any of these crucial steps during his follow-up investigation of the May 14, 2015 incident. Specifically, Defendant McHugh failed to search for, locate, or interview an eye-witness of the incident, Mr. Wright, an employee of Gingko Gardens who was plainly visible in the surveillance video obtained and reviewed by Det. McHugh. Det. McHugh likewise failed to seek additional information from Sergeant Architezo, a senior officer who had reviewed the evidence from Officer Patel's initial interview of Ms. Schulz and determined that the case should properly be investigated as a misdemeanor weapon's

7

charge rather than a felony ADW charge. Defendant McHugh also failed
to investigate Ms. Schulz, the alleged victim, to properly judge her
credibility and any underlying ulterior motives that may have led her to
file a report of this incident of the MPD long after the incident had
concluded. These failures are discussed more fully later in this report.

On May 15, 2015, Det. McHugh interviewed Ms. Schulz at her
apartment.  According to Det. McHugh, during their meeting, Ms. Schulz
claimed that during the May 14, 2015 incident "Mrs. Sherrod went to
her car and reached under the driver's seat, pulling out what Schulz
described as a *black semi-automatic pistol* similar to what a police
officer would carry." (emphasis supplied) *See* McHugh Answer to
Request for Admission No. 32.  Contrary to IACP policy, Det. McHugh
failed to take detailed notes during his investigation and denied taking
any notes other than those sparse notes contained in the exhibits of
record.  *See* McHugh Depo. at 87-88, 286-87; IACP Criminal
Investigations Concepts and Issues Paper at 6-7 ("As with the
preliminary investigation, it is important for Detectives to record all
information obtained during the follow-up investigation. A Det. must
develop the sound habit of taking legible and accurate notes ... from the
moment he or she arrives on the scene ... The importance of note taking
by preliminary investigators and investigative personnel is again
underscored. Field notes should be taken as facts are learned and as
evidence is obtained. These notes are the foundation of the investigative
report; therefore, it is important that they be clear and concise.")

During the afternoon of May 15, 2015, Det. McHugh visited Gingko
Gardens and interviewed Matthew Roberts, an individual Ms. Schulz had
told him was someone to whom he should speak. *See* McHugh Dep. at
116:7-118:1. Mr. Roberts, according to Det. McHugh, did not have
anything significant to add about the event. *Id.* at 118:2-7. Det. McHugh
stated that on May 14, 2015, Mr. Roberts was inside the upper level of
the shop when he heard an argument outside that went on for an
extended period of time. *Id.* at 118:8-16.  However, Mr. Roberts stated
that he never looked to see what was going on or who was involved. *Id.*

Det. McHugh also located a video of the incident, recorded by a
Gingko Gardens security camera, and watched it on the computer in the
flower shop. *Id.* at 118:17-5.  Det. McHugh downloaded the video and

brought it back to the police station, where he showed it to his supervisor, Lieutenant Richard Brady. *Id.* at 119:6-11. The video, according to McHugh, was "grainy and not clear," and he could not tell whether Mrs. Sherrod had a gun in her hand at any point during the encounter. *Id.* at 119:14-16; 147:16-18; 157:15-20. Note that the IACP considers the question of "Does the physical evidence support the facts of the crime related by the victim?" an important factor for an investigating police officer to consider when assessing the credibility of a complaining witness. *See* Criminal Investigations Concepts and Issues Paper at 2. Despite the poor quality of the surveillance video, Defendant McHugh did not seek to have the video-recording enhanced in order to see what was in Mrs. Sherrod's hand more clearly and, in fact, did not even ask whether such enhancement would be possible. *Id.* at 267:2-10.

The video does not corroborate and, in fact, contradicts the allegations that Ms. Schulz had asserted against Mrs. Sherrod. Moreover, the video shows the presence of Gingko Gardens employee Kenneth Wright, who witnessed the May 14, 2015 altercation between Ms. Schulz and Mrs. Sherrod. *See* Wright Declaration at ¶ 4. Despite Mr. Wright clearly appearing in the video during the time of the event, Det. McHugh never sought out or interviewed Mr. Wright. *See* McHugh Dep. at 119:17-120:14; Wright Decl. at ¶ 6. Had Det. McHugh interviewed him, Mr. Wright "would have told the investigator that no gun was used or displayed by Mrs. Sherrod or anyone else involved in the May 14, 2015 altercation." Wright Decl. at ¶ 6.

A critical part of any police investigation is the identification and interview of witnesses to an alleged crime and determining whether there are "any discrepancies in the statements of victims and witnesses." *See* Criminal Investigation Concept and Issues Paper at 2. This should include attempting to locate any potential witnesses at the scene of the alleged offense, as well as canvassing the neighborhood or surrounding area for any witness that may exist. *Id.* The significance of the failure of Det. McHugh to identify and interview Mr. Wright cannot be over stated. This witness plainly contradicted Ms. Schulz' story and, as Det. McHugh would learn, supported Mrs. Sherrod's position that she did not own a gun and did not display or point one at Ms. Schulz at any time during the May 14, 2015 incident.

At no time after his initial meeting with Ms. Schulz did Det. McHugh show Ms. Schulz the video of the incident. *See* McHugh Dep. at 140:16-142:13; 255:6-256:3. Det. McHugh's investigation also never included a review of Ms. Schulz' social media profile, a tactic McHugh testified is a widely accepted means of criminal investigation. *Id.* at 47:7-49:14; 59:3-60:9. In fact, Defendant McHugh testified that he did not locate or view any of Ms. Schulz' social media profiles until the day of the Grand Jury witness conference, after Mrs. Sherrod had already been arrested for the alleged offense. Defendant McHugh confirmed that he had looked at Ms. Schulz' Twitter account (*Id.* at 59:22-60:6); however, he failed to find publicly available Tweets in which Ms. Schulz admitted that she suffered from bipolar disorder and depression. McHugh Dep. at 61:4-13; Ex. 83.

On May 16, 2016, Det. McHugh, accompanied by officers from the Prince George's County Police Department, went to interview Mrs. Sherrod at her Mitchellville, Maryland home. Mrs. Sherrod was not at home, and Det. McHugh left his business card in her mailbox. On the back of the card, Det. McHugh had handwritten a note asking Ms. Sherrod to call him at the telephone number listed on his card.

On May 16, 2015, Det. McHugh posted a felony lookout on the NCIC system for the Sherrod's car, describing it as "felony vehicle" and instructing any police officer who located the vehicle to immediately stop and "secure the vehicle for forensic processing, hold all occupants [and] contact Investigator Phillip McHugh of the First District Detective's Unit." *See* Exs. 14, 15. Det. McHugh also made inquiries with Maryland and federal law enforcement agencies regarding whether either of the Sherrods had purchased a gun or had a permit to possess a gun. As McHugh's inquires revealed, all agencies reported that neither Mr. nor Mrs. Sherrod had a registered gun or a permit to possess one. *See* McHugh Dep. at 145:19-146:13; 183:17-22; 216:3-10.

Over the next several days, Mrs. Sherrod called and left messages for Det. McHugh on his telephone's voicemail. Det. McHugh did not respond to any of the telephone messages that Mrs. Sherrod left for him. On May 21, 2015, Mrs. Sherrod was finally able to reach Det. McHugh by telephone. Det. McHugh explained to her that he was investigating a complaint from Ms. Schulz alleging that Mrs. Sherrod had pointed a gun

toward Ms. Schulz in the aftermath of the May 14, 2015 motor vehicle
collision and that the alleged assault had been captured on videotape.
In her telephone conversation with Det. McHugh, Mrs. Sherrod
emphatically told Det. McHugh that she did not own a gun and had not
pointed a gun at Ms. Schulz at any time.

By this point in time, Det. McHugh had sought an arrest warrant
for Mrs. Sherrod from the U.S. Attorney's Office ("USAO") for the District
of Columbia, which had been denied because the USAO determined that
the surveillance video is not clear enough to determine what was in Mrs.
Sherrod's hand and, consequently, there was insufficient probable cause
to support the issuance of an arrest warrant. *See* Exhibit 38, McHugh
Dep. at 197:18-199:15.

On June 23, 2015, Defendant McHugh contacted Detective
Simmons of the City of Bowie Police Department, requested that she file
an application in the Circuit Court for Prince George's County, Maryland
for a search warrant for the Sherrod's home, and provided her with a
draft search warrant application. Det. Simmons relied entirely on the
information supplied to her by Det. McHugh and did not independently
view the video recording of the May 14, 2015 incident. McHugh Dep. at
170:10-172:15.  This, in effect, made the application for the search
warrant entirely that of Det. McHugh.  On June 29, 2015, Det. Simmons
applied for and obtained a search warrant from Prince George's County
Circuit Court Judge Michael P. Whalen.

In the application for the search warrant for the Sherrod's home
that Det. McHugh drafted (and later in the warrant for Mrs. Sherrod's
arrest), Det. McHugh consistently wrote the following:

The video corroborates C-1's [Ms. Schulz's] series of events.  The
video shows Vashti Sherrod bend down at the driver's seat of her
Mercedes and emerge with her right arm raised as if pointing
something at [Ms. Schulz].  Sherrod walks toward [Ms. Schulz],
who then abruptly reenters her vehicle and leaves the scene.  The
video quality is not clear enough to see what Sherrod has in her
hand, but [Ms. Schulz] described it as a black pistol.

*See* Exs. 30, 40, 53.

11

However, the video, in fact, does not show Mrs. Sherrod bending down and then raising her arm and pointing something at Ms. Schulz. It does not show Mrs. Sherrod walking toward Ms. Schulz. It also does not show Ms. Schulz abruptly reentering her vehicle and leaving the scene. The following is the actual sequence of events recorded in the video, along with the times each event occurred:

| | |
|---|---|
| 26:25 | Sherrod bends over in her car |
| 26:33 | Sherrod visible again |
| 26:36-44 | Sherrod talking to Schulz. Schulz continues bending over hood of Sherrod's car, then starts walking away. |
| 26:45-48 | Schulz starts walking back toward Sherrod and faces her, standing very close to Sherrod's person. |
| 26:49-51 | Schulz starts walking away again and walks behind her truck |
| 26:52-55 | Schulz turns and faces Sherrod. Sherrod is carrying a black handbag. |
| 26:56 | Schulz faces Sherrod, again very close to her person |
| 26:59 | Sherrod points her finger at Schulz and walks in between the vehicles |
| 27:03-07 | Schulz walks in between the vehicles and again confronts Sherrod
Sherrod is standing upright and visible. |
| 27:09 | Schulz starts to walk away toward back of truck, but turns around and faces Sherrod for a third time |
| 27:10-13 | Sherrod points at Schulz with her hand outstretched and continues pointing at her with her arm raised as Schulz calmly walks away |
| 27:16 | Schulz gets into her truck |
| 27:17 | Sherrod appears to be looking through the passenger window of the truck |
| 27:22 | Sherrod gets in her car |
| 27:34 | Schulz drives off |

Mrs. Sherrod is not shown to be bending over and into her vehicle just prior to pointing her arm at Ms. Schulz. In fact, she is shown to be bending over at the driver's side of her car approximately 45 seconds prior to the time she points her arm toward Ms. Schulz. Ms. Schulz does

not get into her car and leave immediately after Ms. Sherrod pointed her arm at her, but delays leaving for 21 seconds, during which time Ms. Sherrod is shown to be appearing to continue to talk to Ms. Schulz through the passenger window.

On June 24, 2015, the Sherrods, while operating their vehicle in the District of Columbia, were stopped by members of the U.S. Capitol Police with their guns drawn and pointed at Mr. and Mrs. Sherrod. This stop occurred as a result a result of NCIC felony lookout that Det. McHugh had issued.  The language which Det. McHugh used in the lookout request made it virtually certain that any law enforcement personnel who approached the Sherrod's car would do so with their weapons drawn. In fact, Det. McHugh testified that he would not find it surprising if an officer who stopped the Sherrods' vehicle used their own guns in an effort to effect the stop of the vehicle. *See* McHugh Dep. at 133:13-134:3.

Det. McHugh was notified and responded to the scene.  After obtaining Mrs. Sherrods permission (which Mrs. Sherrod maintained in her deposition was coerced *see* V. Sherrod Dep. at 225:9-17), Det. McHugh conducted a search of their vehicle for a gun, with negative results.[2]  However, despite the felony lookout that he had issued for the couple and their automobile, Det. McHugh did not arrest Mrs. Sherrod and released her and her husband after completing the search of their car.  *See* McHugh Dep. at 184:16-21.  These events also occurred after Det. McHugh had sought an arrest warrant from the U.S. Attorney's Office and had been denied due to a lack of probable cause based upon the impossibility to determine what Mrs. Sherrod had in her hand during the May 14, 2015 incident.  *See* Exhibit 38, McHugh Dep. at 197:18-199:15.

Thereafter, on July 7, 2015, at approximately 9:00 p.m., Det. McHugh, with the assistance of members of the City of Bowie and Prince George's County Police Departments, executed the search warrant for

---

[2] The IACP Model Policies for Obtaining Search Warrants specifically provides that where consent for a warrantless search is obtained improperly, such as through coercion, the search is rendered illegal. See IACP Obtaining Search Warrant Concepts and Issues Paper at 2.

the Sherrod's home. A forced entry took place and, after searching for over an hour throughout the entire house and garage, no gun was found. McHugh Dep. at 205:6-14, 214:1-219:4.

Eventually, Det. McHugh, with the assistance of the U.S. Attorney's Office, on July 10, 2015, managed to obtain an arrest warrant for Mrs. Sherrod on the felony ADW charge. In the early hours of July 21, 2015, Mrs. Sherrod, with her attorney, went to the First District to comply with the warrant and surrendered to Det. McHugh. She was then arrested, handcuffed, booked, and transported to the Superior Court of the District of Columbia for processing. Several months later, after hearing the testimony of Ms. Schulz and Det. McHugh, the Grand Jury refused to indict Mrs. Sherrod, and the ADW charge was dismissed by the U.S. Attorney's Office.

During the time between their initial meeting on May 15, 2015 and the Grand Jury proceedings in the Fall of 2015, Ms. Schulz did not speak with Det. McHugh or view the videotape of the May 14, 2015 incident. *See* McHugh Dep. at 240:10-20; 255:6-9; 258:15-18. In the Fall of 2015, Ms. Schulz was interviewed in advance of her Grand Jury testimony by the prosecutor assigned to the case, Assistant U.S. Attorney Lisa Walters, and Det. McHugh. During the interviews, it became apparent to Det. McHugh that Ms. Schulz had insurmountable credibility issues. Significantly, Ms. Schulz' demeanor and her description of the gun changed dramatically ("So the color of the gun was something that was -- was different. And then when we explored that more with [Ms. Schulz], she -- she sort of backed -- backed off of it being silver, and changed it to, Well, it was metal, and I got a glint of the metal that was being pointed at me.") *See* McHugh Dep. at 245:5-20; 249:1-205:3; 259:6-22; 260:22-261:6-262:2. Equally important to Det. McHugh was Ms. Schulz' confession in her pre-Grand Jury testimony interview that she was mentally ill and suffered from bi-polar disorder – a revelation which caused Det. McHugh to completely change his view of her and doubt her credibility. *Id.* at 243:9-244:22; 247:18-249:10. After hearing the testimony of Ms. Schulz and Det. McHugh, the Grand Jury refused to indict Mrs. Sherrod, and, on January 6, 2017, the ADW charge was dismissed by the U.S. Attorney's Office. *Id.* at 291:14-293:1, Ex. 78.

## Opinions

It is my opinion: (1) that the criminal investigation performed by the MPD and, in particular, Det. McHugh, was flawed and fell below the standard of care set by the IACP; (2) that, as a result, Det. McHugh failed to determine from the outset that there lacked probable cause to prosecute Mrs. Sherrod of assault with a deadly weapon;[3]  (3) that Det. McHugh's actions during his follow up investigation of the May 14, 2015 incident was not that expected of a reasonable officer similarly situated; his actions were contrary to national police standards for probable cause for an arrest and he conducted a follow up investigation that no reasonable police officer would believe to be proper; (4) that Det. McHugh in his reports and actions during his follow-up investigation submitted police reports that were misleading and contained false information and took actions that were contrary to national police standards for such activities, and that no reasonable police officer would believe this to be proper; (5) that Det. McHugh, in continuing to attempt to prosecute Mrs. Sherrod despite the information obtained during his follow up investigation, acted contrary to national police standards and that no reasonable officer would believe this to be proper; and (6) that Det. McHugh's supervisors, who were monitoring his actions during his investigation, took no steps to prevent Det. McHugh from taking actions such as pursuing the arrest and prosecution of Mrs. Sherrod; failed to properly supervise, correct, and prevent the improper prosecution of Mrs. Sherrod; failed to adequately perform their supervisory duties; and thereby violated national police

---

[3]  The IACP defines probable cause to affect an arrest as: "When facts and circumstances within an officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution to believe that the suspect has committed, is committing, or is about to commit an offense." IACP Arrest Model Policy at 1 (citing *Michigan v. DeFillippo*, 443 U.S. 31 (1979)). Among sources I also reviewed regarding probable cause for arrest is the sections of the text "Legal Guide for Police, Constitutional Issues, by John C. Klotter, J.D 5th Ed., Chapter 3, Authority to Detain.  This text provides that probable cause, once exhibited, can be enhanced or diminished by other factors that later become available to the investigating officer.

standards, conduct that no reasonable police supervisor would believe
to be proper.

Submitted by:

Robert W. Klotz
Consultant

16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VASHTI SHERROD, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-cv-00816 (RC) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANTS' INITIAL DISCLOSURES

Pursuant to Fed. R. Civ. P. 26 (a)(1)(A), Defendants, the District of Columbia and Officer

Phillip McHugh ( "Defendants"),  submits their initial disclosures.  The persons listed below may

have discoverable information regarding the events and facts alleged in the Amended Complaint

and may be relevant to Defendants' potential defenses.

| Name | Position | Areas of Knowledge |
|---|---|---|
| Sapan T. Patel | Metropolitan Police Department (MPD) Officer | Knowledge of Plaintiff Vashti Sherrod's arrest and incident involving Defendant Diane Schulz |
| Walter S. Faryninarz | MPD Officer | Knowledge of the incident involving Defendant Diane Schulz |
| Thomas E. Boone | MPD Officer | Knowledge of Plaintiff Vashti Sherrod's arrest and incident involving Defendant Diane Schulz |
| Richard Brady | MPD Officer | Knowledge of Plaintiff Vashti Sherrod's arrest |
| David Edelstein | MPD Officer | Knowledge of Plaintiff Vashti Sherrod's arrest |
| Denise Fuller | MPD Officer | Knowledge of Plaintiff Vashti Sherrod's arrest |
| Anika A. Simmons | Prince George's (PG) County Detective | Knowledge of the search upon Plaintiffs' home |
| James Pettit | PG County – Maryland | Knowledge of Plaintiff Vashti |

EXHIBIT

6

| | Coordination and Analysis Center | Sherrod's charge of Assault with a Dangerous Weapon (ADW) |
|---|---|---|
| Susan P. Wittrock | U.S. Department of Justice | Knowledge of Plaintiff Vashti Sherrod's charge of Assault with a Dangerous Weapon (ADW) |
| Steve McDonald | MPD Officer | Knowledge of the search of Plaintiff Vashti Sherrod's vehicle |
| Brian K. McDaniel | Plaintiff's prior attorney | Knowledge of Plaintiff Vashti Sherrod's arrest and incident involving Defendant Diane Schulz |
| Legacy User | MPD Officer | Knowledge of Plaintiff Eugene Sherrod's prior arrest |
| Ty Truong | MPD Officer | Knowledge of a prior unrelated incident involving the theft of Plaintiff Vashti Sherrod's personal belongings |
| E.G. Fowler | MPD Lieutenant | Knowledge of the incident involving Defendant Diane Schulz |
| D. Whitaker | MPD Sergeant | Knowledge of the incident involving Defendant Diane Schulz |

Any documents, electronically stored information, and tangible things that may support Defendants' potential defenses were produced via electronic mail on January 6, 2017 in Defendants' Responses to Plaintiff's Requests for Production of Documents. These documents include the following:

1. Documents associated with Plaintiff Vashti Sherrod's arrest.

2. Documents associated with Plaintiff Vashti Sherrod's charge of Assault with a Dangerous Weapon.

3. Documents associated with Detective Anika Simmons' application for a search warrant of Plaintiffs' property.

4. Emails associated with Plaintiff Vashti Sherrod's arrest and search of Plaintiffs' home.

5. Plaintiff Vashti Sherrod's arrest packet.

6. Plaintiff Eugene Sherrod's Public Incident and Public Traffic packets.

7. Surveillance footage of the incident involving Defendant Diane Schulz.

The District is self-insured, and, therefore, this is no insurance agreement to be produced.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

*/s/ Michael K. Addo*
Chief, Civil Litigation Division Section IV

*/s/ David A. Jackson*
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW, Suite 630 South
Washington, D.C. 20001
(202) 724-6618
(202) 741-8999 (fax)
davida.jackson@dc.gov

*/s/ Tram T. Pham*
TRAM T. PHAM [1034963]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
(202) 724-6644
tram.pham@dc.gov

*Counsel for Defendants*

3

**PHILIP P. HAYDEN, Ed.D.**
**CONSULTANT/EXPERT WITNESS**
11602 Stonewall Jackson Drive
Spotsylvania, Virginia 22551
(540) 972-7658

Facsimile: (540) 972-2659        E-Mail:  phil@haydenasc.com

September 30, 2017

Kenneth D. Bynum
Bynum & Jenkins
1010 Cameron Street
Alexandria, VA 22314

Peter T. Enslein
Law Offices of Peter T. Enslein, P.C.
1738 Wisconsin Avenue, N.W.
Washington, D.C. 20007

Re:    *Vashti Sherrod, et al. v. Phillip McHugh, et al.*
         U.S. District Court for the District of Columbia
         Civil Action No. 16-816 (RC)

Dear Messrs. Bynum and Enslein:

I am writing to report the results of my review of the depositions, documents, and video and audio recordings that you have provided to me regarding the above-captioned case to determine whether the actions of Detective Philip McHugh and Officer Sapan T. Patel described in the materials conformed to the national standards for police conduct.

Among the materials I reviewed was the report of Robert W. Klotz, dated May 5, 2017 (the "Klotz report"). I independently verified the facts set forth in Mr. Klotz's report upon which his opinions are based. I agree with the methodologies that Mr. Klotz used in reaching his opinions and concur with his conclusions.

The following report is being submitted in accordance with Rule 26(a)(1) of the Federal Rules of Civil Procedure. I have not authored publications in the past ten years.

   Attachment #1 - My curriculum vitae containing my background and experience.

   Attachment #2 - My fee schedule. I have been paid $3,000 as a retainer for my work to date in this case.

   Attachment #3 - A list of materials I have received and reviewed from attorneys Kenneth D. Bynum & Peter T. Enslein

1

EXHIBIT

7

Attachment #4 - A listing of other cases in which I have testified in either deposition or trial.

After a review of the materials listed in Attachment #3, I have reached the following opinions and conclusions:

## Methodology

The principles of police practices, policies, and procedures are thoroughly discussed by several national law enforcement organizations.   The organizations from which I drew my opinions are the following: The International Association of Chiefs of Police (IACP); Federal Bureau of Investigation (FBI) the Force Science Research Center (FSRC); the National Officer Tactical Association (NOTA); the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA); the Institute for the Prevention of In-Custody Deaths, Inc. (IPICD); and the Americans for Effective Law Enforcement (AELE).  All of these organizations help to establish the standard guidelines for law enforcement to be utilized in conducting criminal investigations.

In order to review this case, I used the law enforcement standards for analyzing search warrants, arrest warrants, and for the conducting of criminal investigations.  In particular, in reaching my opinions, I have relied upon the policies and writings of the IACP.  For over 120 years, the IACP has been a guiding organization for police departments in the United States and throughout the world, and has been accepted as an organization that helps to define and resolve law enforcement issues.[1]

 The IACP's policies for search and arrest warrants and for the conducting of criminal investigations have been adopted by a substantial number of police departments throughout the United States and reflect the prevailing national standards for police conduct for such activities in this country.  I reached this conclusion after reviewing the internal operating procedure policies regarding the issuance of search and arrest warrants and for conducting criminal investigations of over twenty police departments located throughout the United States.

In addition, during my work for the FBI, training law enforcement personnel from across the United States, I have reviewed and/ or discussed the policies and procedures concerning criminal investigations, arrests, and search warrants with personnel from over three hundred law enforcement agencies throughout the United States. The criminal investigations, arrests and search warrants policies and procedures of these organizations are consistent with the policies and procedures to which the IACP adheres.

---

[1] International Association of Chiefs of Police, website http://www.theiaxp.org/History

## Professional Background

My law enforcement professional experience spans forty-eight years. I started as a military officer serving in combat in Vietnam. I then worked for ten years in the FBI as an investigator and assistant commander of a Special Weapons and Tactics (SWAT) team making hundreds of arrests of violent criminals. Additionally, I served for sixteen years as an instructor at the FBI Academy in police tactics, including SWAT and other tactical programs. There, I developed the Law Enforcement Training for the Safety and Survival Program and implemented it into the FBI's Violent Crimes Task Force and other police programs dealing with violent crimes. During that period, I also instructed over 8,000 federal, state, city, and county law enforcement officers in police procedures and tactics. After retiring from the FBI, during the past eighteen years, my work has included serving as a police instructor, both nationally and internationally, teaching police policies and procedures, tactics, and the use of force.

## Opinions and Basis Thereof

I have formed the professional opinions stated in this report based upon my education, training, and experience, as well as my review and analysis of the evidentiary materials provided to me regarding the captioned case.

As Mr. Klotz pointed out in his report, according to the IACP Concept and Issues Paper for Criminal Investigations, "it is very important that patrol officers and first-line supervisors have a broad understanding of the criminal investigation process in order to ensure that they take those measures and avoid missteps that will better ensure the overall success of criminal investigations."[2] Officer Patel of the First District was the officer who responded to the Metropolitan Police Department (MPD) dispatcher's request for assistance following Ms. Schulz's 911 call. Officer Patel interviewed Ms. Schulz about the incident. He had been trained at the MPD's police academy regarding the information that should be gathered to complete a report for the MPD. He took notes during the investigation and then returned to his vehicle and wrote his report.

In deposition, Officer Patel testified that he had initially intended to classify the reported offense as an "assault with a dangerous weapon" (ADW), a felony. Officer Patel discussed with his supervisor, Sergeant Architzeo, the specifics of his conversation with Ms. Schulz, including information about Mrs. Sherrod allegedly pulling a gun on Ms. Schulz. Sergeant Architzeo directed Officer Patel to classify the alleged crime as "threats to do bodily harm," a misdemeanor, which is reflected in the police report that Officer Patel prepared. The following day Det. McHugh, who was completing a one-year probationary period as a detective, was assigned to the case in order to conduct a follow-up investigation. Officer Patel told Det. McHugh that his supervisor, Sergeant Architzeo, had previously directed him not to classify this incident as an ADW, but rather as "threats to do bodily harm," a misdemeanor. Without any additional information, Det. McHugh requested Officer Patel to reclassify Mrs. Sherrods' alleged criminal offense as a felony, ADW.

---

[2] Klotz Report, pg. 4.

It is my opinion, which I hold to a reasonable degree of profession certainty, Officer Patel was in violation of the IACP criminal investigation standard and his department's policies when he reclassified the event between Ms. Schulz and Mrs. Sherrod from a misdemeanor "threat to do bodily harm" to a felony "assault with a dangerous weapon" without having any additional evidence and in total disregard of what his superior advised him to do. Det. McHugh appears to have requested a fellow police officer to change his report to a felony instead of a misdemeanor in order to accommodate what appears to be his biases.

The IACP Criminal Investigation Concepts and Issues Paper states "[t]he primary goal of the follow-up investigation is to gather information and evidence.... when the investigator reinterviews the victim and witnesses, he or she must test and retest the validity of their statements.... the investigator must be able to recognize that factors of fear, stress, relationship, friendship, or dishonesty color and affect the credibility of the responses.... All information gathered should be categorized as investigative leads rather than positive evidence of a suspect's guilt or innocence."[3] It is inappropriate and unacceptable under the standards set forth by the IACP to introduce biases into the investigation as Det. McHugh did. The investigation should be fact-driven, and the investigation should follow the leads developed and information gathered.

Moreover, the IACP Model Policy for Criminal Investigations provides that an investigative officer in charge of a follow-up investigation should "search for new witnesses; complete background checks on witnesses, victims, and suspects, as appropriate; and seek additional information from other officers."[4] Det. McHugh failed to conduct a proper investigation as described in both the IACP policy for criminal investigations and his department's policies and procedures. He failed to adhere to this and other IACP standards, in the following ways:

Det. McHugh did not seek additional information from Sergeant Architzeo, a senior officer who had reviewed the evidence from Officer Patel's initial interview of Ms. Schulz and determined that the case should properly be investigated as a misdemeanor charge rather than a felony ADW charge.

While Det. McHugh obtained the video surveillance recording of the May 14, 2015 incident, he failed to realize that the video not only failed to corroborate Ms. Schultz' retelling of the events to Det. McHugh in his interview of her, the videotape contradicted her story. In his written descriptions of the video recording, Det. McHugh repeatedly significantly misstated the events depicted in the video. For example, Mrs. Sherrod is not shown to be bending over into her vehicle just prior to pointing her arm at Ms. Schulz. In fact, she is shown to be bending over at the driver's side of her car approximately forty-five seconds prior to the time she points her arm toward Ms. Schulz. Also, Ms. Schulz does not get into her car and leave immediately after Mrs. Sherrod pointed her arm at her but delays leaving for twenty-one seconds. Moreover, during that period, Mrs. Sherrod appears to continue to talk to Ms. Schulz through the latter's passenger window. Det. McHugh's making false statements violate the IACP's criminal investigation standard and his department's policies and procedures.

---

[3] Klotz Report, pg. 6.
[4] Klotz Report, pg. 7.

Worse yet, while Det. McHugh admitted that the video was not clear enough to see if Mrs. Sherrod had a gun in her hand, he nevertheless falsely stated in his subsequent affidavits that he prepared to obtain a search warrant for the Sherrods' home and to arrest Mrs. Sherrod and that the video actually "corroborated" Ms. Schulz's story that Mrs. Sherrod had pointed a gun at Ms. Schulz during the May 14, 2015 incident.

In deposition, Det. McHugh claimed the video was too grainy to see what Mrs. Sherrod was holding in her hand but that "the video is clear enough to see movements, an arm outstretched in front of a person's body" and that "[t]o anyone in law enforcement, that's an indication of someone pointing a gun at somebody else."[5]  While the manner in which a person is holding their arm may be an indication that they are pointing something, it certainly does not establish that the person had a gun in her hand. I opine that no reasonable officer would have come to the conclusion that Mrs. Sherrod was pointing a weapon simply by seeing the way she was holding her arm without any objective new information to support this conclusion.[6]

By submitting false affidavits to obtain search and arrest warrants, Det. McHugh violated the IACP national standards for obtaining search and arrest warrants, as well as his own department's policies and procedures governing warrant applications.[7]

The IACP defines probable cause to affect an arrest as "when facts and circumstances within an officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, to believe that the suspect has committed, is committing, or is about to commit an offense."[8]  In my professional opinion, Det. McHugh never had probable cause at any point in his investigation to pursue a criminal case against Mrs. Sherrod and no objectively reasonable police officer would have believed that probable cause existed under the facts of this case.

By violating the search warrant standards, Det. McHugh violated the Sherrods' Fourth Amendment rights and placed the Sherrods at risk of being seriously injured or killed if they had not acted properly when the police entered their home.  The police broke down the door of their home and entered with guns drawn, not knowing into what circumstances they were entering. An entry team must be highly alert to any suspicious movement when making an entry.  If the Sherrods had quickly exited their bedroom and surprised the police officers, it would have been an extremely dangerous situation for the Sherrods in which they could have been shot and killed.

---

[5] McHugh Depo. pg. 159.

[6]  I have reviewed the video recording of the May 14, 2015 incident and its resolution is sufficient to enable me to see that when she raised her right arm, Mrs. Sherrod was merely pointing her hand and may have been holding a notepad in her right hand and not a gun.

[7]  Det. McHugh contacted Det. Simmons of the City of Bowie Police Department and requested that she file an application in the Circuit Court for Prince George's County, Maryland for a search warrant of the Sherrods' home. He provided her with a draft search warrant application. Det. Simmons relied entirely on the information supplied to her by Det. McHugh and did not independently view the video recording. McHugh Depo. pg. 170. This, in effect, made the application for the search warrant entirely that of Det. McHugh. These false statements contained in the application are a gross violation of his department's policies and procedures and the search warrant standard set forth by the IACP.

[8]  IACP Model Policy for Conducting Arrests, August 2010 (*Michigan v. DeFillippo*, 443 U.S. 31 (1979)).

Because he lacked probable cause to arrest Mrs. Sherrod, Det. McHugh violated IACP's arrest warrant standard and Mrs. Sherrods' Fourth Amendment rights. Det. McHugh's negligence and misconduct caused Mrs. Sherrod to needlessly undergo the embarrassing, humiliating, and frightening process of being arrested, handcuffed, booked, photographed, transported to the Superior Court of the District of Columbia for processing, and jailed.

Det. McHugh did not thoroughly vet and investigate Ms. Schulz, the alleged victim, to properly judge her credibility and any underlying ulterior motives that may have led her to file a report of this incident to the MPD long after the incident had concluded. It is inappropriate and grossly negligent to take the word of only one person, especially when dealing with an alleged violent crime. Moreover, after viewing the surveillance video of the May 14, 2015 incident, any objectively reasonable police officer would have re-interviewed Ms. Schulz and confronted her with the obvious inconsistencies between her story about what occurred during the incident (discussed above) and the starkly contrary video evidence. Det. McHugh violated the IACP criminal investigation standard by failing to do so.

In deposition, Ms. Schulz made the astonishing admission that she never saw a gun in Mrs. Sherrod's hand at any time during the May 14, 2015 incident.[9] Had Det. McHugh interrogated Ms. Schulz properly during his May 15, 2015 interview of her, he would have discovered this fundamental flaw in Ms. Schulz's story that would have stopped his investigation in its tracks.

Several months later, at the time of the Grand Jury, Det. McHugh discovered that Ms. Schulz had mental health issues and her credibility was undermined by the fact she changed her version of the weapon that she allegedly saw Mrs. Sherrod point at her. In deposition, Det. McHugh testified he uses social media in his investigations, but he never looked at Ms. Schulz's social media at anytime during the investigation. Had he reviewed Ms. Schulz's Twitter postings at the outset of his investigation or anytime thereafter, he would have discovered Ms. Schulz's longstanding mental illness (bipolar depression) that predated the May 14, 2015 incident. Det. McHugh violated the IACP criminal investigation standard by failing to do so. The knowledge of Ms. Schulz's mental illness would have led any objectively reasonable law enforcement officer to question the veracity of Ms. Schulz's statements, especially given her long delay in reporting the alleged criminal conduct to law enforcement.

Det. McHugh also failed to conduct a search in order to locate or interview an eyewitness to the incident in violation of the IACP criminal investigation standard. Mr. Wright, an employee of Gingko Gardens, was plainly visible in the surveillance video that was obtained and reviewed by Det. McHugh. If Det. McHugh had interviewed Mr. Wright, he would have heard the witness's version of what happened. A gun was never seen by this witness, who was within a few feet of the incident when it occurred.

Det. McHugh placed information into the Washington Area Law Enforcement System (WALES) and the National Crime Information Center (NCIC) system for a felony lookout. He stated: "[i]f the vehicle is located, hold all occupants and seize the vehicle as evidence," as he claimed the

---

[9] *See* Schulz Depo. page 64 line 7-8, "Q. Did you look at her hand? A. "No.""; Lines 18-20: "Q. My question is: Up until the time you left, did you ever look at her hand? A. I don't think I did. I don't know."

vehicle had been involved in an ADW offense.[10]  In the alert's summary section Det. McHugh
stated: "[a] suspect occupying the vehicle brandished a firearm at the victim while exchanging
information following a traffic accident."[11]  However, Det. McHugh's statements had not been
substantiated by his investigation.  Moreover, Det. McHugh's alert made the car Mrs. Sherrod
was driving a high-risk stop for any law enforcement officer who stopped the car.  Therefore,
any law enforcement officers who stopped the Sherrods' car would have approached it with guns
drawn, as in fact occurred when the Capitol Police stopped the Sherrods' car.  During the traffic
stop, one mistake by the Sherrods or a miscalculation by one of the officers could have resulted
in the officers discharging their weapons at the Sherrods.  Det. McHugh put the Sherrods' lives
in danger without good cause.  It appears that he had a total disregard for the people he was
sworn to protect.

Det. McHugh testified that the police department has its way of determining what investigation
is needed to prosecute a case.[12]  However, in the criminal justice system in the United States, the
police do not prosecute a case; it is the prosecutor's office who brings the case to the court
system and, therefore, will be the ones to determine if the evidence is enough to prosecute a case.
I opine that Det. McHugh was grossly negligent in the way he pursued the investigation and
worked outside the parameter of the standards set forth by the IACP in how a case should be
investigated.

After hearing the testimony of Ms. Schulz and Det. McHugh, the Grand Jury refused to indict
Mrs. Sherrod; and on January 6, 2016, the ADW charge was dismissed by the U.S. Attorney's
Office.[13]  Mrs. Sherrod had to go through twenty long and painful months of investigation
because of Det. McHugh's gross negligence in the performance of his duty and incompetence in
how to run a simple investigation.

## Conclusion

It is my opinion, which I hold to a reasonable degree of professional certainty, that the incident
that occurred between Ms. Schulz and Mrs. Sherrod was not investigated according to the
national standards set forth by the IACP and Det. McHugh's own police department.  It is also
my opinion that if Det. McHugh had followed the proper protocol for criminal investigations, he
would have developed information that would have quickly led to the investigation's termination
and the dismissal of the charges against Mrs. Sherrod.  If he had followed these standards, Det.
McHugh would have discovered that Mrs. Schulz's versions of the events were incorrect and
uncorroborated and that there was no reasonable basis to believe that Mrs. Sherrod had
committed a felony or misdemeanor.

In summary, its my opinion, which I hold to a reasonable degree of professional certainty, that:
(1) the criminal investigation performed by Det. McHugh was flawed and fell below the standard
of care set by the IACP; (2) Det. McHugh failed to determine any level of probable cause to

---

[10] McHugh Depo., pg. 126.
[11] McHugh Depo., pg. 130.
[12] McHugh Depo., pg. 199.
[13] Exhibit 78, pg. 1.

conduct a felony investigation of Mrs. Sherrod for an assault with a dangerous weapon; (3) no objectively reasonable police officer would believe that the actions Det. McHugh took during his follow-up investigation of the May 14, 2015 incident were appropriate under the circumstances; (4) Det. McHugh's actions were contrary to national police standards for probable cause in determining justification for a search warrant for the Sherrods' residence and the arrest of Mrs. Sherrod; (5) Det. McHugh, in his reports and actions during his follow-up investigation, submitted police reports that were misleading, contained false information, and took actions that were contrary to national police standards for such activities, no objectively reasonable police officer would believe this to be proper; and (6) Det. McHugh, in continuing to attempt to prosecute Mrs. Sherrod, despite the information obtained during his follow-up investigation, acted contrary to national police standards, and no objectively reasonable officer would believe this to be proper.

I base my opinions on my background and experience as a law enforcement officer with over twenty-six years of experience and as a police trainer with over thirty-five years of experience teaching and developing policies and procedures for conducting arrest techniques, including: making arrests, handling subjects, and preparation for arrest and search warrants.  I expressly reserve the right to alter, amend, modify, or expand upon these opinions should more information be made available to me.

Submitted by,

Philip P. Hayden, Ed.D.
Consultant/Expert Witness

8