# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VASHTI SHERROD, *et al.*,                   :
                                            :
    Plaintiffs,          :    Civil Action No.:  16-0816 (RC)
                                            :
    v.                   :    Re Document Nos.:  56, 65, 66, 68
                                            :
PHILLIP MCHUGH, *et al.*,                   :
                                            :
    Defendants.          :

## MEMORANDUM OPINION

### GRANTING IN PART DISTRICT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT SCHULZ'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART PLAINTIFFS' MOTION IN LIMINE REGARDING LEWIS HICKS; AND DENYING PLAINTIFFS' MOTION IN LIMINE REGARDING SHANA MELL

## I.  INTRODUCTION

This case illustrates the harm that may arise from even the most trivial traffic dispute, when the full weight of the justice system is brought to bear on that dispute.  Plaintiffs Vashti and Eugene Sherrod and Defendant Diane Schulz were involved in a minor accident in the District of Columbia that devolved into an intense shouting match.  Hours after the incident, Ms. Schulz reported to the District of Columbia Metropolitan Police Department ("MPD") that Mrs. Sherrod threatened her with a handgun.  MPD Detective Phillip McHugh, another Defendant, was assigned to investigate Ms. Schulz's accusation.  He obtained a video of the incident that allegedly proves Mrs. Sherrod's innocence, yet he used the power afforded to him by the criminal justice system to stop and search the Sherrods' car, search their home, and ultimately arrest Mrs. Sherrod.

When a grand jury refused to indict Mrs. Sherrod, the Sherrods brought this action against Ms. Schulz, Detective McHugh, and the District of Columbia (together with Detective

McHugh, the "District Defendants") on multiple constitutional and common law grounds. The Defendants have moved for summary judgment, arguing that Detective McHugh is entitled to certain immunities and that the Sherrods have failed to introduce facts supporting their claims. Both sides have also moved to exclude certain testimony. As explained below, because the Sherrods have, in fact, introduced facts that would allow a reasonable jury to find in their favor on certain claims, the Court denies the District Defendants' motion for summary judgment in part and Ms. Schulz's motion for summary judgment in full. The Court also grants the parties' motions to exclude testimony about certain topics.

## II. FACTUAL BACKGROUND

### A. The Traffic Accident

In early May 2015, the Sherrods and Ms. Schulz were involved in a traffic accident in front of a flower shop in the District of Columbia. *See* Defs.' Statement Undisputed Material Facts ("SUMF") ¶¶ 1–4, ECF No. 68-2; Statement Material Facts Not In Dispute ("Schulz's Statement") ¶¶ 3–4, ECF No. 66. The Sherrods are elderly, and Mr. Sherrod is legally blind. Schulz's Statement ¶ 1. According to the Sherrods, when Ms. Schulz attempted to parallel park her truck she collided with the side mirror of their car. SUMF ¶ 4; Schulz's Statement ¶ 3. This act precipitated a lengthy squabble between the Sherrods and Ms. Schulz, during which both sides cursed, made threats, and allegedly used racial epithets. Schulz's Statement ¶ 4. Before going their separate ways, the parties exchanged insurance information and Ms. Schulz recorded the vehicle identification number ("VIN") for the Sherrods' car. SUMF ¶¶ 23–24; Dep. Sapan Patel ("Patel Dep.") 26:1–26:17, District Defendants Mem. P & A. Supp. Mot. Summ. J. ("Defs. Mem.") Ex. 7, ECF No. 68-9.

In the accident's aftermath, Ms. Schulz took several steps that are key to this action. Shortly after the accident, Ms. Schulz called her insurance company to report it. Dep. Diane Schulz ("Schulz Dep.") 67:18–77:15, Defs. Mem. Ex. 4, ECF No. 68-6. Later that day Ms. Schulz called her son and discussed the dispute, initially telling him that the Sherrods threatened her with a gun, but later admitting that she was "not sure if [she] really saw a gun." Dep. Luciano Carafano ("Carafano Dep.") 31:17–34:3, Pls. Opp'n Defs. Mem. & Schulz Mem. ("Pls. Opp'n.") Ex. 2, ECF No. 76-5. Finally, several hours after the dispute and at her son's encouragement, Ms. Schulz called 911. SUMF ¶ 33; Schulz's Statement ¶ 9. She described her dispute with the Sherrods to the 911 operator, and she claimed that the "little 80 year old lady" threatened her with a gun and then "got her gun out," with encouragement from Mr. Sherrod. SUMF ¶¶ 34–37. This phone call triggered the investigation from which the Sherrods' claims arise.

### B. The Initial Investigatory Steps

MPD Officer Sapan Patel was dispatched to interview Ms. Schulz after her 911 call. SUMF ¶¶ 38–41, 52–59; Schulz's Statement ¶ 10. Ms. Schulz repeated to Officer Patel that Mrs. Sherrod "attempted to intimidate me with some sort of gun or weapon." SUMF ¶ 39. She was unable to give Officer Patel "very specific details" about the threat, but she claimed that Mrs. Sherrod pulled a "big black gun" from under her driver's seat. SUMF ¶¶ 54–57. Officer Patel was able to identify the Sherrods as the primary suspects based on the VIN that Ms. Schulz recorded during the altercation. Patel Dep. 26:1–17; *see also* Dep. Phillip McHugh ("McHugh Dep.") 150:2–20, Pls. Opp'n Ex. 3, ECF No. 76-6 (stating that he "ran the VIN number" to obtain a picture of the Sherrods' car, which he showed to Ms. Schulz during their initial interview). Officer Patel initially classified Mrs. Sherrod's alleged act as a misdemeanor, but the

act was subsequently reclassified as a violent crime, felony-assault with a dangerous weapon. SUMF ¶¶ 62–66.

Detective McHugh was assigned to handle the investigation after Officer Patel conducted the initial interview.  SUMF ¶ 64; Schulz's Statement ¶ 11.  From the very beginning, Ms. Schulz's claim should have been viewed skeptically.  Detective McHugh thought it was "strange" that Ms. Schulz had waited several hours before reporting the incident to the police. McHugh Dep. 83:2–15.  Moreover, even Detective McHugh thought it normally would strain credulity for an elderly woman to be accused of such a violent confrontation with a gun.  *See* Email from Detective McHugh to Susan Wittrock, June 24, 2015 (stating that "the suspect is pushing 80 years old . . . if it wasn't on video, not sure I would've believed it myself"), Defs. Mem. Ex. 11, ECF No. 68-13.  Detective McHugh began his investigation in earnest on May 15, 2015.

First, on May 15, Detective McHugh interviewed Ms. Schulz.  Dep. Diane Schulz ("Schulz Dep.") 93:9–95:5, Defs. Mem. Ex. 4, ECF No. 68-6; McHugh Dep. 87:5–8; Schulz's Statement ¶ 11.  Ms. Schulz repeated the same allegations to Detective McHugh that she had made to the 911 operator and Officer Patel—Mrs. Sherrod threatened Ms. Schulz with a gun, and then reached into the driver's seat area of her car, pulled out a black gun, and pointed it at Ms. Schulz.  SUMF ¶¶ 72–77.  Again, Ms. Schulz could not identify the gun's specific make, but she did tell Detective McHugh that it was "semi-automatic" and similar to the gun owned by one of her family members, who is a police officer.  SUMF ¶¶ 78–79.

The day after he interviewed Ms. Schulz, Detective McHugh emailed Ms. Schulz his police report classifying the incident as an assault with a dangerous weapon, including Ms. Schulz's accusation that Mrs. Sherrod "brandished a large black handgun."  Pls. Opp'n. Ex. 21,

ECF No. 76-24. Ms. Schulz responded to Detective McHugh's email and clarified a minor detail in the report, but despite her apparent reservations she did not express that Mrs. Sherrod may not have wielded a gun. Pls. Opp'n Ex. 27, ECF No. 76-30. Notably, the record contains no evidence indicating that Ms. Schulz ever indicated to MPD—during her 911 call, her interview with Officer Patel, or her interview with Detective McHugh—that she was not sure whether Mrs. Sherrod had brandished a gun.

After interviewing Ms. Schulz, despite his apparent skepticism and before interviewing Mrs. Sherrod and seeking evidence and witnesses at the flower shop, Detective McHugh issued a "bulletin" over the Washington Area Law Enforcement System ("WALES") and the National Crime Information System ("NCIS"). SUMF ¶ 85; McHugh Dep. 125:17–22; Pls. Opp'n Ex. 19, ECF No. 76-22. The bulletin, captioned "Felony Vehicle, ADW gun," notified all local law enforcement agencies that the Sherrods' car was involved in a possible assault with a deadly weapon and that it should be stopped so that Detective McHugh could question its occupants. McHugh Dep. 127:16–128:14; SUMF ¶ 85; Defs. Mem. Ex. 10, ECF No. 68-12; Pls. Opp'n Ex. 19 & Ex. 20, ECF No. 76-23.

Finally, after interviewing Ms. Schulz and issuing the bulletin, Detective McHugh went to the flower shop to interview potential witnesses. SUMF ¶ 81. The lone employee Detective McHugh interviewed heard the altercation between Ms. Schulz and the Sherrods but did not see it, so he could not corroborate Ms. Schulz's allegations. SUMF ¶ 82. However, Detective McHugh obtained a video from the store's security camera (hereafter, the "security video") that captured the altercation, albeit without sound. SUMF ¶ 83. The security video shows that another employee of the flower shop—Kenneth Wright—witnessed at least some of the altercation, but Detective McHugh did not interview Mr. Wright. McHugh Dep. 119:17-120:14;

Decl. of Kenneth Wright ¶ 4–6, ECF No. 76-16. Detective McHugh also showed the video to his supervisor, Lieutenant Richard Brady. SUMF ¶ 84, 98; Decl. of Richard Brady ¶ 5, ECF No. 68-15.

As discussed below, the parties dispute the conclusions to be drawn from the security video, but they concede that the video is authentic and that it captures the altercation. *See generally* Partial Consent Mot. Def. Diane Lee Schulz Summ. J. Dismissal ("Schulz Mem."), ECF No. 66; Defs. Mem., ECF No. 68; Pls. Opp'n, ECF No. 76. The parties also agree that no gun is visible on the video. McHugh Dep. 157:19–20; Pls. Statement Mat. Facts Genuine Dispute ("Pls. Statement") ¶ 97, ECF No. 76-1. Despite this admission Detective McHugh believes that the video corroborates Ms. Schulz's allegations. McHugh Dep. 158:7–160:2. The Sherrods, on the other hand, believe it exonerates them. Pls. Statement ¶ 98. But, from this point forward in the investigation there is no dispute that all evidence developed was exculpatory of Mrs. Sherrod.

Detective McHugh took several investigatory steps after viewing the security video, many of which prompted the Sherrods' claims. First, approximately one week after viewing the video, Mrs. Sherrod and Detective McHugh spoke over the telephone about the incident, and Mrs. Sherrod told Detective McHugh that she did not own a gun and did not point a gun at Ms. Schulz. SUMF ¶¶ 90, 93–94; McHugh Dep. 154:13–15 (agreeing that Mrs. Sherrod "vehemently denied" brandishing a gun at Ms. Schulz). The parties dispute whether Mrs. Sherrod independently brought up the possible existence of a gun, without Detective McHugh prompting her. SUMF ¶¶ 91–95; Pls. Statement ¶ 91. Next, Detective McHugh contacted the Prince George's County Police Department and the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives, and confirmed that the Sherrods had not registered a firearm with

either agency.  SUMF ¶¶ 86–87; Defs. Mem. Ex. 11; McHugh Dep. 145:19–146:13.  Then, Detective McHugh met with the Assistant United States Attorneys ("AUSAs") assigned to the case, showed them the security video, and recounted the statements of Ms. Schulz and Mrs. Sherrod.  McHugh Dep. 158:2–160:7.  The AUSAs apparently did not believe that the evidence presented was sufficient to arrest Mrs. Sherrod at this stage of the investigation, even before the investigation produced additional exculpatory facts.  *Id.* 160:3–7; Email from Detective McHugh to Susan Wittrock, June 24, 2015 (stating that "the video isn't clear enough for the [AUSAs] to sign a warrant since we can't say definitively what is in suspect's hand"), Defs. Mem. Ex. 11.  At this point, Detective McHugh determined that the proper course of action was to continue the investigation and search the Sherrods' car and home.  McHugh Dep. 158:11–19, 160:8–19.

### C.  The Car Search

On June 24, Detective McHugh's bulletin prompted two United States Capitol Police patrol cars to pull the Sherrods over as they drove near the Capitol.  SUMF ¶ 101; Pls. Statement ¶ 103.  After Mrs. Sherrod pulled her car to the curb, three police officers approached and two of them pointed shotguns at the Sherrods.  Pls. Statement ¶ 103.  The Sherrods claim that the officers' actions terrified them to the point of tears.  *Id.*

Detective McHugh arrived on the scene ten to forty minutes later and obtained Mrs. Sherrod's consent to search the car.  SUMF ¶¶ 102–104; Pls. Statement ¶ 102–104.  The Sherrods assert that Detective McHugh told them he would impound their car if Mrs. Sherrod did not consent, an assertion that Detective McHugh denies.  Pls. Statement ¶ 104; McHugh Dep. 181:12–14.  Detective McHugh searched the car for approximately one hour but did not find a gun or any other contraband.  SUMF ¶ 105; McHugh Dep. at 183:6–13; Vashti Sherrod Dep. 152:1–155:9, Pls. Opp'n Ex. 7, ECF No. 76-10.  After the search Detective McHugh requested

that Mrs. Sherrod accompany him to the police station for further questioning, but Mrs. Sherrod

refused.  Vashti Sherrod Dep. 155:15–22.

### D.  The Home Search

In addition to the car search, Detective McHugh sought to search the Sherrods' home.

Because the Sherrods live in Maryland, Detective McHugh coordinated the search with the

Prince George's County Police Department.  SUMF ¶ 99.  Detective McHugh supplied

information on the case, including a description of the security video, to a Bowie, Maryland

detective who used the information to complete a search warrant affidavit.  SUMF ¶ 100; Pls.

Statement ¶ 100.  The affidavit stated in part that:

> The [security] video corroborates the victim's series of events.  The video
> shows Vashti Sherrod bend down at the driver's seat of her Mercedes and emerge with her
> right arm raised as if pointing something at the victim.  Sherrod walks toward the
> victim, who then abruptly reenters her vehicle and leaves the scene.  The video
> quality is not clear enough to see what Sherrod has in her hand, but the victim
> described it as a black pistol.

Pls. Opp'n Ex. 23 at 3, ECF No. 76-26.  A magistrate judge approved the warrant based on that

information.  Defs. Mem. Ex. 14, ECF No. 68-16.  On Wednesday, July 7 at approximately 9:00

p.m., Detective McHugh and a team of Maryland police officers conducted a search of Plaintiffs'

home.  SUMF ¶¶105–106; Decl. of David Edelstein ("Edelstein Decl.") ¶ 5, Defs. Mem. Ex. 16,

ECF No. 68-18.

According to District Defendants, the team knocked on the front and back doors,

announced themselves multiple times by shouting into the house, turned their police lights on,

and attempted to call the Sherrods from both Detective McHugh's cell phone and the Prince

George's County 911 call center.  SUMF ¶¶ 108–114.  Detective McHugh saw someone—

allegedly the Sherrods—look through an upstairs bedroom window at the police, and he could

see that a television was on in that room.  SUMF ¶ 110; McHugh Dep. 207:15–18.  Finally, after

approximately thirty minutes, the officer in charge ordered the team to force entry into the Sherrods' home—to "breach" the front door.  SUMF ¶ 114; McHugh Dep. 210:7–211:21.  Detective McHugh claims that he asked the Prince George's County officers to use less force than is normally used when serving a search warrant for a possible weapon.  McHugh Dep. 208:20–209:5.  Detective McHugh did not participate in the initial breach, and only entered the Sherrods' house after it had been secured by the team.  SUMF ¶ 115.

According to the Sherrods, on the night of the search they were startled by a ringing doorbell, pounding on their back door, and flashing lights visible through their windows.[1]  Pls. Statement ¶ 16.  The Sherrods thought that they might have been experiencing a home invasion, and they feared for their safety.  *Id*.  This fear was exacerbated by Mr. Sherrod's blindness; he could not see who was in his home.  *Id*.  After the police breached the door, they briefly handcuffed Mr. Sherrod and told Mrs. Sherrod to put her hands over her head.  *Id*.  Detective McHugh told the Sherrods that they could not leave the home until he permitted them to, then he personally searched their home, allegedly ransacking their property in the process.  *Id*.  Detective McHugh did not find any guns or ammunition in the house.  *Id*.

### E.  The Arrest

Despite not finding any evidence that the Sherrods owned or had access to a gun, on July 10 Detective McHugh secured an arrest warrant for Mrs. Sherrod.  SUMF ¶ 116; Pls. Statement ¶ 116; McHugh Dep. 231:18–21; Defs. Mem. Ex. 17, ECF No. 68-19.  Detective McHugh's affidavit in support of that warrant described the security video in identical terms to the affidavit in support of the search warrant.  Defs. Mem. Ex. 17.

---

[1] The Sherrods also claim that the police team failed to announce their presence and did not give the Sherrods a chance to open the door before entering the home, but that claim is contradicted by the Sherrods' admission that they heard pounding on their door.  *Id*.

On July 21, Mrs. Sherrod surrendered herself to MPD and was processed, handcuffed, jailed, and ultimately released that day on her personal recognizance pending a preliminary hearing before a District of Columbia Superior Court magistrate judge.[2] Resp. of Vashti Sherrod to the Interrogs. Propounded by Ms. Schulz ("Vashti Sherrod ROG") at 20, Pls. Opp'n Ex. 39, ECF No. 76-42; SUMF ¶ 117; McHugh Dep. 240:4–6; Defs. Mem. Ex. 18, ECF No. 68-20. A District of Columbia Superior Court magistrate judge conducted the preliminary hearing, heard testimony from Detective McHugh, and found that the case should be submitted to a grand jury for a probable cause determination. SUMF ¶ 118–19; McHugh Dep. 240:22–242:9.

The government's case against Mrs. Sherrod unraveled at the grand jury stage. Before testifying, Ms. Schulz met with Detective McHugh and the AUSA handling the case, and Ms. Schulz had difficulty recalling the gun that Mrs. Sherrod allegedly threatened her with. SUMF ¶ 120; Pls. Statement ¶ 123; Schulz's Statement ¶ 12. She also revealed that she was bipolar and taking medication to treat that condition, factors that may have influenced her memory and mental state. SUMF ¶ 121–22; Schulz's Statement ¶ 2. The grand jury ultimately did not issue an indictment. SUMF ¶ 124–125; Schulz's Statement ¶ 14. After the case was dropped, the Sherrods brought this action.

### F. Procedural History

The Sherrods have challenged Detective McHugh's investigation on multiple federal law and common law grounds. *See generally* Second Amended Compl. ("SAC"), ECF No. 41. They claim that the car and home searches, and Mrs. Sherrods' arrest, were not supported by probable

---

[2] The Sherrods imply that Mrs. Sherrod spent the night in jail, Pls. Opp'n at 24–25 (stating that Mrs. Sherrod surrendered on July 20 and was released on July 21), but they do not explicitly make this argument and it is unsupported by the documentary evidence. *See* Defs. Mem. Ex. 18; Pls. Opp'n Ex. 14, Ex. 15.

cause, leading to several constitutional and common law violations. *Id*. They also claim that Detective McHugh negligently failed to follow proper police practices, and that he intentionally or negligently inflicted emotional distress on the Sherrods. *Id*. They claim that the District of Columbia is vicariously liable for certain of Detective McHugh's violations. *Id*. Finally, they claim that Ms. Schulz is culpable for certain of their injuries because she negligently or intentionally filed a false police report, prompting Detective McHugh's investigation. *Id*.

Having failed to obtain partial dismissal of the Sherrods' claims, *Sherrod v. McHugh*, No. 16-0816, 2017 WL 627377 (D.D.C. Feb. 15, 2017), District Defendants and Ms. Schulz now seek summary judgment. *See generally* Schulz Mem.; Defs. Mem. As discussed below, the Court grants District Defendants' motion in part, and it denies Ms. Schulz's motion in full.

## III.  LEGAL STANDARD

### A.  Summary Judgment

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-

movant must point to specific facts in the record that reveal a genuine issue that is suitable for

trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must

"eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475

F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the

light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless,

conclusory assertions offered without any evidentiary support do not establish a genuine issue

for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### B. 42 U.S.C. § 1983

The Sherrods have asserted multiple claims against Detective McHugh under

42 U.S.C. § 1983. Section 1983 provides a cause of action against:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws.

42 U.S.C. § 1983. A plaintiff bringing a § 1983 claim "must allege both (1) that he was deprived

of a right secured by the Constitution or laws of the United States; and (2) that the defendant

acted 'under color of' the law of a state, territory or the District of Columbia." *Hoai v. Vo*, 935

F.2d 308, 312 (D.C. Cir. 1991).

Section 1983 claims are properly brought against government actors in their personal

capacity. *See Jones v. Horne*, 634 F.3d 588, 602 (D.C. Cir. 2011). Thus, to maintain

a § 1983 suit, "a plaintiff must plead that each Government-official defendant, through the

official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662,

676 (2009). "Government officials may not be held liable for the unconstitutional conduct of

their subordinates under a theory of respondeat superior," and "vicarious liability is

inapplicable." *Id.*

### C. Qualified Immunity

District Defendants argue that Detective McHugh is entitled to qualified immunity from the Sherrods' claims that he violated their constitutional rights. Defs. Mem. at 25–38; District Defs. Reply at 7–20, ECF No. 81. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For a right to be "clearly established," at the time of the officer's conduct, "existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft*, 563 U.S. at 741). The legal principle to be applied must be "dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority,'" that "clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 589-90 (quoting *Ashcroft*, 563 U.S. at 741-42).

Trial courts have discretion to decide which qualified immunity prong to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see Rasul v. Myers*, 563 F.3d 527, 530 (D.C. Cir. 2009) (noting that "lower federal courts have the discretion to decide only the more narrow 'clearly established' issue 'in light of the circumstances of the particular case at hand.'" (quoting *Pearson*, 555 U.S. at 236)). The defendant bears the burden of pleading and proving the defense of qualified immunity. *Harlow*, 457 U.S. at 815.

### IV. ANALYSIS

District Defendants and Ms. Schulz seek summary judgment on nearly all of the Sherrods' constitutional and common law claims. Because the existence or lack of probable cause for Detective McHugh to act is material to many of the Sherrods' claims and the

Defendants' arguments, the Court will address probable cause first, then the Sherrods' claims against District Defendants, and finally the Sherrods' claims against Ms. Schulz. For the reasons explained below, the Court grants District Defendants' motion in part, and it denies Ms. Schulz's motion in full.

## A. Probable Cause

As noted, most of the Sherrods' claims turn on whether Detective McHugh had probable cause to conduct various searches and seizures during his investigation. A police officer has probable cause to conduct a search if "the facts available to [him] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (quoting *Texas v. Brown,* 460 U.S. 730, 742 (1983) (plurality opinion)); *see also Safford Unified School Dist. # 1 v. Redding,* 557 U.S. 364, 370–371 (2009). Similarly, an officer has probable cause to arrest a suspect if, "at the moment the arrest [i]s made . . . the facts and circumstances within [the officer's] knowledge and of which [the officer] had reasonably trustworthy information [a]re sufficient to warrant a prudent man in believing' that the suspect has committed or is committing a crime." *Smith v. United States*, 843 F.3d 509, 515 (D.C. Cir. 2016) (internal quotation marks omitted) (citing *Wesby v. District of Columbia*, 765 F.3d 13, 19 (D.C. Cir. 2014), *rev'd on other grounds*, 138 S. Ct. 577 (2018)).

The Supreme Court has emphasized that probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Therefore, in evaluating whether an officer has met this practical and commonsensical standard, a court must look to the totality of the circumstances. *See Maryland v. Pringle,* 540 U.S. 366, 371 (2003); *Gates*, 462 U.S. at 243–46. In other words, if Detective McHugh possessed sufficient

information to support a reasonable belief that Mrs. Sherrod threatened Ms. Schulz with a gun during their dispute, there was probable cause for him to take further investigative steps and, eventually, to arrest Mrs. Sherrod. Considering these principles and the record, at this stage the Court cannot conclude that Detective McHugh's actions were supported by probable cause at any point during the investigation.

As an initial matter, the parties dispute whether the existence of probable cause is a question of fact to be determined by a jury at trial, or a question of law that the Court may resolve at the summary judgment stage. Both sides are correct, because "[t]he existence of probable cause is a mixed question of law and fact." *Pitt v. District of Columbia*, 491 F.3d 494, 502 (D.C. Cir. 2007) (quoting *Smith v. Tucker,* 304 A.2d 303, 306 (D.C. 1973)); *see also Cousins v. Hathaway*, No. 12-1058, 2014 WL 4050170, at *6 (D.D.C. Aug. 15, 2014) (citations omitted). District Defendants correctly assert that "[w]here the facts are not in dispute[,] the question of probable cause is one of law to be decided by the court." *Jackson v. District of Columbia*, 541 F. Supp. 2d 334, 341 (D.D.C. 2008) (quoting *Dent v. May Dept. Stores Co.,* 459 A.2d 1042, 1044 (D.C. 1982)); *see also Smith v. United States*, 843 F.3d at 515 (affirming the district court's grant of summary judgment on the issue of probable cause because a video indisputably supported the defendant officer's contention that the plaintiff nearly struck the officer with a vehicle). However, the existence of the facts underlying a probable cause determination is a question for the jury. *See Bolger v. District of Columbia*, 608 F. Supp. 2d 10, 21 (D.D.C. 2009) ("This factual dispute, which goes to the heart of the central element of the [offense at issue], makes it impossible to evaluate the totality of the circumstances at the time of the arrests . . . and therefore the [c]ourt cannot determine as a matter of law whether [the defendant officers] had probable cause to arrest [the] plaintiffs."); *Dingle v. District of Columbia*,

571 F. Supp. 2d 87, 96 (D.D.C. 2008) (denying summary judgment where the plaintiff and the defendant officer provided differing accounts of an arrest). Therefore, "[o]nly where the facts are undisputed or clearly established does probable cause become a question of law for the court." *Amobi v. District of Columbia*, 755 F.3d 980, 990 (D.C. Cir. 2014) (citing *Bradshaw v. District of Columbia*, 43 A.3d 318, 324 (D.C. 2012)).

District Defendants assert that "information from a single eyewitness can be sufficient to establish probable cause." Defs. Mem. at 22 (citing *Page v. Mancuso*, 999 F. Supp. 2d 269, 280 (D.D.C. 2013)). They correctly note that it is undisputed that Ms. Schulz unequivocally told a 911 operator, Officer Patel, and Detective McHugh that Mrs. Sherrod had threatened her with a gun during their traffic dispute. *See generally* Schulz Dep.; *see also* Patel Dep. 23:10–25:16; McHugh Dep. 87:6–13, 92:18–93:4; Pls. Opp'n at 5, 10, 14. They therefore argue that "Ms. Schulz's statements to law enforcement on May 14 and 15, 2015 alone established probable cause to search and seize Plaintiffs." Defs. Mem. at 23. That argument, however, fails to account for the balance of information in Detective McHugh's possession at the time of the challenged searches and seizures.

In *Pendergast v. United States*, a case cited by District Defendants, the D.C. Circuit established the circumstances under which a victim's statement alone may provide probable cause for a search or arrest. The Circuit held that "probable cause is established where (a) the victim of an offense (1) communicates to the arresting officer information affording credible ground for believing that the offense was committed and (2) unequivocally identifies the accused as the perpetrator, and (b) materially impeaching circumstances are lacking." 416 F.2d 776, 785 (D.C. Cir. 1969); *see Garay v. Liriano*, 943 F. Supp. 2d 1, 18–19 (D.D.C. 2013) (holding that an officer had probable cause to make an arrest based on an eyewitness statement when the officers

"had no reason to believe that the eyewitness was lying or providing them with false information"). Other circuits have similarly held that an "eyewitness identification will constitute sufficient probable cause 'unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.'" *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (quoting *United States v. Amerson*, No. 93-6360, 1994 WL 589626, at *2–3 (6th Cir.1994) (unpublished table decision)); *see also Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity").

Defendants are therefore correct that in certain circumstances, Ms. Schulz's statements to the 911 operator, Officer Patel, and Detective McHugh would, on their own, provide probable cause for Detective McHugh to take further investigatory steps. Here, however, Detective McHugh had "reason to believe that [Ms. Schulz] was lying" or at least mistaken. *Garay*, 943 F. Supp. 2d at 18–19. First, and as discussed in greater detail below, the security video provided ample ground for Detective McHugh to question Ms. Schulz's accusation. Pls. Opp'n at 16. Second, Ms. Schulz waited several hours before reporting the alleged incident; "strange" behavior for someone who had been threatened with a gun. McHugh Dep. 83:2–15. Third, Mrs. Sherrod—an elderly woman—did not fit the profile of the typical perpetrator of an assault with a deadly weapon. *See* Defs. Mem. Ex. 11. Accordingly, District Defendants' reliance on *Mancuso* is misguided because the Sherrods, unlike the *Mancuso* plaintiff, raised "genuine issues regarding the circumstances that [Detective McHugh] confronted" when arresting Mrs. Sherrod, and in *Mancuso* there was no indication that the officer possessed *any* evidence contradicting the

eyewitness statements supporting probable cause, much less video evidence. *Mancuso*, 999 F. Supp. 2d at 279–80.

Even setting aside the other factors giving Detective McHugh reason for skepticism, there is a material question regarding whether a reasonable officer would have concluded that the security video tended to corroborate or contradict Ms. Schulz's allegations. District Defendants argue that Ms. Schulz's allegations "were supported by the surveillance video," and therefore that "it was reasonable for Detective McHugh and his supervisors to believe that Mrs. Sherrod had committed a crime and that the handgun would be found in Plaintiffs' vehicle or their home." Defs. Mem at 25. The Sherrods, on the other hand, contend that "the video was sufficiently clear to enable an objective and reasonable viewer to see that when Mrs. Sherrod raised her right arm, she was merely pointing her hand and was certainly not pointing a gun." Pls. Opp'n at 31–32 (citing Hayden Decl. Ex. 1 at 4). Based on this interpretation, the Sherrods conclude that "the video contradicted the allegations of the only complaining witness," and therefore that Detective McHugh could not have had probable cause to believe that Mrs. Sherrod had committed an assault with a deadly weapon. *Id.*

Having reviewed the video, the Court cannot conclude that the District Defendants' interpretation—the video corroborates Ms. Schulz's accusations—is the only defensible interpretation. It is true that a court need not credit the non-movant's interpretation of a video where the "videotape quite clearly contradicts the version of the story told by [the non-movant]." *Scott v. Harris*, 550 U.S. 372, 378–80 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Here, however, the video is far too pixelated for the Court to conclude that it shows

Mrs. Sherrod pointing a gun at Ms. Schulz, which would directly corroborate Ms. Schulz's allegation. The more difficult question is whether, considering the sequence of events evident from the video, the actions and body language of the Sherrods and Ms. Schulz, and the positioning of Mrs. Sherrod's hands, the security video supports Ms. Schulz's allegation or contradicts it. The jury, not this Court, is the proper mechanism by which that question should be resolved. *See Westfahl v. District of Columbia*, No. 11-2210, 2015 WL 6746479, at *6 (D.D.C. Nov. 4, 2015) (refusing to adopt the defendant officers' interpretation of an MPD video where "the MPD video does not compel only one reasonable set of inferences at odds with the jury's verdict").[3]

Because there is a material dispute of fact regarding whether, after first watching the security video, Detective McHugh had probable cause to suspect that Mrs. Sherrod had committed an assault with a deadly weapon, the Court cannot conclude that Detective McHugh had probable cause at any point in the investigation. District Defendants do not argue that Detective McHugh discovered any evidence—aside from the video—supporting Ms. Schulz's allegation. Nor could they, because at each point in the investigation it became less likely that Mrs. Sherrod had committed a crime. Mrs. Sherrod denied threatening Ms. Schulz with a gun, or even owning one. SUMF ¶ 94. Detective McHugh determined that there were no guns registered to the Sherrods. *Id*. ¶ 87. The AUSAs assigned to the case declined to authorize Mrs. Sherrod's arrest before Detective McHugh searched the Sherrods' car and home. Email from

---

[3] For what it is worth, the Court believes the video is more consistent with the Sherrods' version of events than District Defendants' version. Although the parties focus most of their attention on the video images of Mrs. Sherrod's arms and hands, the Court's view is significantly influenced by Ms. Schulz's body language; she did not appear to react in a manner consistent with someone who had just been threatened point-blank with a gun. Detective McHugh himself acknowledged that her reaction "seemed hard to believe," considering the alleged circumstances. McHugh Dep. 98:7–21.

Detective McHugh to Susan Wittrock, June 24, 2015 (stating that "the video isn't clear enough for the [AUSAs] to sign a warrant since we can't say definitively what is in suspect's hand"), Defs. Mem. Ex. 11. The car search did not bear fruit. SUMF ¶ 105. Nor did the home search. Pls. Statement ¶ 16. Therefore, if Detective McHugh did not have probable cause at the outset of his investigation, he never had probable cause.

Having decided that issue, the Court will consider the Defendants' summary judgment arguments. The Sherrods' claims arise from three distinct events: (1) the stop and search of the Sherrods' car; (2) the search of the Sherrods' home; and (3) Mrs. Sherrod's arrest. Certain of their claims relate to specific events, while others cover the investigation as a whole. The Court will organize its analysis accordingly, focusing first on the Sherrods' claims against District Defendants, followed by the Sherrods' claims against Ms. Schulz.

## B. Constitutional Claims

The Sherrods claim that District Defendants violated their constitutional rights at several different points, and in several different ways, during Detective McHugh's investigation. The Court will first address the validity of the warrants to search the Sherrods' home and arrest Mrs. Sherrod, as those warrants are material to many of the Sherrods' constitutional claims and District Defendants' summary judgment arguments. The Court will then address the constitutional claims, which are captured rather vaguely in Counts I, II, and III of the complaint. As noted above, where, as here, a defendant official claims qualified immunity, the Court must determine (1) whether the official "violated a statutory or constitutional right," and (2) whether "the right was clearly established at the time of the challenged conduct." *Ashcroft*, 563 U.S. at 735. Having made this determination, the Court concludes that only the Sherrods' constitutional

claims challenging the searches of the Sherrods' home and car and the arrest of Mrs. Sherrod survive summary judgment.

## 1. Reliance on the Search and Arrest Warrants

While Detective McHugh may not have had probable cause to independently search the Sherrods' car and home and to arrest Mrs. Sherrod, it is undisputed that the Sherrods' home search and Mrs. Sherrod's arrest were authorized by warrants signed by judges. The Court must determine the significance of those warrants because, as District Defendants correctly note, "[w]hen police officers obtain a warrant before executing an arrest, they are ordinarily entitled to rely on the issuing judge's determination that probable cause exists." Defs. Mem. at 32–33 (citing *United States v. Spencer*, 530 F.3d 1003, 1006–07 (D.C. Cir. 2008)). However, as explained below, Detective McHugh may not rely on the warrants to immunize his allegedly unconstitutional actions because a reasonable jury may conclude that Detective McHugh himself procured those warrants through materially false statements.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It prohibits "searches and seizures . . . without a [valid] warrant." *Groh v. Ramirez*, 540 U.S. 551, 558–59, 564 (2004); *see, e.g., Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). A warrant is valid, in turn, only if it is based "upon probable cause, supported by [o]ath or affirmation," and only if it "particularly describe[s] the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. "Because a search warrant provides the detached scrutiny of a neutral magistrate," the Supreme Court has "expressed a strong preference for warrants and [has] declared that in a doubtful or marginal case a search under a warrant may be

sustainable where without one it would fail." *United States v. Leon*, 468 U.S. 897, 913–14 (1984) (internal quotation marks and citations omitted).

Under a rule established by the Supreme Court in *Franks v. Delaware*, deference to a warrant "gives way when the affidavit upon which the magistrate relied 'contain[ed] a deliberately or recklessly false statement.'" *Lane v. District of Columbia*, 211 F. Supp. 3d 150, 173 (D.D.C. 2016) (quoting *Franks*, 438 U.S. 154, 165 (1978)).  A finding of deliberate or reckless falsity does not, however, end the inquiry.  The Court must also consider whether the false statements were "material." *Id.* at 173.  "[A]llegedly false information in an affidavit is material only if, when it is 'set to one side, the affidavit's remaining content is insufficient to establish probable cause.'" *United States v. Ali,* 870 F. Supp. 2d 10, 27 (D.D.C. 2012) (quoting *Franks,* 438 U.S. at 156).  Similarly, "omitted facts are only material if 'their inclusion in the affidavit would defeat probable cause.'" *Id.* (quoting *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008)).

Applying this standard, the Sherrods have raised a genuine dispute regarding whether the warrants at issue here were valid.  The affidavits drafted by Detective McHugh in support of both warrants state that the security video "corroborates the victim's series of events."  Defs. Mem. Ex. 14 at 3, ECF No. 68-16; Defs. Mem Ex. 17 at 2, ECF No. 68-19.  As discussed above, a reasonable jury could, if it determines that the security video clearly contradicts Ms. Schulz's accusation, conclude that Detective McHugh acted with at least recklessness in submitting affidavits stating that the video corroborated Ms. Schulz's accusation.  Moreover, this recklessness would be material because in the absence of Detective McHugh's characterization of the security video and with the addition of the Sherrods' characterization, the affidavits would

no longer have supported a finding of probable cause.[4]  Therefore, the warrants would not be entitled to this Court's deference.  *Franks*, 438 U.S. at 165.  Moreover, regardless of whether other officers could rely in good faith on the warrants, "because [Detective McHugh] himself prepared the invalid warrant[s], he may not argue that he reasonably relied on the [judge's] assurance that the warrant[s]" established probable cause.  *Groh*, 540 U.S. at 564; *see S.H. v. District of Columbia*, 270 F. Supp. 3d 260, 286 (D.D.C. 2017); *Pitts v. District of Columbia*, 177 F. Supp. 3d 347, 364 (D.D.C. 2016); *Davis v. District of Columbia*, 156 F. Supp. 3d 194, 202–03 (D.D.C. 2016); *Lane*, 211 F.Supp.3d at 178.  At this stage, the warrants therefore cannot immunize Detective McHugh's actions.

### 2.  Claims Related to the Car Search

The Court first addresses the Sherrods' claims arising from the stop and search of their car on June 24, 2015.  SUMF ¶ 101.  The Sherrods claim that their rights were violated both during the initial car stop by the Capitol Police and during Detective McHugh's subsequent search of their car.  The Court concludes that (1) the initial stop did not violate the Sherrods' clearly established constitutional rights; but (2) there is a dispute of fact regarding whether the search did.  Accordingly, Detective McHugh is entitled to qualified immunity from claims arising from the stop but not the search.[5]

_____

[4] Moreover, while District Defendants claim that Detective McHugh's July 10, 2015 affidavit in support of the arrest warrant contained "the only knowable facts to Detective McHugh at the time," Defs. Mem. at 33, the affidavit does not state that Detective McHugh unsuccessfully searched the Sherrods' car on June 24.  Defs. Mem. Ex. 17.  This omission casts further doubt on the warrant's validity.

[5] As noted, evaluation of a police officer's claim to qualified immunity requires a two-pronged inquiry to determine "(1) whether the facts in the record show the officers' conduct violated a constitutional right, and if so, (2) whether the constitutional right was clearly established at the time of the incident."  *Corrigan v. District of Columbia*, 841 F.3d 1022, 1029 (D.C. Cir. 2016).

*a. Initial Stop*

The Sherrods claim that Detective McHugh's "false" felony vehicle bulletin caused them to be unconstitutionally seized by the District of Columbia Capitol Police without probable cause. SAC ¶¶ 27, 60, 71. District Defendants counter that the bulletin and the resulting stop needed only to be supported by reasonable suspicion, rather than probable cause, and that Detective McHugh "possessed probable cause, much more than reasonable suspicion." Defs. Mem. at 27. They argue that Detective McHugh is therefore entitled to qualified immunity on this claim because his actions did not violate the Sherrods' constitutional rights. *Id*. at 27–28. The Court agrees.

As an initial matter, the precise contours of the Sherrods' claims with respect to the car stop are unclear. They admit that they are not asserting claims against the Capitol Police. Pls. Opp'n at 43. However, they appear to claim that the Capitol Police violated their constitutional rights by stopping their car and detaining them for "approximately 20–40 minutes" while they awaited Detective McHugh's arrival. *Id*. at 44. According to the Sherrods, Detective McHugh caused this unconstitutional detention because he "lacked probable cause to post the felony lookout for the Sherrods' vehicle." *Id*. at 43. This claim must fail because, even drawing all factual inferences in favor of the Sherrods, they have not demonstrated that Detective McHugh or the Capitol Police violated their constitutional rights during the initial car stop.

A police officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion exists if "the totality of the circumstances" presents "a particularized and objective basis for suspecting the particular person

stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18 (1981). "This is not a particularly high bar: 'a *Terry* stop requires only a minimal level of objective justification.'" *United States v. Abdus-Price*, 518 F.3d 926, 929 (D.C. Cir. 2008) (quoting *United States v. Edmonds,* 240 F.3d 55, 59 (D.C. Cir. 2001)).

Detective McHugh issued the bulletin, directing police to stop the Sherrods' car, based on Ms. Schulz's unequivocal allegations—to a 911 operator, Officer Patel, and Detective McHugh—that Mrs. Sherrod threatened her with a gun. The record indicates that Detective McHugh issued the bulletin before viewing the allegedly exculpatory security video. *See* McHugh Dep. 125:17–22 (stating that he issued the bulletin at 1:15 p.m. on May 15); *id*. 116:21–22 (stating that he visited the flower shop at 2:45 p.m. on May 15). And even if Detective McHugh had issued the bulletin after viewing the security video, the Sherrods have not argued that Detective McHugh lacked *reasonable suspicion* to take further investigatory steps. *See generally* SAC, Pls. Opp'n. Under the totality of the circumstances, considering Ms. Schulz's allegations and Detective McHugh's confirmation that the Sherrods were involved in the altercation, Detective McHugh had the "minimal level of objective justification" to stop and question the Sherrods. *Abdus-Price*, 518 F.3d at 929.

Moreover, "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that [a] wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification . . . to pose questions to the person, or to detain the person briefly while attempting to obtain further information." *United States v. Hensley*, 469 U.S. 221, 232 (1985) (citation omitted). The stop must be "not significantly more intrusive than would have been permitted" for the officer who issued the bulletin. *Id.* at 236. Though "a detention might well be so lengthy or intrusive as to exceed the permissible limits of a

*Terry* stop," *id.* at 235, the Supreme Court has consistently recognized that there are no rigid

time limitations for effectuating such a stop. *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

Rather, courts have counseled that the constitutional duration of an investigative atop will "vary

to some extent with the particular facts and circumstances of each case[,]" but must last "no

longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491,

500 (1983).

There is no evidence that the Sherrods' *Terry* detention was unreasonable. When

considering whether a detention's duration was too long, courts consider whether the police

"diligently pursued a means of investigation that was likely to confirm or dispel their suspicions

quickly." *Sharpe*, 470 U.S. at 686–87 (holding a detention of 20 minutes reasonable when a

DEA agent stopped a vehicle and waited for the State Highway Patrol to arrive to conduct a

search). The Sherrods allege that the Capitol Police detained them for between twenty and forty

minutes after the initial stop. Pls. Opp'n at 44. Detective McHugh stated that once the stop was

made the Capitol Police called him, and he immediately drove to the scene and sought the

Sherrods' consent to search their car. McHugh Dep. 177:1–181:11. The Sherrods have not

provided evidence that the initial stop lasted any longer "than [was] necessary to effectuate the

purpose of the stop." *Royer*, 460 U.S. at 500. Accordingly, Detective McHugh is entitled to

qualified immunity on this claim because the stop did not violate the Sherrods' constitutional

rights or, at the very least, it was not clearly established that a stop of this duration violated the

Sherrods' constitutional rights. The Court therefore grants District Defendants' motion for

summary judgment on Counts I and III insofar as those Counts cover the initial stop of the

Sherrods' car by the Capitol Police.

*b.  Detective McHugh's Search*

The Sherrods also claim that Detective McHugh unconstitutionally seized the Sherrods and searched their vehicle without probable cause or a warrant once he arrived on the scene. SAC ¶¶ 36–37, 60, 71.  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–455 (1971)); *Chambers v. Maroney*, 399 U.S. 42, 51 (1970); *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *Id*. (citing *Davis v. United States*, 328 U.S. 582, 593–594 (1946); *Zap v. United States*, 328 U.S. 624, 630 (1946)).  The Supreme Court has "long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so."  *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991).

"The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances.'"  *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (quoting *Schneckloth*, 412 U.S. at 248–49).  In conducting this analysis, "a court may consider various factors, including the consenting party's 'age, poor education or low intelligence, lack of advice concerning his constitutional rights, the length of any detention before consent was given, the repeated and prolonged nature of the questioning, and the use of physical punishment.'"  *United States v. Wilson*, 605 F.3d 985, 1027 (D.C. Cir. 2010) (quoting *United States v. Hall,* 969 F.2d 1102, 1107 (D.C. Cir. 1992)).

District Defendants concede that Detective McHugh's search of the Sherrods car was subject to Fourth Amendment protection. *See generally* Defs. Mem. They argue, however, that Mrs. Sherrod signed a consent form authorizing the search; "[o]ne of the 'established exceptions to the requirements of both a warrant and probable cause." Defs. Mem. at 30 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). District Defendants are correct on the law, but the Sherrods have raised a dispute of fact regarding whether their consent was voluntarily given. This dispute renders qualified immunity inappropriate at this stage.

Mrs. Sherrod's signing of the consent form suggests that she voluntarily consented to Detective McHugh's search. Courts in this jurisdiction have held that consent was voluntary where the plaintiffs signed forms stating "in clear and unambiguous language that the [plaintiffs] could deny the search at any time and affirm[ing] that the [plaintiffs] were not 'threatened, ordered or intimidated' into submitting to the search." *Fraternal Order of Police/Dep't of Corr. Labor Comm. v. Washington*, 394 F. Supp. 2d 7, 14 (D.D.C. 2005); *see Anderson v. Salter*, No. 94-2132, 1996 WL 434996, at *3 (D.D.C. Mar. 28, 1996) ("[T]here is no suggestion by the plaintiffs that the consent form relinquishing the auto, signed by Ms. Mason, was involuntary when given."). The consent form signed by Mrs. Sherrod contained very similar language informing her of her right to refuse Detective McHugh's search. Defs. Mem. Ex. 19, ECF No. 68-21. Moreover, as District Defendants note, Mrs. Sherrod's refusal to accompany Detective McHugh to the police station after the search further indicates that she understood her rights. Vashti Sherrod Dep. 155:15–22.

However, the Sherrods contend that considering their "advanced age," their fear of arrest, Mr. Sherrod's blindness, and Detective McHugh's threat that he would seize the Sherrods' car if Mrs. Sherrod did not consent to the search, their consent was coerced, not voluntary. Pls. Opp'n

at 46–47 (citing Vashti Sherrod Dep. at 149:10–13); *see also* Dep. of Eugene Sherrod at 59:17–20, Pls. Opp'n Ex. 6, ECF No. 76-9.  Courts in this jurisdiction have held that a show of force by the police may render consent involuntary, particularly when the individual whose consent is sought is susceptible to coercion.  *See United States v. Maragh*, 756 F. Supp. 18, 22–23 (D.D.C. 1991) (holding that consent was coerced when given by a young, foreign-born individual in the presence of three officers, one of whom was "formidable").  Verbal threats by the officer seeking consent may also render that consent involuntary.  *See United States v. Holmes*, 505 F.3d 1288, 1295 (D.C. Cir. 2007) (holding that search consent was involuntary where the officers seeking consent informed the plaintiff that they had the authority to arrest him if he did not consent); *Jones v. Unknown Agents of FEC*, 613 F.2d 864, 879–80 (D.C. Cir. 1979) (holding that a 59-year-old retiree with "a serious heart condition" did not voluntarily give consent when an FEC agent threatened to seize his home and imprison him).

In light of this well-established case law, and taking the Sherrods' alleged circumstances into account, a reasonable jury could conclude that the presence of multiple officers with weapons, combined with Detective McHugh's "implication" that the Sherrods only prayer for keeping their vehicle was to consent to the search, created a "coercive situation" rendering consent involuntary.  *Holmes*, 505 F.3d at 1295; *see United States v. Washington*, 387 F.3d 1060, 1076 (9th Cir. 2004) ("[The officer's] repeated reminders to [the plaintiff] that the officers could arrest him at any time, in our view, appear to have been given as a tactic to coerce [the plaintiff] into consenting to the search of his room.").  Moreover, it is clearly established that such a coercive situation would violate the Sherrods' constitutional rights.  *Holmes*, 505 F.3d at 1295; *Jones*, 613 F.2d at 879–80.  Accordingly, Detective McHugh would not be entitled to qualified immunity if the jury accepts the Sherrods' account.

"At the summary judgment stage, qualified immunity will not protect a government official from trial when there is a dispute of material fact in the record." *Gudger v. District of Columbia*, No. 14-576, 2015 WL 9047831, at *2 (D.D.C. Dec. 16, 2015) (citing *Holcomb v. WMATA*, 526 F. Supp. 2d 20, 22 (D.D.C. 2007)); *see also Gainor v. Rogers*, 973 F.2d 1379, 1385 (8th Cir. 1992) ("the defense of qualified immunity shielding the defendant from trial must be denied . . . [because] it is impossible for the court to determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law."). Here, because there is a dispute of fact regarding the circumstances under which the Sherrods consented to Detective McHugh's car search, the Court cannot determine whether Detective McHugh's actions violated the Sherrods' clearly established constitutional rights. The Court therefore denies District Defendants' motion on Counts I and III insofar as those Counts cover Detective McHugh's search of the Sherrods' car.

### 3. Claims Related to the Home Search

The Court next addresses the Sherrods' claims arising from the search of their home on July 7, 2015. The Sherrods claim that their rights were violated both during the initial breach of their front door and during the subsequent search. Having reviewed the record and the parties' briefing, the Court concludes that the Sherrods' constitutional rights were not violated during the officers' entrance into their home, but a reasonable jury may rule in the Sherrods' favor on their claims arising from Detective McHugh's search of their home.

### a. Initial Breach

In their opposition brief, the Sherrods claim that "Detective McHugh violated the Sherrods' Fourth Amendment rights by executing the search warrant in a constitutionally unreasonable manner." Pls. Opp'n at 41. The Sherrods' complaint, however, does not make

clear that they are asserting an excessive force claim in addition to their unlawful search and seizure claims. *See generally* SAC. In this Circuit, dismissal of a claim may be appropriate where the complaint is "unclear or . . . fail[s] to give the defendants fair notice of the claim[] against them." *Ciralsky v. CIA,* 355 F.3d 661, 670 (D.C. Cir. 2004). While dismissal is appropriate here for that reason alone, District Defendants address the claim on its merits in their reply brief, and the Court will too. The Court concludes that even if the Sherrods properly raised an excessive force claim, Detective McHugh would be entitled to qualified immunity because the initial breach of the Sherrods' home did not violate their clearly established constitutional rights.[6]

A search may violate the Fourth Amendment, and therefore give rise to a valid 42 U.S.C. § 1983 claim, if the use of force during that search was objectively unreasonable. *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (citing *Saucier v. Katz*, 533 U.S. 194, 207 (2001)); *accord Hall v. District of Columbia*, 867 F.3d 138, 157 (D.C. Cir. 2017). In conducting this analysis, courts must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). The Court must pay "careful attention to the facts and circumstances of [the] particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Hall*, 867 F.3d at 157 (internal

---

[6] Again, the Court's qualified immunity analysis requires a two-pronged inquiry to determine "(1) whether the facts in the record show the officers' conduct violated a constitutional right, and if so, (2) whether the constitutional right was clearly established at the time of the incident." *Corrigan*, 841 F.3d at 1029.

citations and quotation marks omitted) (quoting *Johnson v. District of Columbia*, 528 F.3d 969, 974 (D.C. Cir. 2008)).  "An officer's act of violence violates the Fourth Amendment's prohibition against unreasonable seizures if it furthers no governmental interest, such as apprehending a suspect or protecting an officer or the public."  *Johnson*, 528 F.3d at 976.

The Sherrods and District Defendants dispute whether Detective McHugh can be liable for excessive force used during a breach that he may not have directly participated in.  The Court need not address that issue, however, because it concludes that the facts set forth by the Sherrods do not rise to the level of unconstitutionally excessive force.  Those facts, taken in the light most favorable to the Sherrods, are as follows.

The Prince George's County Police Department, in consultation with Detective McHugh and considering the Sherrods' age, determined that the search should be carried out by a smaller team of officers rather than the SWAT team normally utilized for weapons searches.  McHugh Dep. 208:16–209:10.  The team arrived at the Sherrods' home around dusk, as it was beginning to get dark.  Vashti Dep. 166:19.  To alert the Sherrods of their presence, the team rang the Sherrods' doorbell at least twice, pounded on their back door, and activated the police lights on their cars in front of the Sherrods' home.  Vashti Dep. 166:20–169:20, 171:4–172:19, 181:9–182:8; McHugh Dep. 207:11–208:1, 209:21–22.  The team also called the Sherrods multiple times, although the Sherrods claim that they did not hear the phone ringing because they kept their cellphones in another room and did not keep a house phone in their bedroom.  Vashti Dep. 170:8–16; McHugh Dep. 210:15–21.  Finally, after half an hour, the team breached the Sherrods' front door and announced their presence with guns drawn.  Vashti Dep. 171:4–5, 185:7–186:1; McHugh Dep. 212:2–213:1.  The officers directed the Sherrods downstairs with their hands on their heads, and they handcuffed Mr. Sherrod while they secured the house.  Vashti Dep. 186:3–

7; McHugh 212:22–213:1. They then released Mr. Sherrod's handcuffs and directed the Sherrods to stay on the sofa while they conducted the search. Vashti Dep. 188:2–8; McHugh 213:8–18.

It was not constitutionally unreasonable for the officers searching the Sherrods' home to announce themselves and then breach the door with weapons drawn. "In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." *Los Angeles Cty. v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Muehler v. Mena,* 544 U.S. 93, 98–100 (2005)). To secure a home, particularly when officers suspect that the home contains weapons, the officers are entitled to brandish their guns while exercising "unquestioned command of the situation." *Id.* at 615*; see Croom v. Balkwill*, 645 F.3d 1240, 1252–53 (11th Cir. 2011) (holding that it was not unreasonable for officers to push an elderly woman to the ground "and hold[] her there with a foot . . . in the back for up to ten minutes" while the officers secured a home to be searched). Given the circumstances here, the officers reasonably took "immediate steps to secure their own safety by establishing control at the outset of a surprise search for . . . weapons formally authorized by a warrant issued by a judicial officer." *Wright v. United States*, No. 95-0274, 1996 WL 34401516, at *6 (D.D.C. Feb. 8, 1996) (holding that it was not unreasonable for officers to breach the plaintiffs' bedroom door, handcuff them, push them, and hold guns to their heads while initially securing a home pursuant to a search warrant). The Sherrods do not contend that the officers ever pointed guns *at them*, and they do not contend that the officers continued to brandish their guns once the home was secure.

Moreover, while handcuffing can in certain circumstances support an excessive force claim, Mr. Sherrod's handcuffing here was not unreasonable given that he was only handcuffed

while the officers secured the home and the handcuffs were released during the officers' search. *See Pitts*, 177 F. Supp. 3d at 377–79 (holding that it was not unreasonable for officers to handcuff a "frail and disabled" plaintiff who was not suspected of committing a crime, "particularly given that the need to ensure the officers' safety was heightened in light of the fact that they were searching for guns and gun-related accessories"); *United States v. Brinson-Scott*, 714 F.3d 616, 619–21 (D.C. Cir. 2013) (holding that it was not unreasonable for officers to handcuff an individual for the duration of a home search for guns, to ensure officers' safety during the search). Cases in which handcuffing has been found to violate the Fourth Amendment involved far more aggressive action than that taken here. *Turmon v. Jordan*, 405 F.3d 202, 207–08 (4th Cir. 2005) (holding that it was unreasonable to handcuff a suspect for an extended period at gunpoint where the suspect was compliant and there was no evidence that the suspect posed a danger to police); *Nelson v. District of Columbia*, 953 F. Supp. 2d 128, 131–32 (D.D.C. 2013) (holding that it was unreasonable to handcuff the plaintiff for two hours after verifying that she was unarmed and alone in the house). The Sherrods have not identified any case law involving circumstances similar to those here in which handcuffing was found to violate the Fourth Amendment. The Court therefore holds that no reasonable jury could conclude that Detective McHugh used excessive force or caused it to be used, and Detective McHugh is thus entitled to qualified immunity. The Court grants District Defendants' motion for summary judgment on Counts I and III insofar as those Counts cover the breach of the Sherrods' home.

### b. Detective McHugh's Search

The Sherrods also claim that Detective McHugh unconstitutionally seized the Sherrods and searched their home without probable cause. SAC ¶¶ 38–41, 60, 71. As with the car search, the parties do not dispute that the search of the Sherrods' home was subject to Fourth

Amendment protection. Furthermore, as noted above, "a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions'" that District Defendants do not contend were present with respect to Detective McHugh's search. *Schneckloth*, 412 U.S. at 219.

District Defendants argue that Detective McHugh cannot be liable for any violations related to the search of the Sherrods' home because the search was conducted by the Prince George's County Police Department pursuant to a warrant supported by probable cause. Defs. Mem. at 36–37. However, Detective McHugh himself has admitted that he participated in the search, *See* McHugh Dep. 212:14–220:16; Pls. Opp'n at 22–23, and, as discussed above, there is a question of fact regarding whether Detective McHugh's affidavit rendered the search warrant invalid. If the search warrant was invalid, it is clearly established that the search violated the Sherrods' constitutional rights, *Schneckloth*, 412 U.S. at 219, and that "because [Detective McHugh] himself prepared the invalid warrant, he may not argue that he reasonably relied on the [judge's] assurance that the warrant" established probable cause. *Groh*, 540 U.S. at 564. Accordingly, Detective McHugh is not entitled to qualified immunity on the Sherrods' claims arising from the search of their home, and the Court denies District Defendants' motion on Counts I and III insofar as those Counts cover the search of the Sherrods' home.

### 4. Claims Related to Mrs. Sherrod's Arrest

Finally, the Court addresses the Sherrods' claims arising from Mrs. Sherrod's arrest and her release after the grand jury failed to return an indictment. The Sherrods claim that Mrs. Sherrod's arrest was unconstitutional and that the grand jury's failure to return an indictment renders Detective McHugh liable for malicious prosecution. The Court agrees regarding Mrs.

Sherrod's arrest, but it concludes that Detective McHugh is entitled to qualified immunity from the malicious prosecution claim.

*a. The Arrest*

The Sherrods claim that Detective McHugh unconstitutionally arrested Mrs. Sherrod. SAC ¶¶ 60. More specifically, they claim that Mrs. Sherrod's constitutional rights were violated when she surrendered to Detective McHugh after the issuance of an arrest warrant based on Detective McHugh's allegedly false or misleading affidavit. SAC ¶ 60; Vashti Sherrod ROG at 20–21. As discussed above, the Fourth Amendment prohibits "searches and seizures . . . without a [valid] warrant," *Groh*, 540 U.S. at 558–59.

District Defendants contend that Detective McHugh is entitled to qualified immunity because Mrs. Sherrod's arrest was authorized by a warrant supported by probable cause. Defs. Mem at 32–35. However, as noted, a reasonable jury could conclude that Detective McHugh recklessly or intentionally mischaracterized the security video in his arrest warrant affidavit, rendering the warrant invalid and violating Mrs. Sherrod's constitutional rights. Moreover, "it is clearly established that '[p]olice officers cannot, in good faith, rely on a judicial determination of probable cause when that determination was premised on an officer's own material misrepresentations to the court.'" *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015) (quoting *Gregory v. City of Louisville,* 444 F.3d 725, 758 (6th Cir. 2006)); *see also Franks*, 438 U.S. at 155–56. Accordingly, qualified immunity is again unavailable to Detective McHugh and the Court denies District Defendants' motion for summary judgment on Counts I and III insofar as those Counts cover Mrs. Sherrod's arrest and subsequent temporary detention.

*b. Malicious Prosecution*

The Sherrods also claim that Detective McHugh is liable for constitutional malicious prosecution arising from Mrs. Sherrod's arrest and its aftermath.  SAC ¶ 66.  To support a malicious prosecution claim under 42 U.S.C. § 1983, "a plaintiff must plead facts establishing (1) that the defendant instituted or continued a criminal proceeding against the plaintiff; (2) that the proceedings terminated in favor of the plaintiff; and (3) that a predicate constitutional violation occurred as a result of the proceedings."  *Turpin v. Ray*, No. 17-2543, 2018 WL 3404149, at *7 (D.D.C. July 12, 2018) (citing *Mehari v. District of Columbia*, 268 F. Supp. 3d 73, 81–82 (D.D.C. 2017)); *see also Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998) (holding malicious prosecution actionable under § 1983 if there is deprivation of liberty "accompanying the prosecution").  Put more simply, "malicious prosecution is actionable under the Fourth Amendment to the extent that the defendant's actions cause the plaintiff to be seized without probable cause."  *Pitt*, 491 F.3d at 510.

District Defendants appear to conflate the Sherrods' constitutional malicious prosecution claim with the Sherrods' common law malicious prosecution claim, arguing that the constitutional claim fails for two reasons: (1) Detective McHugh had probable cause to arrest Mrs. Sherrod; and (2) the Sherrods cannot prove malice.  Defs. Mem. at 38.  Malice is not an element of a constitutional malicious prosecution claim, *Pitt*, 491 F.3d at 510, and as noted a reasonable jury may conclude that Detective McHugh lacked probable cause to arrest Mrs. Sherrod.  However, because District Defendants also claim that Detective McHugh is entitled to

qualified immunity on this claim, Defs. Mem. at 37, the Court will address the claim in further detail.[7]

In evaluating whether Detective McHugh is entitled to qualified immunity, as discussed above the Court must first determine whether the claim arises from a constitutional violation. *Corrigan,* 841 F.3d at 1029. Unlike common law malicious prosecution or false arrest, constitutional malicious prosecution requires a deprivation of liberty above and beyond the mere institution of a criminal proceeding. For instance, in *Pitt*, the plaintiff was detained post-arrest for ten days in a halfway house against his will. 491 F.3d at 511. Similarly, in *Thorp v. District of Columbia*, the plaintiff was subjected to "burdensome" and "humiliating" pretrial conditions, including drug testing and weekly interviews with court officials, that the court deemed an unlawful seizure. 142 F.Supp.3d 132, 145–46 (D.D.C. 2015). On the other hand, in *Spiller v. District of Columbia*, the court held that the plaintiff's arrest and appearance in court alone were insufficient to satisfy the "modest" showing of restriction of liberty necessary for his constitutional malicious prosecution claim to survive a motion to dismiss. 302 F. Supp. 3d 240, 248 (D.D.C. 2018).

As the *Spiller* court noted, "[e]xactly what pretrial restrictions constitute 'seizures'" for purposes of a constitutional malicious prosecution claim is unclear. *Spiller*, 302 F. Supp. 3d at 246. However, other courts within this jurisdiction have held that relatively short periods of detention, combined with cumbersome pretrial conditions, are sufficient to state a constitutional malicious prosecution claim. *See Mehari*, 268 F. Supp. 3d at 81–82 (holding sufficient the plaintiff's allegations that he was detained for "several hours," was "seized and deprived of his

---

[7] District Defendants do not dispute that a criminal proceeding was instituted against Mrs. Sherrod, and that it was terminated in her favor.

liberty following his arraignment," and "was subjected to burdensome limitations on his freedom as a condition of his pretrial release"); *Demery v. Montgomery Cty.*, 602 F. Supp. 2d 206, 209, 212 (D.D.C. 2009) (holding that the plaintiff sufficiently asserted a constitutional malicious prosecution claim where he was jailed for several days, then released on 1,500 dollar bond before the charges were dropped); *see also Manuel v. City of Joliet*, 137 S. Ct. 911, 915, 918–19 (2017) (holding that the plaintiff sufficiently alleged constitutional malicious prosecution where he was held in pretrial detention for over two months based on false statements by police officers).

In light of this case law, the Court concludes that Mrs. Sherrod did not suffer an unlawful seizure, independent from her arrest, which could support a constitutional malicious prosecution claim. Viewing the facts in the light most favorable to the Sherrods, Mrs. Sherrod surrendered following the issuance of the arrest warrant, at which point she was fingerprinted, handcuffed, temporarily jailed, and then released the same day after a hearing before a magistrate judge. Vashti Sherrod ROG at 20–21; Defs. Mem. Ex. 18; Pls. Opp'n Ex. 14, Ex. 15. She does not allege that she was required to post a bond to obtain her release, that she was subjected to conditions of release other than the requirement that she attend a preliminary hearing, or that she was further detained before the grand jury refused to bring an indictment against her. While the deprivation of Mrs. Sherrod's liberty was slightly more intrusive than the mere arrest and release that the *Spiller* court found insufficient, 302 F. Supp. 3d 248–49, the intrusion did not rise to the level of a ten-day detention that this Circuit held supported a malicious prosecution claim in *Pitt*, 491 F.3d at 511, nor did it involve the invasive pretrial conditions supporting other constitutional malicious prosecution claims in this District. *See Mehari*, 268 F. Supp. 3d at 81–82.

Accordingly, because Detective McHugh did not commit a constitutional violation necessary to support a constitutional malicious prosecution claim or, at least, not one that was clearly established, he is entitled to qualified immunity. The Court thus grants District Defendants' motion for summary judgment on Count II.

### C. Common Law Claims Against District Defendants

Having addressed the Sherrods' constitutional claims, the Court now turns to the Sherrods' common law claims against District Defendants. The Sherrods assert the following claims: (1) assault; (2) false arrest and imprisonment; (3) malicious prosecution; (4) negligence; (5) negligent infliction of emotional distress; and (6) intentional infliction of emotional distress.[8] District Defendants argue that they are entitled to summary judgment on all of the claims. The Court will address each in turn.

### 1. Assault

First, the Court addresses the Sherrods' Count VII claim that Detective McHugh is liable for assault. SAC ¶¶ 91–94. As noted in this Court's prior memorandum opinion, "to successfully plead assault, a plaintiff must plausibly show that the defendant intentionally created 'an imminent apprehension of . . . a harmful or offensive . . . contact,' and that the plaintiff did indeed experience such an apprehension."[9] *Sherrod*, 2017 WL 627377, at *5 (quoting *Jackson v. District of Columbia*, 412 A.2d 948, 956 (D.C. 1980)); *accord Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007). A defendant acts intentionally if he knows

---

[8] The Sherrods argue that the District of Columbia is vicariously liable for Detective McHugh's actions taken in his capacity as an MPD officer. *See, e.g., Blakeney v. O'Donnell*, 117 F. Supp. 3d 6, 19 (D.D.C. 2015); SAC ¶ 152. District Defendants do not contest that theory of liability.

[9] The parties do not dispute that District of Columbia law applies to the Sherrods' common law causes of action.

with substantial certainty that a harmful or offensive apprehension will result from his action. *See Konah v. District of Columbia*, 915 F. Supp. 2d 7, 23 (D.D.C. 2013) (quoting Restatement (Second) of Torts § 18, cmt. e). A tortfeasor may intentionally create such an apprehension through the actions of a third party. *See* Restatement (Second) of Torts § 25, cmt.; *accord Judah v. Reiner*, 744 A.2d 1037, 1042 n.8 (D.C. 2000).

While these principles govern assault generally, "a police officer is privileged to use force so long as the 'means employed are not in excess of those which [he] reasonably believes [are] necessary.'" *Rogala v. District of Columbia*, 161 F.3d 44, 57 (D.C. Cir. 1998) (quoting *Etheredge v. District of Columbia,* 635 A.2d 908, 916 (D.C. 1993)). The officer's judgment is to be reviewed "from the perspective of a reasonable officer on the scene," with allowance for the officer's need to make quick decisions under potentially dangerous circumstances. *Etheredge*, 635 A.2d at 916 (quoting *Graham v. Connor,* 490 U.S. at 396–97). This standard is similar to the excessive force standard applied in the 42 U.S.C. § 1983 context. *See id.* at 915 n.10.

The Sherrods allege that they were assaulted when "Defendant McHugh and/or police officers acting on his behalf and/or direction" (1) "pointed shotguns at Plaintiffs who sat terrified in their car"; and (2) "kicked down the door to Plaintiffs' home in the middle of the night, without first announcing themselves and allowing Plaintiffs the opportunity to answer, in order to execute a search warrant that Defendant McHugh knew, or should have known, was invalid." Pls. Opp'n at 51–52; SAC ¶¶ 91–92. District Defendants' summary judgment briefing regarding the Sherrods' assault claims is cursory, to say the least. They do not at all address the Sherrods'

allegation that they were assaulted during the stop and search of their car.[10]  *See* Pls. Opp'n at

52.  As to the Sherrods' allegation that they were assaulted during the search of their home,

District Defendants argue that (1) the search was conducted pursuant to a warrant based on

probable cause; and (2) "Detective McHugh did not execute nor direct the forced entry of the

Sherrods' front door."  Defs. Mem. at 40.  Neither of these points entitle District Defendants to

summary judgment.

First, as discussed above, the existence of probable cause in this case turns on a factual

issue that must be resolved by the jury.  Furthermore, even if the warrant authorizing the search

of the Sherrods' home was supported by an accurate affidavit indicating probable cause, the

officers involved in that search, including Detective McHugh, still could have committed an

assault.  *See Hall v. District of Columbia*, 73 F. Supp. 3d 116, 121 (D.D.C. 2014) (evaluating the

plaintiffs' claims for assault and battery arising from an arrest, having already held that the

officers had probable cause to make the arrest); *Jackson*, 412 A.2d at 955 ("Even though the

arrest was lawful, a claim for assault and battery may be established if excessive force was used

to maintain the arrest.").

Second, in its prior Memorandum Opinion, this Court rejected District Defendants'

argument that Detective McHugh could not be liable for assault as a matter of law because he did

not personally breach the Sherrods' front door with his gun drawn.  As the Sherrods correctly

note, Pls. Opp'n at 53, the Court explained that "if a defendant acts knowing with substantial

certainty that his actions will cause a third party to create the apprehension of imminent harmful

---

[10] An argument not raised in a movant's opening brief is waived.  *See New York v. EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005); *Verizon Tel. Cos. v. FCC*, 292 F.3d 903, 911–12 (D.C. Cir. 2002).

or offensive contact in another, he is liable for assault." *Sherrod*, 2017 WL 627377, at *5. In his

deposition, Detective McHugh stated that:

> PG County uses their SWAT team for every violent-crime-related warrant that they
> do. And they do just go knock on the door. If they don't get an answer, they knock
> down the door. They go in, body armor, helmets, flash bangs.

McHugh Dep. 208:20–209:3. While Detective McHugh also claimed that he "did not want [the

PG County police] to do that in this case," *id*. 209:4–5, a reasonable jury could infer from this

testimony that he knew that the home search was likely to be traumatizing to an elderly couple

such as the Sherrods. *See Konah*, 915 F. Supp. 2d at 23. Furthermore, Mrs. Sherrod testified

that the officers conducted the search late in the evening while the Sherrods "cowered inside

their home, suspecting a home invasion." Vashti Sherrod ROG at 18.

A reasonable jury could therefore conclude that Detective McHugh intentionally created

"an imminent apprehension of (a harmful or offensive) contact" through the actions of the Prince

George's County Police Department. *Jackson*, 412 A.2d at 956 (quoting Restatement (Second)

of Torts § 21(a)). A reasonable jury could also conclude that even if the Prince George's County

officers on the scene did not use unconstitutionally unreasonable force, Officer McHugh could

have committed an assault in initiating the search, given his knowledge of the security video.

*See Flythe v. District of Columbia*, 791 F.3d 13, 18 (D.C. Cir. 2015) (noting that at trial, the jury

found an officer liable for assault but not excessive force); *Qutb v. Ramsey*, 285 F. Supp. 2d 33,

51 (D.D.C. 2003) (holding that the defendant officer's "gratuitous" physical contact with the

plaintiff was not privileged, although it did not violate the Fourth Amendment). Finally, because

a reasonable jury could conclude that Detective McHugh acted unreasonably in seeking the

search warrant, he is not entitled to the common law privilege. *See Rogala*, 161 F.3d at 57.

Accordingly, the Court denies District Defendants' motion for summary judgment on the

Sherrods' assault claims.

## 2. Malicious Prosecution

Second, the Court addresses the Sherrods' claims in Counts VI and XIII that Detective McHugh and the District are liable for common law malicious prosecution arising from the arrest and prosecution of Mrs. Sherrod. SAC ¶¶ 87, 143. Under District of Columbia law, a plaintiff alleging malicious prosecution must prove (1) a criminal proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the proceeding; and (4) malice, defined as "a primary purpose in instituting the proceeding other than that of bringing an offender to justice."[11] *DeWitt v. District of Columbia*, 43 A.3d 291, 296 (D.C. 2012) (quoting *Jarett v. Walker*, 201 A.2d 523, 526 (D.C. 1964)); *see also Moore v. United States*, 213 F.3d 705, 710 (D.C. Cir. 2000). As District Defendants correctly note, "[l]ack of probable cause is an essential element [of a malicious prosecution claim] and a showing of probable cause is thus a valid defense which warrants a directed verdict for the defendants." Defs. Mem. at 61 (quoting *Ammerman v. Newman*, 384 A.2d 637, 639 (D.C. 1978)). Additionally, "[t]he determination of malice is 'exclusively for the factfinder,' and 'the requisite malice can be established from the existence of a willful, wanton, reckless, or oppressive disregard for the rights of the plaintiff.'" *Pitt*, 491 F.3d at 504 (quoting *Tyler v. Cent. Charge Serv., Inc.,* 444 A.2d 965, 969 (D.C. 1982)); *see Amobi*, 755 F.3d at 993 (noting that "it is axiomatic that malice may be presumed from the lack of probable cause").

Parroting their argument regarding the Sherrods' constitutional malicious prosecution claim, District Defendants argue that this claim fails for two reasons: (1) "Detective McHugh had probable cause to believe that Mrs. Sherrod assaulted Mrs. Schulz"; and (2) "Plaintiff cannot

---

[11] District Defendants do not dispute that a criminal proceeding was instituted against Mrs. Sherrod, and that it was terminated in her favor.

prove malice." Defs. Mem. at 62.[12]  The Sherrods counter that despite an "utter lack of probable

cause, Detective McHugh continued to pursue a criminal investigation of the Sherrods," and that

this "unfounded investigation culminated in Mrs. Sherrod's arrest pursuant to an invalid arrest

warrant," rendering Detective McHugh and the District liable for malicious prosecution.  Pls.

Opp'n at 49.  The Court concludes that a reasonable jury may agree with the Sherrods.

   As discussed above, under the Sherrods' version of events, Detective McHugh lacked

probable cause to search and arrest the Sherrods.  Furthermore, while the record may not directly

indicate that Detective McHugh acted with malice, the jury may infer it from the facts.  In *Pitt*,

for instance, evaluating a similar malicious prosecution claim against officers who submitted a

misleading warrant affidavit, the D.C. Circuit held that "a reasonable jury could have concluded

that [the defendant officers] acted with malice because the arrest report and the affidavit

submitted to prosecutors contained several material misstatements and omissions."  491 F.3d at

504.  In particular, the affidavit mischaracterized the timeline of events underlying the officers'

arrest of the plaintiff shortly after the crime was committed, and it failed to include information

suggesting that the plaintiff was not the perpetrator.  *Id*. at 504–05.

   Similarly, under the Sherrods' characterization of events here, Detective McHugh

repeatedly failed to note in his affidavits that the security video contradicted Ms. Schulz's

---

[12] District Defendants also make the conclusory argument that District Defendants "had no involvement in bringing criminal charges against Plaintiff."  Defs. Mem. at 61.  However, Detective McHugh drafted the complaint against Mrs. Sherrod, supplied the affidavit underlying Mrs. Sherrod's arrest warrant, and testified at her preliminary hearing.  Vashti Sherrod ROG at 19–21; Pls. Opp'n Ex. 24, ECF No. 76-27; Pls. Opp'n Ex. 25.  "'[A]ppearing in court and testifying and keeping the prosecution alive' creates a genuine issue of fact as to whether a defendant continued a malicious prosecution."  *Amobi*, 755 F.3d at 992 (quoting *Viner v. Friedman,* 33 A.2d 631, 632 (D.C.1943)); *see also Cousins v. Hathaway*, 2014 WL 4050170, at *11 (D.D.C. Aug. 15, 2014).  Moreover, the District may be held vicariously liable for Detective McHugh's involvement because it was undertaken while Detective McHugh acted within the scope of his employment.  *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007).

accusation and he repeatedly mischaracterized the timeline of events captured by the video, suggesting that Ms. Schulz took actions more consistent with having been threatened by a gun than what the video shows. *See* Defs. Mem. Ex. 14, Ex. 17. A reasonable jury could conclude that these misstatements and omissions indicate that Detective McHugh had a "reckless disregard" for Mrs. Sherrod, and therefore acted with malice. *Pitt*, 491 F.3d at 504. Accordingly, because the existence of probable cause here hinges on a dispute of fact, and because a reasonable jury may infer malice on the part of Detective McHugh, the Court denies District Defendants' motion for summary judgment on this claim.

### 3. False Arrest and False Imprisonment

Third, the Court addresses the Sherrods' claims in Counts IV, V, and XII that District Defendants are liable for common law false arrest and false imprisonment. SAC ¶¶ 76, 81, 133. To support a viable claim of false arrest, a plaintiff must allege that she was unlawfully detained. *See Dent v. May Dep't Stores Co.,* 459 A.2d 1042, 1044 (D.C. 1982) ("The gist of any complaint for false arrest or false imprisonment is an unlawful detention."). [13] The concept of "arrest" is substantially malleable, and "[c]onfinement, no matter how brief, suffices to establish a prima facie case of false arrest." *Marshall v. District of Columbia,* 391 A.2d 1374, 1381 (D.C. 1978). "The plaintiff must produce evidence showing 'a restraint against [his] will, as where [he] yields to force, to the threat of force or to the assertion of authority.'" *Dingle v. District of Columbia*, 571 F. Supp. 2d 87, 95 (D.D.C. 2008) (quoting *Faniel v. Chesapeake and Potomac Tel. Co. of Maryland,* 404 A.2d 147, 152 (D.C. 1979)).

---

[13] Under District of Columbia law, "'[f]alse arrest' is indistinguishable as a practical matter from the common law tort of 'false imprisonment.'" *Enders v. District of Columbia,* 4 A.3d 457, 461 (D.C. 2010).

"In actions for false arrest and false imprisonment, the central issue is whether the arresting officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting officer is privileged and the action fails." *Bradshaw*, 43 A.3d at 323 (quoting *Scott v. District of Columbia,* 493 A.2d 319, 321 (D.C. 1985)). "A police officer may justify an arrest by showing that he or she had probable cause, in the constitutional sense, to make the arrest." *District of Columbia v. Murphy,* 631 A.2d 34, 36 (D.C. 1993). However, the officer "need not demonstrate probable cause in the constitutional sense . . . it will suffice if the officer can demonstrate that (1) he or she believed, in good faith, that his [or her] conduct was lawful, and (2) this belief was reasonable." *Id.* (alterations in original) (citation and internal quotation marks omitted); *see also Minch v. District of Columbia,* 952 A.2d 929, 937 (D.C. 2008) ("The Metropolitan Police Department is immune from claims for both false arrest and false imprisonment if it can affirmatively demonstrate either that probable cause existed to arrest or that the arresting officer believed, reasonably and in good faith, that probable cause existed.").

District Defendants argue that Detective McHugh is immune from these claims under the qualified privilege defense because "Detective McHugh had a good faith belief that his conduct was lawful under the facts and circumstances he faced, probable cause existed to arrest the Plaintiff Vashti Sherrod, and he did not arrest Plaintiff Eugene Sherrod."[14]  Defs. Mem at 39–40.

_____

[14] Under District of Columbia law, an arrest occurs "where a show of authority or actual force by an officer would lead a reasonable person to conclude he was not free to leave." *In re D.T.B.*, 726 A.2d 1322, 1235 (D.C. 1999) (citing *In re J.M.*, 619 A.2d 497, 500 (D.C. 1992); *Johnson v. United States,* 468 A.2d 1325, 1327 (D.C.1983)).  During the search of the Sherrods' home, in which Detective McHugh participated, Mr. Sherrod was allegedly handcuffed, surrounded by officers with guns drawn, and not free to leave.  Vashti Sherrod ROG at 18; McHugh Dep. 213:19–20.  A reasonable jury could conclude, on the basis of these facts, that Detective McHugh arrested Mr. Sherrod.  *See In re D.T.B.*, 726 A.2d at 1234–36 (holding that the appellant had been seized where an officer, with a service firearm at his waist, blocked the only exit to a room and ordered the appellant, in a "stern voice," to "come here"); *Scott v.*

The Sherrods respond that whether Detective McHugh "reasonably could have believed that there was probable cause to arrest" the Sherrods, and is therefore entitled to the qualified privilege defense, "is inherently an issue of fact for the jury to decide." Pls. Opp'n at 50–51. The Sherrods are correct again.

If there is a dispute regarding the key facts underlying a probable cause determination, courts typically conclude that they cannot make a qualified privilege determination at the summary judgment stage. For instance, in *Bradshaw*, the District of Columbia Court of Appeals evaluated whether a defendant officer was entitled to the qualified privilege, where the officer gave conflicting testimony regarding whether he was told *before* he arrested the plaintiff that the plaintiff had committed a crime. 43 A.3d at 325–26. The District of Columbia Court of Appeals concluded that "we cannot say as a matter of law either that the [witness's] communication gave [the officer] probable cause to believe that [the plaintiff] had committed an arrestable offense, or that the inference (if that is what it was) that [the officer] drew from the [witness's] statement or 'motion'—the inference that [the plaintiff] had tried to fight another patron—was a reasonable one." *Id*. at 327; *see Amobi*, 755 F.3d at 991 (holding that the defendant officers who misstated the information underlying the plaintiff's arrest warrant were not entitled to summary judgment because "[f]ailing to disclose . . . material facts evinces a lack of good faith"); *Mazloum v. District of Columbia Metro. Police Dep't,* 576 F. Supp. 2d 25, 34–35 (D.D.C. 2008) ("The jury, then, might reasonably have decided that—given the facts known to the officers at the time (as construed by the jury)—the officers could not have credibly determined that [the plaintiff] . . . had committed or was about to commit a crime.").

---

*District of Columbia*, 101 F.3d 748, 754 (D.C. Cir. 1996) (holding that the plaintiff had been arrested for purposes of a false arrest claim when the officers "had handcuffed him and placed him in a secure transport vehicle; in no sense was he free to leave").

This case law dictates that the jury is entitled to weigh in on Detective McHugh's entitlement to the qualified privilege defense. As discussed above, a reasonable jury could conclude that the security video contradicted Ms. Schulz's allegation, and that Detective McHugh mischaracterized the video in his search and arrest warrant affidavits. Failing to properly characterize the video, a material aspect of the probable cause determination, "evinces a lack of good faith" on Detective McHugh's part. *Amobi*, 755 F.3d at 991. Because at this stage the Court cannot determine as a matter of law that Detective McHugh had "probable cause to believe that [Mrs. Sherrod] had committed an arrestable offense, or that the inference (if that is what it was) that [Detective McHugh] drew from the [security video] . . . was a reasonable one," it must deny District Defendants' motion for summary judgment on the false arrest and imprisonment claims. *Bradshaw*, 43 A.3d at 327.

### 4. Negligence

Fourth, the Court addresses the Sherrods' claims in Counts VIII and XIV that District Defendants are liable for negligence. SAC ¶ 100–103, 150–152. Under District of Columbia law, "[t]he plaintiff in a negligence action bears the burden of proof on three issues: 'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Butera v. District of Columbia*, 235 F.3d 637, 659 (D.C. Cir. 2001) (quoting *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988)). To prove that a defendant deviated from the standard of care, a plaintiff must "put on expert testimony to establish what that standard of care is if the subject in question is so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson." *Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C. 1995) (quoting *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987)). In cases involving

allegations of police misconduct, including "excessive use of force, the applicable standard of care is that of a reasonably prudent police officer." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 29 (D.D.C. 2011) (citing *Smith v. District of Columbia,* 882 A.2d 778, 788 (D.C. 2005)). "Expert testimony to establish the applicable standard of care is required in such cases because '[t]he applicable standard of care in cases of this kind is beyond the ken of the average lay juror.'" *Id.* (quoting *Etheredge*, 635 A.2d at 917).

To establish a national standard of care, an expert must do more than rely on his own experience or "simply . . . declare that the District violated the national standard of care." *Butera*, 235 F.3d at 659 (quoting *Clark v. District of Columbia,* 708 A.2d 632, 635 (D.C. 1997)) (internal quotation marks omitted). Rather, the expert "must refer to commonly used police procedures, identifying specific standards by which the jury could measure the defendant's actions." *Id.* (citing *Scott*, 101 F.3d at 758); *Doe v. Dominion Bank of Washington,* 963 F.2d 1552, 1563 (D.C. Cir. 1992); *Phillips v. District of Columbia,* 714 A.2d 768, 775 (D.C. 1998)); *see also Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 95–96 (D.D.C. 2015). In so doing, however, the expert need not "enumerate the facilities across the country at which that standard is in effect." *District of Columbia v. Wilson,* 721 A.2d 591, 599 (D.C. 1998).

District Defendants argue that they are entitled to summary judgment on these claims because the Sherrods have failed to establish a standard of care and have failed to establish a breach of that standard. Defs. Mem. at 40–43. While the Sherrods have submitted an expert report by Dr. Phillip Hayden, as required to establish the standard of care in a typical police negligence case, District Defendants argue that the report is so deficient that the Court should

disregard it. *Id.*[15] District Defendants also argue that the Sherrods cannot show that Detective McHugh "deviat[ed] from the appropriate" standard of care. Defs. Mem. at 43. Having considered the case law and the Sherrods' expert report, the Court concludes that the report meets the criteria necessary to establish the applicable standard of care, and that a reasonable jury could conclude that Detective McHugh breached that standard in certain respects during the investigation. The Court therefore denies District Defendants' motion with respect to the negligence claims.

### a. Reliance on Policies and Procedures

First, District Defendants challenge Dr. Hayden's reliance on certain policies and procedures in formulating his report. Specifically, they challenge Dr. Hayden's reliance on (1) the International Association of Chiefs of Police ("IACP") Concepts and Issues Papers; (2) certain IACP model policies; and (3) MPD policies, including its General Orders. Defs. Mem. at 45–47. District Defendants argue that none of these sources are sufficient to establish a standard of care against which Detective McHugh's actions may be compared. *Id.* Predictably, the Sherrods argue that "[g]iven the numerous concrete bases for his expert testimony, under District of Columbia law, Dr. Hayden's analysis of the policies of police departments nationwide and the model policies of the IACP is sufficient to establish the national standard of care." Pls. Opp'n at 60–61 (internal quotation marks and citation omitted).

The Court concludes that Dr. Hayden's report, while rather cursory, sufficiently establishes a standard of care for Detective McHugh's investigation. The Sherrods have

---

[15] District Defendants argue both that Dr. Hayden's report is insufficient to establish the elements of the Sherrods' negligence claim, and that it should be excluded as inadmissible under Federal Rule of Evidence 702. Defs. Mem. at 42–43. Because the Sherrods make certain similar arguments in their motion to exclude District Defendants' expert report, the Court will discuss those arguments together below.

presented Dr. Hayden as an expert based on his forty-eight years of law enforcement experience,

which included experience as a SWAT commander and as a police tactics instructor. Hayden

Report at 3, Defs. Mem. Ex. 21, ECF No. 68-23. Rather than relying on this experience in the

abstract to proffer a national standard of care, Dr. Hayden set forth concrete bases for his expert

testimony: his review of the MPD's General Orders, his consultation with personnel from

hundreds of law enforcement agencies, and his assessment of

> the principles of police practices, policies, and procedures as thoroughly discussed
> by several national law enforcement organizations, including: The IACP, Federal
> Bureau of Investigation the Force Science Research Center, the National Officer
> Tactical Association, the Commission on Accreditation for Law Enforcement
> Agencies, Inc., the Institute for the Prevention of In-Custody Deaths, Inc. and
> Americans for Effective Law Enforcement.

Hayden Report at 2–3. *See Butera,* 235 F.3d at 660 (holding that the plaintiff's expert

established a national standard of care where he relied on "his consultation with police officers in

Prince George's County, his review of the MPD's General Orders, and his examination of the

U.S. Department of Justice Drug Enforcement Administration Handbook and Manual, and the

Narcotics Investigators' Manual of the Institute of Police Technology and Management,

University of North Florida, which provides training for police officers.").

District Defendants' arguments to the contrary are again conclusory. They challenge Dr.

Hayden's reliance on certain IACP model policies as being not reflective of actual police

practice, Defs. Mem. at 43–45, but Dr. Hayden's report and declaration make clear that Dr.

Hayden concluded that the model policies were substantially similar to policies adopted by a

number of law enforcement agencies throughout the United States.[16] Decl. of Philip Hayden

---

[16] Moreover, District Defendants' expert, Lewis R. Hicks, also relies on IACP policies.
*See* Pls. Mot. Limine Exclude Trial Testimony Lewis R. Hicks ("Hicks Mem.") Ex. A at 8, ECF
No. 65-3.

("Hayden Dec.") ¶ 6–9, ECF No. 76-15. District Defendants cite one case with respect to the IACP policies, and that case supports the proposition that such policies may be used to establish a standard of care. *See Hetzel v. United States*, No. 91-2986, 1993 WL 294794, *3–4 (D.D.C. June 1, 1993). Furthermore, District Defendants concede that MPD General Orders "may have some bearing on the applicable standard of care," particularly where, as here, they are not relied upon exclusively. Defs. Mem. at 46–47; *see also Dormu*, 795 F. Supp. 2d at 29 (holding that "internal guidelines and policies do not establish a standard of care . . . but may properly be received in evidence as bearing on the standard of care" (citations and internal quotation marks omitted)). District of Defendants' sufficiency challenge fails.

### b. Reliance on Dr. Klotz's Report

Second, District Defendants challenge Dr. Hayden's reliance on a report by Robert Klotz, the Sherrods' previous police practices expert. Defs. Mem. at 43–45. They claim that such reliance is improper under Federal Rule of Evidence 703, which authorizes an expert to rely on information that is otherwise inadmissible in evidence only if it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Id.* at 44 (quoting *In re A.B.*, 999 A.2d 36, 42 (D.C. 2010)); *see also* Fed. R. Evid. 703. According to District Defendants, "neither Mr. Klotz nor his report" are the types of information that Dr. Hayden may rely upon under Rule 703. However, they cite only one District of Columbia Court of Appeals case in support of this rather conclusory argument, *In re A.B.*, and that case supports, rather than undercuts, Dr. Hayden's citations to Dr. Klotz's findings.

In *In re A.B.*, the District of Columbia Court of Appeals considered whether a doctor lacking expertise in genetics could rely on a geneticist's report in rendering an opinion on whether an individual suffered from a genetic disorder. 999 A.2d at 41. In allowing the expert's

reliance on the geneticist, the court noted that the expert was sufficiently qualified to opine on the genetics issue on her own, despite her lack of specialization, and that while an expert "is not permitted to be the [mere] mouthpiece of [an expert] in a different specialty," in most cases "objections to the reliability of out-of-court material relied upon by [an expert witness] will be treated as affecting only the weight, and not the admissibility, of the evidence." *Id.* at 43 (citations and internal quotation marks omitted).

Similarly, here, District Defendants have not sufficiently demonstrated that Dr. Hayden's report is "the mere mouthpiece" of Dr. Klotz. District Defendants do not challenge Dr. Hayden's qualifications to render his own opinion on Detective McHugh's practices. *See generally* Defs. Mem. They also "overstate[] the extent to which [Dr. Hayden] relied on [Dr. Klotz's] findings," *In re A.B.*, 999 A.2d at 41, as Dr. Hayden cites Mr. Klotz's report only three times in his nine-page report, and two of those citations appear to merely be in support of his independent opinion. *See* Hayden Report at 3, 4. These citations do not raise a question of whether Dr. Hayden "lacks an adequate foundation for [his] opinion apart from the judgment of the other expert," *In re A.B.*, 999 A.2d at 41, and the Court therefore declines to strike Dr. Hayden's report on these grounds.[17]

---

[17] District Defendants also argue, with no legal support, that "any reference to the opinions held by Mr. Klotz should be excluded under Rule 403 because its probative value is outweighed by the unfair prejudice to the Defendants who had no opportunity to depose Mr. Klotz." Defs. Mem. at 44–45. Because Dr. Hayden merely cites Dr. Klotz's report in support of his own opinions, rather than as independent evidence, and because the Defendants have had the opportunity to depose Dr. Hayden, the Court fails to see how those citations prejudice the Defendants. *See Dormu*, 795 F. Supp. 2d at 28 n.16 (holding that a party's late-filed affidavit did not prejudice the opposing party because it "sets forth references, not new opinions, and therefore does not blindside defendants with new information"). The Court therefore declines to exclude Dr. Hayden's citations to Dr. Klotz's report. But that is not to say that Dr. Klotz's report itself would be admissible at trial.

### c. Dr. Hayden's Opinions

Third, failing to successfully argue that Dr. Hayden's report does not establish the standard of care, District Defendants argue that Dr. Hayden's report "offers opinions that have no relevance to the claims in this case, are based on misleading factual scenarios, lacks a factual basis, represents his personal opinions, and are purely speculative." Defs. Mem. at 47. In other words, District Defendants argue that "[Dr.] Hayden fails to meet his burden of proving that Det. McHugh's conduct during his criminal investigation deviated from the standard of care relating to police practices." Defs. Mem. at 47. As explained in further detail below, in the Court's discussion of the Sherrods' motions in limine, these arguments go to the weight of Dr. Hayden's testimony rather than its admissibility. They are not appropriate for the summary judgment stage.[18]

A reasonable jury may conclude that Detective McHugh should have known that the security video contradicted Ms. Schulz's allegation, or at the very least that the video warranted additional investigatory steps before Detective McHugh searched the Sherrods' car and home and arrested Mrs. Sherrod. The jury may credit Dr. Hayden's testimony in reaching this conclusion, or it may discount Dr. Hayden's testimony in favor of District Defendants' expert. Either way, the jury is "the arbiter of disputes between conflicting opinions" and "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo*

---

[18] That said, as discussed in further detail below, because Detective McHugh acted constitutionally in issuing the car stop bulletin, District Defendants are entitled to summary judgment on the Sherrods' assertion that Detective McHugh was negligent in issuing the bulletin without "good cause." Hayden Report at 7.

*v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). District Defendants are not entitled to summary judgment merely because they disagree with Dr. Hayden's conclusions.

### 5. Negligent Infliction of Emotional Distress

Fifth, the Court assesses the Sherrods' claims in Counts IX and XV that District Defendants are liable for negligent infliction of emotional distress ("NIED") arising from the car stop, home search, and arrest of Mrs. Sherrod. SAC ¶¶ 108–17, 154–62. To state a cognizable NIED claim under District of Columbia law, a plaintiff must show that (1) the plaintiff was in a zone of physical danger; (2) which was created by the defendant's negligence; (3) the plaintiff feared for her own safety, and (4) the plaintiff's emotional distress was serious and verifiable.[19] *See Rice v. District of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011). For plaintiffs to be in the zone of physical danger, a defendant must have "*actually* expose[d] them to danger.*" *Arias v. DynCorp*, 752 F.3d 1011, 1018 (D.C. Cir. 2014) (citing *Williams v. Baker*, 572 A.2d 1062, 1064 (D.C. 1990)).

Considering the "strong public policy considerations [that] counsel against imposing 'virtually infinite liability' for negligent conduct," the "zone of danger" test is stringent. *Mackey v. United States*, 8 F.3d 826, 831 (D.C. Cir. 1993) (quoting *Cauman v. George Washington Univ.*, 630 A.2d 1104, 1107 (D.C. 1993)). That said, showing reasonable fear for one's safety suffices to satisfy the "zone of danger" element. *See Asare v. LM-DC Hotel, LLC*, 62 F. Supp. 3d 30, 35 (D.D.C. 2014). Such a fear may be based upon "a high risk . . . of physical impact." *Golden v. World Sec. Agency, Inc.*, 884 F. Supp. 2d 675, 697 (N.D. Ill. 2012). "A classic example is that of the reckless driver who speeds by a pedestrian, missing her by only inches."

---

[19] District Defendants do not dispute that the Sherrods suffered serious and verifiable emotional distress.

*Arias*, 752 F.3d at 1017.  In the context of false arrests, depending on the circumstances of the arrest "[a] reasonable jury could . . . conclude[] . . . that . . . [an officer's] negligent conduct in effecting [a] false arrest . . . create[s] a zone of danger and caused [the arrestee] to fear for [the arrestee's] safety, resulting in emotional distress."  *David v. District of Columbia*, 436 F. Supp. 2d 83, 90 (D.D.C. 2006).

District Defendants argue that they are entitled to summary judgment on these claims because "Detective McHugh did not cause Plaintiffs' [sic] to be in fear of physical harm."  Defs. Mem. at 67.  More specifically, District Defendants contend that with respect to the car stop, Detective McHugh "did not direct the Capitol Police to approach the Sherrods with shot guns or their service weapons pointed at the car," and with respect to the home search, Detective McHugh "did not direct the actions of the Prince George's County police."  *Id*.  Unsurprisingly, the Sherrods contend that "there are issues of material fact regarding Plaintiffs' NIED claims which require the denial of the summary judgment on this issue."  Pls. Opp'n at 88.  District Defendants are correct in part.

As discussed above, the Court has concluded that Detective McHugh's car stop bulletin did not violate the Sherrods' constitutional rights because Detective McHugh had reasonable suspicion—at the time he issued the bulletin—that Mrs. Sherrod had committed an assault with a deadly weapon.  The Sherrods appear to claim that Detective McHugh was negligent in issuing the bulletin because he lacked "good cause," Hayden Report at 7, but the Court's conclusion disposes of that theory.  Accordingly, Detective McHugh cannot be liable for NIED resulting from the Capitol Police's actions taken while stopping the Sherrods' car, because the Sherrods have failed to show that Detective McHugh was negligent in prompting that stop.  *See Harris v. U.S. Dep't of Veteran Affairs*, 776 F.3d 907, 917 (D.C. Cir. 2015) (holding that "probable cause

for arrest defeats [NIED] claims" arising from the mere fact of the arrest); *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 95–96 (D.D.C. 2015) (holding that because the defendant officers properly effected a *Terry* stop, their "conduct did not amount to any deviation from the standard of care by either defendant officer" that could support a claim for NIED).

Moreover, a reasonable jury could not conclude that Detective McHugh placed Mrs. Sherrod in a zone of physical danger during her arrest. As discussed above, Mrs. Sherrod surrendered to Detective McHugh following the issuance of an arrest warrant, at which point she was fingerprinted, handcuffed, temporarily jailed, and then released the same day after a hearing before a magistrate judge. Vashti Sherrod ROG at 20–21; Defs. Mem. Ex. 18; Pls. Opp'n Ex. 14, Ex. 15. She was accompanied by her lawyer when she surrendered, and the record indicates that she spent only a short period of time in jail. Vashti Sherrod ROG at 20–21. She has not alleged, nor provided evidence, that she was in any physical danger during the arrest or that she reasonably feared physical danger, only that the arrest was emotionally traumatic.[20] *See* SAC ¶ 113 (alleging that Detective McHugh caused Mrs. Sherrod "to experience extreme humiliation when she was forced to appear in shackles before the D.C. Superior Court"). Mrs. Sherrod's "claim that [she] suffered psychological injury is not, 'in the absence of physical injury or impact,' enough" to show that Detective McHugh placed her in a zone of physical danger. *Minch v. District of Columbia*, 952 A.2d 929, 942 (D.C. 2008) (quoting *Waldon v. Covington,* 415 A.2d 1070, 1076 (D.C. 1980)); *see also Drejza v. Vaccaro,* 650 A.2d 1308, 1312

---

[20] The Sherrods do allege that Mrs. Sherrod experienced "extreme fear for her physical safety" during the arrest, SAC ¶ 113, but this conclusory assertion is unsupported by the record and is not sufficient at the summary judgment stage to show that Mrs. Sherrod's fear was reasonable. *See Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017) ("[P]arty assertions 'so conclusory' as to put a jury in 'no position to assess' whether they are based in fact will not suffice") (quoting *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999)).

n.9 (D.C. 1994) (rejecting NIED claim by rape victim subjected to verbal, but not physical, abuse during investigation by police officer at police station). Accordingly, District Defendants are entitled to summary judgment on this claim.

However, to the extent the Sherrods' claim arises from Detective McHugh's search of the Sherrods' home, the claim survives. Again, as discussed above, a reasonable jury may conclude that Detective McHugh knew or should have known that he lacked probable cause to search the Sherrods' home after viewing the security video, and that he at the very least negligently mischaracterized the security video in his affidavits in support of the search warrant. Pursuant to those negligently obtained warrants, officers breached the Sherrods' door with guns drawn, causing the Sherrods to fear a break-in. *See Gregory v. Burnett*, 577 Fed. Appx. 512, 520 (6th Cir. 2014) (holding that the plaintiff's NIED claim arising from an arrest should survive summary judgment because the jury could conclude, based on a video, that the defendant officer lacked probable cause to effect the arrest). Accordingly, because the Sherrods' NIED claim survives with respect to the home search but not the car search or arrest of Mrs. Sherrod, the Court grants in part District Defendants' motion for summary judgment on the Sherrods' NIED claim.

### 6. Intentional Infliction of Emotional Distress

Sixth, and finally, the Court assesses the Sherrods' claims in Counts X and XVI that District Defendants are liable for intentional infliction of emotional distress ("IIED") arising from the car stop, home search, and arrest of Mrs. Sherrod. SAC ¶¶ 118–23, 163–70. Under District of Columbia law, to establish a prima facie case of IIED, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) cause[d] the plaintiff severe emotional distress." *Competitive Enter. Inst. v. Mann*,

150 A.3d 1213, 1260 (D.C. 2016) (quoting *Williams v. District of Columbia*, 9 A.3d 484, 493–94

(D.C. 2010)).  The conduct must be "so outrageous in character, and so extreme in degree, as to

go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable

in a civilized community."  *Id*. (quoting *Williams*, 9 A.3d at 494); *see also Cooke-Seals v.

District of Columbia*, 973 F. Supp. 184, 188 (D.D.C. 1997).  In other words, "[t]he requirement

of outrageousness is not an easy one to meet."  *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C.

1994).

 In seeking summary judgment on these claims, District Defendants argue that the

Sherrods' evidence "is insufficient to establish that Detective McHugh's actions rose to the level

of extreme and outrageous conduct" necessary to support the claims.[21]  Defs. Mem. at 64.  The

Sherrods, on the other hand, argue that their evidence is "more than sufficient" to support IIED

liability.  Pls. Opp'n at 80.  The Court agrees.

While each individual step of Detective McHugh's investigation alone may not have been

outrageous, a reasonable juror could conclude that the investigation, in totality, was.  Drawing all

inferences in favor of the Sherrods, Detective McHugh mischaracterized the security video in

warrant affidavits and aggressively investigated the Sherrods when he knew or should have

known that the video contradicted Ms. Schulz's allegation.  This conduct is sufficient to raise an

IIED claim.

Courts applying District of Columbia law have held that false reporting causing police

action is sufficiently outrageous to state a claim for IIED.  *See Smith,* 121 F. Supp. 3d 124–25

(holding that alleged misrepresentations by a defendant officer about the plaintiff were not

---

[21] Again, District Defendants do not dispute that the Sherrods suffered severe emotional
distress.

sufficiently outrageous only because "the alleged misrepresentations . . . were, at most, an *exaggeration* of conduct that already justified arrest, and not a full-fledged fabrication of criminal conduct"); *District of Columbia v. Tulin*, 994 A.2d 788, 802–03 (D.C. 2010) (holding that the defendant officer's false statement that the plaintiff caused a car accident was sufficiently outrageous); *Carter v. Hahn*, 821 A.2d 890, 895 (D.C. 2003) (holding that intentionally filing a false police report "may rise to [the] level" of outrageous conduct sufficient to support an IIED claim). Moreover, Detective McHugh was aware that his actions were likely to weigh especially hard on the Sherrods, considering their age. *See* McHugh Dep. 208:20–209:8 (stating that he asked the Prince George's County Police Department to use a smaller team to search the Sherrods' home "[c]onsidering the age of Mr. and Mrs. Sherrod"); *see also Mann v. Bahi*, 242 F. Supp. 3d 6, 11–12 (D.D.C. 2017) (holding that offensive conduct may become outrageous when "the tortfeasor has knowledge that the [victim] is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity" (internal quotation marks omitted) (quoting *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993))). Accordingly, the Court denies District Defendants' motion for summary judgment on the Sherrods' IIED claim.

### D. Common Law Claims Against Ms. Schulz

The Court next turns to the Sherrods' common law claims against Ms. Schulz. The Sherrods assert claims for: (1) malicious prosecution; (2) intentional infliction of emotional distress; and (3) negligence. The Court will again address each claim in turn.

Before the Court addresses the claims, however, it must address the Sherrods' contention that Ms. Schulz's summary judgment arguments should be disregarded because she has not provided "any factual or legal basis" for them. Pls. Opp'n at 75–76. The Court tends to agree

with the Sherrods.  It is well established in this circuit that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived." *Johnston v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) (citing *Krupa v. Naleway,* No. 06-1309, 2010 WL 145784, *8 (N.D. Ill., Jan. 12, 2010); *see Raines v. DOJ,* 424 F. Supp. 2d 60, 66 n.3 (D.D.C. 2006) (noting that it is not the obligation of the court to research and construct legal arguments open to parties, especially when they are represented by counsel).  "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."  *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (quoting *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990)).  That said, the Court will address the merits of Ms. Schulz's arguments.

### 1.  Malicious Prosecution

First, the Court addresses the Sherrods' claim in Count VI that Ms. Schulz is liable for common law malicious prosecution.  SAC ¶¶ 85–87.  As discussed above, "four elements make up the tort of malicious prosecution: (1) the defendant's initiation or procurement of a criminal proceeding against the plaintiff; (2) absence of probable cause for the proceeding; (3) malicious intent on the part of the defendant; and (4) termination of the proceeding in favor of the plaintiff."  *Moore*, 213 F.3d at 710.  With respect to the first element, "a person who 'procures' a criminal proceeding may be liable for malicious prosecution."  *Moore*, 213 F.3d at 710.  *See also* Restatement (Second) of Torts § 653 (1977).  "In order to find that a defendant procured a prosecution, the plaintiff must establish 'a chain of causation' linking the defendant's actions with the initiation of criminal proceedings."  *Id*. (quoting *Dellums v. Powell,* 566 F.2d 167, 192 (D.C. Cir. 1977)).

Ms. Schulz argues—albeit without any legal support—that summary judgment is appropriate on this claim because her actions "cannot be considered extreme and outrageous conduct and/or intentionally reckless conduct," and her "act of making a police report cannot be considered the 'proximate cause' of [the Sherrods'] claim." Schulz Mem. at 10–11. In response, the Sherrods argue that, despite Detective McHugh's actions taken without Ms. Schulz's involvement, Ms. Schulz's "false police report" may still constitute the proximate cause of the Sherrods' injuries. Pls. Opp'n at 77–78. They also argue that the "act of filing a false criminal police report" and the alleged use of a racial epithet during the initial altercation with the Sherrods demonstrate the malice necessary to support a malicious prosecution claim. *Id.* at 76–77.

Ms. Schulz's argument that she did not "cause" the prosecution at issue here, Schulz Mem. at 10, does not hold up against the principles laid out above. Her allegation that Mrs. Sherrod threatened her with a gun—made to a 911 operator, Officer Patel, and Detective McHugh—initiated Detective McHugh's investigation and served as a basis for the arrest warrant for Mrs. Sherrod. Schulz's Statement ¶¶ 9–11; SUMF ¶¶ 34–37, 39, 72–77; Defs. Mem Ex. 17. Ms. Schulz has supplied no evidence that the chain of causation between her allegedly false accusation and Mrs. Sherrod's arrest and the presentment of her case to the grand jury was broken at any point during Detective McHugh's investigation, and the record shows that her accusation was used to justify each of Detective McHugh's steps. *See Logan v. Caterpillar, Inc.*, 246 F.3d 912, 922 (7th Cir. 2001) (noting that "[l]egal causation will be attributed to a private citizen [for purposes of a malicious prosecution claim] . . . if the plaintiff can demonstrate that the defendant . . . knowingly made false statements to the police"); *Moore*, 213 F.3d at 711 (holding that postal inspectors could be liable for malicious prosecution if their false statements

to a grand jury witness caused that witness to implicate the plaintiff); *Dellums*, 566 F.2d at 192–93 (holding that the defendant could be liable for malicious prosecution because he supplied false information to prosecutors, leading to the filing of informations against the plaintiffs); Defs. Mem. Ex. 18, ECF No. 68-20. Furthermore, the jury may infer malice from Ms. Schulz's allegedly false statement, and her failure to correct that statement when given the opportunity. *Pitt*, 491 F.3d at 503–04; *see* Defs. Mem. Ex. 21. The Court therefore denies Ms. Schulz's motion for summary judgment on this claim.

### 2. Intentional Infliction of Emotional Distress

Second, the Court addresses the Sherrods' claim in Count X that Ms. Schulz is liable for intentional infliction of emotional distress. SAC ¶¶ 119–23. As discussed above, to establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) cause[d] the plaintiff severe emotional distress." *Competitive Enter. Inst.,* 150 A.3d at 1260.

Ms. Schulz unpersuasively argues that the Sherrods have failed to meet each of these elements. First, Ms. Schulz claims that "an inaccurate police report cannot be deemed extreme and outrageous conduct." Schulz Mem. at 12. The Court does not agree. Drawing all inferences in favor of the Sherrods, Ms. Schulz knowingly filed a false police report, and then failed to retract that report when given an opportunity. As discussed above, this type of false statement is sufficiently outrageous to support an intentional infliction of emotional distress claim. *See Smith,* 121 F. Supp. 3d 125; *Tulin*, 994 A.2d at 802; *Carter*, 821 A.2d at 895; *see also Amobi*, 755 F.3d at 996 (holding that where the plaintiff alleged false and misleading statements underlying an arrest, it "[i]s for the jury to determine whether the conduct has been sufficiently extreme and outrageous to result in liability"). Next, Ms. Schulz claims that she did not cause

the Sherrods' emotional distress. Schulz Mem. at 12. As discussed in the following section, this argument fails as a matter of law. Finally, Ms. Schulz claims that she did not act with the requisite intent. However, a jury may "infer the existence of the second element of the tort-intent or recklessness-from the very outrageousness of a defendant's conduct." *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (citations omitted); *see Harris*, 776 F.3d at 917. The Court therefore denies Ms. Schulz's motion for summary judgment on this claim.

### 3. Negligence

Third, the Court addresses the Sherrods' claim in Count XVII that Ms. Schulz is liable for negligence. SAC ¶¶ 172–75. Again, Ms. Schulz argues that she did not proximately cause the Sherrods harm because Detective McHugh's actions were an intervening cause of that harm. Schulz Mem. at 14. Again, that argument fails.

As noted above, "[t]he plaintiff in a negligence action bears the burden of proof on three issues: 'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Butera v. District of Columbia*, 235 F.3d 637, 659 (D.C. Cir. 2001) (quoting *Toy,* 549 A.2d at 6). With respect to a normal citizen, such as Ms. Schulz, "[a] uniform standard of care applies in actions for negligence [in the District of Columbia]: reasonable care under the circumstances." *Sherrod*, 2017 WL 627377 at *6 (quoting *O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C. 1982)).

"Causation for purposes of [a] negligence claim entails a two-pronged inquiry: (1) whether the defendant's alleged negligence was the 'cause-in-fact' of the plaintiff's injury, and (2) whether the defendant proximately caused the injury or instead, despite cause-in-fact, should be relieved of liability because the 'chain of events leading to the plaintiff's injury is unforeseeable or highly extraordinary in retrospect.'" *Hall v. District of Columbia*, 867 F.3d

138, 150 (D.C. Cir. 2017) (quoting *Majeska v. District of Columbia*, 812 A.2d 948, 950 (D.C. 2002)). Liability attaches to an individual who sets in motion harmful conduct performed by another individual—such as Detective McHugh here—when "the danger of an intervening negligent or criminal act should have been reasonably anticipated and protected against." *District of Columbia v. Carlson*, 793 A.2d 1285, 1290 (D.C. 2002) (quoting *Lacy v. District of Columbia*, 424 A.2d 317, 323 (D.C. 1980)).

The D.C. Circuit recently addressed a similar negligence action in *Hall*. The plaintiff sued a restaurant after an employee called the police and falsely alleged that the plaintiff had failed to pay a $1000 bill, which led the police to arrest the plaintiff with excessive force. 867 F.3d at 144–45. The district court granted summary judgment to the restaurant because, in its view, the restaurant did not proximately cause the plaintiff's injuries. *Id*. at 150. In reversing that decision, the Circuit held that "a jury could find both that [the restaurant employee's] call to the police was the cause-in-fact of [the plaintiff's] arrest, and that they should have foreseen that their allegation of facts amounting to felony theft would cause an arrest and some associated harm, satisfying the proximate cause requirement." *Id*. The Circuit further concluded that:

> A reasonable jury could find it foreseeable that an unjustified arrest, even without excessive force, would cause some modicum of the physical and emotional harm the record suggests [the plaintiff] experienced due to [the restaurant's] 911 call. Arrest without justification can be deeply disturbing, and arrest itself often involves some physical discomfort, unnatural restraint, and forceful handling.

*Id*.

Drawing all inferences in favor of the Sherrods, Ms. Schulz falsely accused Mrs. Sherrod of threatening her with a gun, and she made that unequivocal accusation to three different MPD employees. Even if such actions were not knowing, a jury could easily conclude that they were negligent. As reflected in the conversation Ms. Schulz had with her son, she was uncertain of what had occurred from the start. Carafano Dep. 31:17–34:3 (stating that Ms. Schulz told her

66

son "I'm not sure if I really saw a gun . . . I'm not sure now"). But she conveyed none of these uncertainties in the 911 call, to Officer Patel, or to Detective McHugh. *See Hall*, 867 F.3d at 150 (noting that there was "no evidence that [the defendant restaurant's employees] told the police that arrest was unnecessary"). On these facts, "a jury could find both that [Ms. Schulz's] call to the police was the cause-in-fact of [Mrs. Sherrods'] arrest [and the searches of the Sherrods' car and home], and that [she] should have foreseen that [her] allegation of facts amounting to [assault with a deadly weapon] would cause an arrest and some associated harm, satisfying the proximate cause requirement." *Id.* The Court therefore denies Ms. Schulz's motion for summary judgment on this claim.

### E. Punitive Damages

Fourth, and finally, the Court addresses the Sherrods' Count XI claim for punitive damages against Detective McHugh and Ms. Schulz. SAC ¶ 125–26. To be awarded punitive damages under District of Columbia law, a plaintiff must show that the defendant's act was committed "with an evil motive, actual malice, deliberate violence or oppression or otherwise establish outrageous conduct in willful disregard for another's rights." *Dormu*, 795 F. Supp. 2d at 34 (quoting *Calvetti v. Antcliff,* 346 F.Supp.2d 92, 108 (D.D.C. 2004)). This requirement reflects the fact that "punitive damages are not favored by courts." *Id.* (citing *King v. Kirlin Enters., Inc.,* 626 A.2d 882, 884 (D.C. 1993)). Direct evidence is not necessary to prove the requisite state of mind; rather, a defendant's state of mind "may be inferred from all the facts and circumstances of the case." *Robinson v. Sarisky,* 535 A.2d 901, 906 (D.C. 1988). As discussed above in the Court's discussion of the Sherrods' malicious prosecution claim against Ms. Schulz, a reasonable jury may conclude that Ms. Schulz's allegedly false accusation was made with malice, warranting punitive damages. Furthermore, District Defendants made no argument in

their briefs regarding this claim, and therefore cannot seek its dismissal. *New York*, 413 F.3d at 20. Accordingly, the Court denies both motions for summary judgment on this claim.

*       *       *

In summary, with respect to the parties' motions for summary judgment, the Court holds as follows. First, the Court grants District Defendants' motion for summary judgment on (1) the Sherrods' constitutional, negligence, and NIED claims arising from the initial stop of the Sherrods' car by the Capitol Police; (2) the Sherrods' excessive force claims arising from the actions of the Prince George's County police officers in entering the Sherrods' home; and (3) the Sherrods' constitutional malicious prosecution and NIED claims arising from Mrs. Sherrod's arrest. Second, the Court denies District Defendants' motion in all other respects. Third, the Court denies Ms. Schulz's motion for summary judgment in full.

## V. THE SHERRODS' MOTIONS IN LIMINE

In late 2017, the Sherrods filed motions to preclude the trial testimony of two witnesses: (1) Shana Mell; and (2) Lewis R. Hicks. *See generally* Pls. Mot. Preclude Trial Testimony Shana Mell ("Mell Mem."), ECF No. 56; Pls. Mot. Limine Exclude Trial Testimony Lewis R. Hicks ("Hicks Mem."), ECF No. 65. The Court will now consider these motions, along with District Defendants' motion to exclude Dr. Hayden's testimony.

### A. Motion Regarding Shana Mell

The Court first considers the Sherrods' motion to exclude the trial testimony of Shana Mell. Ms. Mell is the MPD's "policy writer," and she intends to testify about her "[k]nowledge of IACP and the extent to which MPD relies on IACP's knowledge." Defs.' Suppl. Initial Disclosures at 1, Mell Mem. Ex. 1, ECF No. 56. The Sherrods argue that she should be foreclosed from testifying because District Defendants did not supplement their Federal Rule

68

26(a) disclosures to identify her as a trial witness until October 17, 2017, over one month after the originally scheduled close of discovery.  Mell Mem. at 3.  District Defendants, however, argue that the timing of their identification of Ms. Mell was reasonable because Ms. Mell's testimony is intended to address Dr. Hayden's expert report, which was not produced until September 30, 2017.  District Defs.' Mem. P. & A. Opp'n Mell Mem. ("Mell Opp'n") at 5, ECF No. 63.  The Court agrees that the severe sanction of excluding Ms. Mell's testimony is not warranted here.

Under Federal Rule of Civil Procedure 26(a)(1)(A)(i) "a party must, without awaiting a discovery request, provide to the other parties . . . the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Federal Rule of Civil Procedure 37(c)(1) allows a court to impose "appropriate sanctions," including the exclusion at trial of any information not disclosed pursuant to Rule 26(a), unless the failure to disclose is harmless or if there was substantial justification for such failure.  A Rule 37(c)(1) exclusion, however, is an "extreme sanction" that should be used sparingly. *Richardson v. Korson*, 905 F. Supp. 2d 193, 200 (D.D.C. 2012).  The circumstances here do not justify such a sanction.

First, as District Defendants note, Mell Opp'n at 6, by the time they identified Ms. Mell as a trial witness the close of expert discovery had been extended to November 17, 2017.  *See* Min. Order Granting ECF No. 53, Pls. Consent Mot. Am. Scheduling Order, Sept. 13, 2017.  The Sherrods had one month to depose Ms. Mell before discovery would fully close, so her late identification was arguably harmless.

Second, the Sherrods' contention that District Defendants knew that they would rely on Ms. Mell's testimony as early as May 8, 2017, when the Sherrods disclosed Dr. Klotz's report, relies on a faulty assumption about the contents of Dr. Hayden's report. Mell Mem. at 3. While Dr. Klotz's report relied heavily on IACP policies, the Sherrods have not shown that District Defendants knew that *Dr. Hayden's* report would similarly rely on IACP policies, rather than on a completely different set of sources. District Defendants only learned of Dr. Hayden's reliance on IACP policies when the Sherrods produced his report on September 30, 2017, at which point District Defendants identified Ms. Mell as the witness best suited to address the report.

Third, there are "less drastic" options available to cure any prejudice to the Sherrods from the late identification of Ms. Mell. *See Robinson v. District of Columbia*, 75 F. Supp. 3d 190, 197 (D.D.C. 2014) (holding that, where a trial date had not been set and the harm of untimely expert disclosure was relatively minor, "any possible prejudice to Plaintiff can be rectified by allowing her more time to examine [the expert] in a deposition"); *Richardson*, 905 F. Supp. 2d at 200–01 (permitting additional discovery rather than excluding an untimely expert report). Because the Court has not yet set a trial date, it will reopen discovery to allow the Sherrods to depose Ms. Mell, and it will exercise its authority under Rule 37(c)(1) to require District Defendants to bear the cost of that deposition. *See Perkinson v. Gilbert/Robinson, Inc.*, 821 F.2d 686, 690 (D.C. Cir. 1987) (acknowledging that it was appropriate under Rule 37 for the district court to order the defendant to bear the cost of a deposition).

### B.    Motions Regarding Lewis R. Hicks and Philip P. Hayden

The Court next considers each party's motion to exclude the other party's expert testimony. The Sherrods challenge the qualifications, methodology, and certain opinions of District Defendants' expert witness, Lewis R. Hicks. *See generally* Hicks Mem. District

Defendants likewise challenge the methodology of the Sherrods' expert witness, Dr. Hayden. Defs. Mem. at 43–60. Each party argues that the other side's expert should be excluded under Federal Rule of Evidence 702. Having reviewed the expert reports, the Court concludes that certain portions of both are inadmissible, but that neither expert should be entirely excluded.

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid.702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court famously held that Rule 702 requires district courts to ensure that an expert's scientific testimony "both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). Rule 702 therefore imposes a "gatekeeping" duty on this Court to exclude from trial expert testimony that is unreliable and irrelevant. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert*, 509 U.S. at 589; *see also, Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996). The Supreme Court ultimately extended the *Daubert* analysis to include any expert testimony based on "technical" and "other specialized knowledge." *Kumho Tire*, 526 U.S. at 152.

Pursuant to Rule 702, *Daubert*, and its progeny, when determining the admissibility of expert testimony, the Court must consider: (1) whether the testimony is based upon sufficient facts and data; (2) whether the testimony is the product of reliable principles and methods, i.e. whether the reasoning and methodology underlying the expert's opinion is scientifically valid; and (3) whether the witness has applied the principles and methods reliably to the facts of the case. *See generally Ambrosini*, 101 F.3d at 133. Once the court is satisfied that the witness is an

expert within the meaning of Rule 702, "[u]nder *Daubert* the district court is required to address two questions, first whether the expert's testimony is based on 'scientific knowledge,' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1126 (D.C. Cir. 2001) (quoting *Daubert*, 509 U.S. at 592). The party proffering the expert testimony bears the burden of showing its admissibility under Rule 702. *Daubert*, 509 U.S. at 592 n.10.

### 1. The Experts' Qualifications

The Court first considers whether the experts are sufficiently qualified to offer their testimony. Rule 702 requires that an expert be qualified to testify on the basis of "knowledge, skill, experience, training, or education[,]" and thus the Rule encompasses "not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values." Fed. R. Evid. 702 advisory committee's note (1972) (internal quotation marks and citation omitted). While "a person who holds a graduate degree typically qualifies as an expert in his or her field[,]" *Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 11 (D.D.C. 2011), such formal education is not required and "an expert may still be qualified on the basis of his or her practical experience or training." *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 196 (D.D.C. 2015) (quoting *Robinson v. District of Columbia*, No. 09-2294, 2014 WL 6778330, at *4 (D.D.C. Dec. 2, 2014)).

As noted above, District Defendants do not appear to challenge Dr. Hayden's qualifications. The Sherrods, on the other hand, argue that Mr. Hicks "lacks the academic credentials necessary to qualify" as an expert, Hicks Mem. at 10, and that he lacks the relevant

experience necessary to make up for his lack of credentials, Hicks Mem. at 8. The Court disagrees.

Mr. Hicks has twenty years of experience in police training, and decades of military experience before that. *See* Hicks Mem. Ex. A at 12–15. While it is true that much of his experience appears to relate more to the use of force than investigation procedure, he has stated that he has taught courses and taken courses in police procedure. Decl. of Lewis R. Hicks ¶¶ 2–4, ECF No. 73-2. The Court cannot conclusively determine, based on the papers submitted, that Mr. Hicks is not sufficiently qualified to discuss police investigation procedure under Rule 702. The Court is somewhat hindered in its analysis due to the Sherrods' strategic decision not to depose Mr. Hicks, during which they could have developed a more complete record of his qualifications. For now, the Court concludes that Mr. Hicks is qualified based on his practical experience and training. *Rothe Dev.,* 107 F. Supp. 3d at 196. Of course, at trial, the District will have to lay the appropriate foundation for the admission of his expert testimony.

### 2. Interpretation of the Security Video

The Court next addresses whether the experts may testify as to the proper interpretation of the security video. Both the Sherrods and District Defendants argue that the other side's expert either should not be allowed to interpret the video, Hicks Mem. at 15, or has improperly interpreted the video, Defs. Mem. at 54–56. Predictably, the experts reach opposite conclusions about what the security video shows, demonstrating the unhelpfulness of expert testimony on this issue.

Although the Court is not aware of D.C. Circuit cases directly on point, other courts have held that "when cases involve review of videotaped events, an expert's opinion should not be permitted when the expert is no better suited than the jury to interpret the video's contents."

*Estate of Collins v. Wilburn*, 253 F. Supp. 3d 989, 992 (E.D. Ken. 2017) ("[T]here is little need for Plaintiff's expert to tell the jury whether the officers' actions were objectively reasonable under the circumstances because a video captures the incident.") (citations omitted); *Dunlap v. Hood*, 2009 WL 362292 at * 1 (N.D. Tex. 2009) ("Because [the expert] is no better suited than the jury to interpret the contents of the video [showing an alleged use of excessive force], his supplemental opinion is not the proper subject of expert testimony."); *accord United States v. Mitchell*, 49 F.3d 769, 780–81 (D.C. Cir. 1995) (holding that the district court properly declined to allow expert linguistic testimony about the content of tape-recorded conversations before the jury); *Highland Capital Mgmt L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) ("While an expert must of course rely on facts or data in formulating an expert opinion . . . an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.").

Here, having reviewed the security video, the Court concludes that the jury is equally as capable as the experts of determining whether the video corroborates or contradicts Ms. Schulz's allegations. Therefore, allowing the experts to opine on what the video shows will not assist the jury in understanding the evidence or determining a material fact at issue.[22] *Meister,* 267 F.3d at 1126. The experts may testify about the investigatory steps Detective McHugh reasonably should have taken before and after watching the video, but they may not testify about whether the video tends to show that Mrs. Sherrod threatened Ms. Schulz with a gun.

---

[22] District Defendants claim that Mr. Hicks is especially qualified to interpret the security video because of his experience with "Weaver" analysis and certain Navy Seal training he conducted in the 1980s. District Defs.' Mem. P. & A. Supp. Opp'n Hicks Mem. at 8–9, ECF No. 73-1. These vague references are not sufficient to show the "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152. District Defendants have therefore failed to show that Mr. Hicks is any more capable than the jury of evaluating the video.

### 3. Probable Cause Conclusions

The Court next addresses whether the experts may testify as to whether Detective McHugh had probable cause to take the challenged investigatory steps. Again, whether expert opinion testimony is "otherwise admissible" depends, in part, on whether it will "assist the trier of fact" in either "understand[ing] the evidence or . . . determin[ing] a fact in issue." *See* Fed. R. Evid. 702. "Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect, and thus it is not 'otherwise admissible.'" *Burkhart v. WMATA*, 112 F. 3d 1207, 1212-13 (D.C. Cir. 1997) (citing *Torres v. Cty. of Oakland,* 758 F.2d 147, 150 (6th Cir. 1985) (holding that expert testimony couched in terms of a "legal conclusion" is "not helpful to the jury")); *see also Halcomb v. WMATA*, 526 F. Supp. 2d 24, 27 (D.D.C. 2007).

However, "the line between an inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence or in determining a fact in issue is not always bright." *Burkhart*, 112 F.3d at 1212. For instance, "an expert may use terms such as 'probable cause' or 'deliberate indifference,' as long as he or she uses them in a manner that is readily understood by the jury and not likely to cause confusion or lead the jury to an incorrect view of the law." *Huthnance v. District of Columbia*, 793 F. Supp. 2d 183, 208 (D.D.C. 2011) (citing *Burkhart,* 112 F.3d at 1212–13). "In other words, an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Burhkart*, 112 F.3d at 1212–13.

Here, the Court concludes that it will not be helpful for the jury to hear the experts' conclusions that the security video either did or did not give Detective McHugh probable cause to search the Sherrods' car and home and arrest Mrs. Sherrod. It is true that other courts have

allowed experts to issue probable cause opinions. In *Huthnance*, for instance, another court in this District held that a police practices expert could testify that there was not sufficient evidence for a defendant officer to reasonably believe that there was probable cause for an arrest. 793 F. Supp. 2d at 208. The Fifth Circuit reached the same conclusion in *Hayter v. City of Mount Vernon,* 154 F.3d 269, 274 (5th Cir. 1998). In those cases, however, the experts drew their conclusions based on factual records that were relatively settled, while here the proper interpretation of the security video is hotly disputed and the experts' opinions regarding probable cause may unduly influence the jury's analysis of the video. Because it is improper for the experts to opine on what the security video shows, it is also improper for the experts to opine on what legal conclusions should be drawn from the video.[23]

### 4. District Defendants' Remaining Arguments

Finally, the Court addresses District Defendants' remaining arguments, all of which relate to Dr. Hayden's opinions regarding the investigatory steps Detective McHugh should have taken according to the standard of care. Defs. Mem. at 51–54, 56–57, 59–61. District Defendants clearly disagree with Dr. Hayden's opinions, but because the Sherrods have made "the requisite threshold showing [of admissibility]; further disputes go to weight, not admissibility." *Rothe Dev.*, 107 F. Supp. 3d at 197 (quoting *United States v. Machado–Erazo,* 950 F. Supp. 2d 49, 52 (D.D.C. 2013)). District Defendants may exercise their disagreement by presenting their own expert testimony contradicting Dr. Hayden's opinions, and by vigorously cross-examining Dr. Hayden at trial.

*　　　　*　　　　*

---

[23] However, the experts may testify as to the factors, including objects, actions, and body language, a detective such as Detective McHugh would be looking for in the security video to reach a probable cause determination.

In summary, with respect to the parties' motions to exclude testimony, the Court holds as follows. First, Ms. Mell may testify at trial, but the Court will reopen discovery to allow the Sherrods to depose her, and District Defendants must bear the cost of that deposition. Second, both experts may testify, but not about (1) their interpretations of what the security video shows; and (2) their conclusions regarding whether the video gave Detective McHugh probable cause to search the Sherrods' car and home and to arrest Mrs. Sherrod. The experts should focus their testimony on whether the standard of care dictated that Detective McHugh should have taken certain investigatory steps, for instance interviewing Mr. Wright, showing Ms. Schulz the security video, re-interviewing Ms. Schulz after reviewing the security video, or running social media searches on Ms. Schulz.

## VI.  CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS:**

1. District Defendants' Motion for Summary Judgment (ECF No. 68) is **GRANTED IN PART** as follows:

    a. It is **GRANTED** as to the following claims: (1) the Sherrods' constitutional, negligence, and NIED claims arising from the initial stop of the Sherrods' car by the Capitol Police; (2) the Sherrods' excessive force claims arising from the actions of the Prince George's County police officers in entering the Sherrods' home; and (3) the Sherrods' constitutional malicious prosecution and NIED claims arising from Mrs. Sherrod's arrest.

    b. It is **DENIED** as to the remaining claims.

2. Ms. Schulz's Motion for Summary Judgment (ECF No. 66) is **DENIED**.

3. The Sherrods' Motion in Limine to Exclude the Trial Testimony of Shana Mell (ECF No. 56) is **DENIED**. It is **FURTHER ORDERED** that, as of the date of this Order, discovery is re-opened for a period of **sixty days** to allow the Sherrods to depose Ms. Mell. District Defendants shall bear the cost of that deposition.

4. The Sherrods' Motion in Limine to Exclude the Trial Testimony of Lewis R. Hicks (ECF No. 65) is **GRANTED IN PART**. As explained above, Mr. Hicks may not testify about certain topics discussed in his report. It is **FURTHER ORDERED** that Mr. Hayden also may not testify about those topics.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 25, 2018                                        RUDOLPH CONTRERAS
                                                                United States District Judge